IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____
                              )
 UNITED STATES OF AMERICA,     )
                              )
      Plaintiff,               )
                              )
      vs.                      ) Case No. 2:23-cr-00153-DAK
                              )
 ROBERT SUTHERLAND MACLEAN,    )
                              )
      Defendant.               )
_____)

JURY TRIAL

BEFORE THE HONORABLE DALE A. KIMBALL

VOLUME I

Pages: 1 - 89

JULY 21, 2025

Time: 8:40 a.m. to 12:17 p.m.

Reported by:
Michelle B. Gonsalves, RPR, CRR, CBC, CSR
351 South West Temple, Room 7.431, Salt Lake City, Utah 84101
michelle_gonsalves@utd.uscourts.gov || 801.783.8657

**APPEARANCES**


**FOR THE PLAINTIFF:**

    Michael P. Kennedy, Esq.
    **US ATTORNEY'S OFFICE**
    111 South Main Street, Suite 1800
    Salt Lake City, Utah 84111
    801.524.5682
    michael.kennedy@usdoj.gov

    Bryan N. Reeves, Esq.
    **US ATTORNEY'S OFFICE**
    111 South Main Street, Suite 1800
    Salt Lake City, Utah 84111
    801.524.5682
    bryan.reeves@usdoj.gov


**FOR THE DEFENDANT:**

    Aaron B. Clark, Esq.
    **DENTONS DURHAM JONES & PINEGAR PC**
    111 South Main Street, Suite 2400
    Salt Lake City, Utah 84110-4050
    801.415.3000
    aaron.clark@dentons.com

    Jordan E. Westgate, Esq.
    **DENTONS DURHAM JONES & PINEGAR P**C
    111 South Main Street, Suite 2400
    Salt Lake City, Utah 84110-4050
    801.415.3000
    jordan.westgate@dentons.com

# I N D E X

CONTENTS                                                    PAGE

PERSPECTIVE JUROR VOIR DIRE                                    1

JURY SELECTION                                               65

PRELIMINARY INSTRUCTIONS                                     68

OPENING STATEMENTS
  Opening Statement by Mr. Reeves                            72
  Opening Statement by Ms. Westgate                         80

July 21, 2025          Salt Lake City, Utah          8:40 a.m.

P R O C E E D I N G S

* * *

THE COURT:  Good morning, everyone.

MR. REEVES:  Good morning, Your Honor.

MR. CLARK:  Good morning, Your Honor.

THE COURT:  Don't blame me if the temperature is too high.  It's supposedly coming down.

THE COURTROOM DEPUTY:  Yes, supposedly.

THE COURT:  Get angry with the system.  I mean not the legal system, I mean the heating and air conditioning system.

Thank you for coming in, and if people like you did not come in to sit on our juries, our legal system would be awful, and it is not awful.  It's pretty good.  We know you have jobs, families, commitments, and problems, but we just need you to come in here and sit as jurors in our cases, and we appreciate you being here very much.

We're here for the beginning of the trial in *United States of America v. Robert MacLean*, 2:23-cr-153.

The United States is represented by Mr. Michael Kennedy and Mr. Bryan Reeves.  Is the Government ready to proceed?

MR. KENNEDY:  We are, Your Honor.  Thank you.

THE COURT:  The Defendant is represented by Mr. Aaron

4

Clark and Ms. Jordan Westgate.  Is the Defendant ready to proceed?

**MR. CLARK:**  We are, Your Honor.  Thank you.

**THE COURT:**  Thank you.

Let's see, we need to swear in the panel, don't we?

**THE COURTROOM DEPUTY:**  We do.

Please stand and raise your right hands.

You and each of you do solemnly swear that you will give true answers to such questions which may be asked of you touching your qualifications as a juror during the present term in court and the case coming before the Court.  If so, please say I do.

**ALL PROSPECTIVE JURORS:**  I do.

**THE COURTROOM DEPUTY:**  You may be seated.

**THE COURT:**  Thank you.

I need to ask you some preliminary questions to make sure you're qualified for jury service.  First, you should be a citizen of the United States.  Is there anyone here who is not a citizen of the United States?  If you're not a citizen, please raise your hand.

*(No hands were raised.)*

**THE COURT:**  Thank you.

Second, you must be eighteen years of age or older. If anyone is not eighteen years old, raise your hand.  And remember, you are under oath.  You can't lie about your age.

5

*(No hands were raised.)*

THE COURT:  First, you should have resided in this judicial district, which is the state of Utah, for at least one year.  Has anyone not -- yes, you have not?

PROSPECTIVE JUROR NO. 33:  I have not --

*(Court reporter requests speaker identification.)*

THE COURT:  Yeah, you're number, what?

THE COURTROOM DEPUTY:  Please stand and say your juror number.

PROSPECTIVE JUROR NO. 33:  Juror 33.  I have not lived in the state of Utah for the last twelve months.

THE COURT:  All right.  Thank you.  What number again?

PROSPECTIVE JUROR NO. 33:  33.

THE COURT:  33.  Thank you.

We can excuse him, can't we, counsel?

MR. KENNEDY:  Yes, Your Honor.

MR. CLARK:  Yes, Your Honor.

THE COURT:  Thank you for coming in.

*(Juror No. 33 exits the courtroom.)*

THE COURT:  If you're unable to read, write, and understand the English language please raise your hand, assuming that you understood me.

No hands.

Is there anyone here who is unable to speak English,

6

raise your hand.

No hands.

Now, on these -- there will come a time during this voir dire, we call it, where we're picking a jury, where you can come up privately with me, the lawyers, the reporter, and my courtroom deputy to answer questions you may not want to answer publicly. And these last two questions may be -- may affect some of you.

Do any of you suffer at the present time from a physical or mental infirmity that in your judgment would make you unable to render satisfactory jury service?

Any hands at this time?

**THE COURTROOM DEPUTY:** Please stand up.

**THE COURT:** Your number?

**PROSPECTIVE JUROR NO. 22:** 22.

**THE COURT:** 22?

**PROSPECTIVE JUROR NO. 22:** 22.

**THE COURT:** Do you want to come up privately? Well, I didn't mean right now. I mean later.

**PROSPECTIVE JUROR NO. 22:** Oh, okay.

**THE COURT:** All right. We'll bring you up.

Finally, if there's anyone here who has a criminal charge pending against him or her, or who has convicted of a felony, you need to indicate that or come up at the appropriate time when we have the sidebar.

No hands at this time.

One hand on the Question No. 6.

Again.  Thank you for being here.  We have a very good legal system, and largely because people like you come in and sit on our juries.

Now, this -- we're going to ask a series of questions, and we're trying to find out who should or should not be on this jury.  But also the lawyers will be making their judgments about how to use their peremptory challenges.  This is a criminal case, and in a criminal case the Defense has ten peremptory challenges, and the Government has six.

The first thing we're going to do is my courtroom deputy, Elizabeth Tuscano, is going to hand you -- go around with a questionnaire that has some general information we need to know.

**THE COURTROOM DEPUTY:**  Pass it down for each person's turn, and speak into this mic.  It's important to speak into it.

**PROSPECTIVE JUROR NO. 1:**  Name is [name redacted].  The city or town where I live is Millcreek, Utah.  Salt Lake City.  I've lived there for three years.  I am employed.  My education is college-level education.  I'm not married.  I'm not a member of any club, civic groups, or professional organizations.  My hobbies include like skiing, table tennis, board games.  And then magazines, newspapers, and news outlets

that I subscribe to or read regularly?  Not much.  Mostly sports stuff on Twitter.

THE COURTROOM DEPUTY:  And with respect to your employment, just say what you do.

PROSPECTIVE JUROR NO. 1:  Oh, I work in IT for Deloitte.

*(Court reporter clarification.)*

PROSPECTIVE JUROR NO. 1:  Deloitte.

THE COURTROOM DEPUTY:  Pass the mic on down.

PROSPECTIVE JUROR NO. 2:  Okay.  Name, [name redacted].  I live in Saratoga Springs, Utah.  Lived there for nineteen years.  I'm employed.  I'm a seasonal maintenance worker at my city.  Education, I have a high school diploma and a little bit of college.  I am not married.  Not a member of any clubs.  My hobbies are outdoor recreation and sports.  I am not subscribed to any magazines.

THE COURTROOM DEPUTY:  Yes.  Thank you.

PROSPECTIVE JUROR NO. 3:  My name is [name redated].  I live in Millcreek.  I've lived there for five years.  I'm employed.  I work in marketing.  College educated.  Not married.  Not a member of any club, civic groups, or professional organizations.  I love to ski, trail run, and read.  And I read the *Wall Street Journal* and *The New York Times* regularly.

PROSPECTIVE JUROR NO. 4:  My name is [name redacted].

9

I live in Herriman.  I've lived there for about three years.  I work at Walmart as a team associate.  I'm actively pursuing a GED.  I am single.  I am not a member of any clubs, civic groups, or professional organizations.  Hobbies: It's just outdoor stuff, fishing, gaming, stuff like that.  And then I'm not subscribed to any magazines, newspapers, or news outlets.

**PROSPECTIVE JUROR NO. 5:**  My name is [name redacted].  I've lived in West Jordan for the last twenty-four years.  I'm employed by Provo, Utah, as a laboratory manager at a water reclamation plant.  I have a bachelor's degree in biology.  I am married.  My spouse works in -- he's a draftsman.  I'm a member of WEF, which is Water Environment Federation, and Women of Water.  My hobbies are scrapbooking.  Newspapers: I read *Wall Street Journal*, and I can't think of what I read now.

**PROSPECTIVE JUROR NO. 6:**  My name is [name redacted].  I live in Saratoga Springs.  I've lived there for thirty-one years.

**THE COURT:**  Will you speak up and into the microphone, please.  The reporter has to take down everything you say.

**PROSPECTIVE JUROR NO. 6:**  I'm [name redacted].  I live in Saratoga Springs.  I've lived there for about thirty-one years.  I am employed.  I'm a nurse case manager on a homeless team on the Salt Lake City VA.  I have master's degree.  I am married.  My spouse teaches at Neumont College

downtown.  I'm the member at large for the American Psychiatric Nurses Association.  Hobbies:  I read, travel.  I work a lot. I don't have a whole lot of time left for hobbies.  I -- I don't know.  I listen to, you know, KSL, NPR, various radio stations.  I read *The New Yorker*.  I read things that are online in terms of news sources.

**PROSPECTIVE JUROR NO. 7:**  I'm [name redacted].  I'm from Tooele.  I've lived there twenty-four years.  Right now I am unemployed.  I was a government contractor, my last position.  Just got my bachelor's degree.  I am married, and my husband is a mechanic for Union Pacific Railroad.  I'm part of the Eagles Lodge.  And hobbies: outdoors, kayaking, fishing, rock climbing.  I don't do magazines or newspapers or TV.

**THE COURT:**  We didn't hear the last thing you said.

**PROSPECTIVE JUROR NO. 7:**  I don't do newspapers, TV or anything.

**PROSPECTIVE JUROR NO. 8:**  My name is [name redacted]. I'm living in Salt Lake City for the past eight years.  I'm employed with the biotech company called BioFire Defense as a research associate.  I have a master's degree in biochemistry. I am divorced. I'm not a member of any clubs, civic groups, or organizations.  I like occasional hiking and enjoy outdoors. I'm subscribed to *The New York Times* and just general news outlets.

**PROSPECTIVE JUROR NO. 9.:**  My name is [name

redacted].  I live in Payson City.  I lived there for about eight years.  I'm currently employed with Rocky Mountain ATV as a return specialist.  I have a college education.  I am not married.  I am not a member of any club, civic groups, or professional organizations.  I like outdoors, power sports, gaming, working on cars.  I'm not subscribed to any magazines or newspapers.  I do not read anything regularly.

**PROSPECTIVE JUROR NO. 10:**  My name is [name redacted].  I've lived in Ogden for twenty-five years.  I'm retired.  I retired from customer service.  My education is high school graduate.  Widowed.  Not a member of any clubs or organizations.  Hobbies are crafting, reading, and I subscribe to *The Standard-Examiner*.

**PROSPECTIVE JUROR NO. 11:**  My name is [name redacted].  I've lived in Millcreek, Utah, for the last two years.  I'm employed with Intermountain Health as an inventory coordinator.  College level.  I'm single.  I don't belong to any clubs, civic groups, or professional organizations.  Hobbies: I like anything outdoors, kayaking, fishing, hiking.  And I do not subscribe to any magazines or newspapers.

**PROSPECTIVE JUROR NO. 12:**  My name is [name redacted].  I live in Sandy.  I've lived there for nine years.  I'm employed by Jacobs as a structural engineering management.  College education.  I am married.  My spouse has his own construction contracting business.  I'm not a member of any

12

specific clubs.  Hobbies: I really don't have much time for hobbies, but I do like outdoor activities and house projects. I do not regularly subscribe to magazines or newspapers.

**PROSPECTIVE JUROR NO. 13:**  My name is [name redacted].  I live in Fielding, Utah.  I've lived there for four years.  I'm now retired.  Before that I was in field service.  I do have some college.  I am married, and my wife is retired as well.  I'm not a member of any club or professional organizes.  I do enjoy getting out on the golf course, and I do not have any magazine, newspapers subscriptions.

**PROSPECTIVE JUROR NO. 14:**  My name is [name redacted].  I'm from Springville, Utah.  I've lived there for five years.  I am a staffing coordinator for Intermountain Health.  I have my high school diploma, but I'm currently in college.  I am married, and my spouse is an airplane mechanic for Duncan Aviation.  I am not a part of any club, civic groups, or professional organizations.  My hobbies are camping, card names, stuff like that.  And I don't subscribe to any magazines or news outlets.

**PROSPECTIVE JUROR NO. 15:**  My name is [name redacted].  I've lived in the Salt Lake area for over thirty-five years.  I live in Emigration Canyon.  I am currently retired.  I was -- I worked as a science writer at the University of Utah.  I have a Ph.D.  I'm married.  My husband is professor at the University of Utah.  And in terms

of groups and so forth, I'm a docent at the Utah Museum of Fine Arts.  Hobbies-wise, I like to kayak, I like to paint, gardening, house things.  We get *The New York Times* and *Bon Appétit*, and then I read a lot of news online.

**PROSPECTIVE JUROR NO. 16:**  I'm [name redacted].  I've lived in Saratoga Springs for the last three months.  I'm employed by a private medical cannabis facility as a sales manager.  College educated.  I am married.  My spouse is a sales manager at Nordstrom.  I am a state agent for UDAF.  Not too many hobbies, and no subscriptions.

**PROSPECTIVE JUROR NO. 17:**  I'm [name redacted].  I live in Magna, Utah.  I've lived there for thirty-five years.  I'm employed.  I work as a human resource manager for Tom Stewart Construction.  I have a bachelor's degree.  I'm married.  My spouse is a shop foreman for Larry H. Miller as a mechanic.  I'm not a member of any clubs or organizations.  My hobbies are gardening, yardwork, mountain biking, fitness stuff.  I don't subscribe to any magazines or newspapers, but I do read the news online, *The New York Times* and *The Washington Post.*

**THE COURT:**  Be sure to speak up and speak into the mic.  Don't be shy, anybody.

**PROSPECTIVE JUROR NO. 18:**  Got you.  I'm [name redacted].  I've lived in Bluffdale for about ten years.  I am employed at Challenger School.  I'm the preschool director at

the Traverse Mountain campus.  I'm college educated.  I'm not married.  I'm not a member of any clubs.  I love gardening, art, painting, drawing, reading, all the things.  I subscribe -- Challenger actually subscribes us all to *Reason* magazine.  So I get *Reason* magazine, but I don't necessarily read it.  And I subscribe to the *Bella Grace* magazine.  And, yeah, I love Ben Shapiro and Russell Brand, yeah, those are where I get my news.

**PROSPECTIVE JUROR NO. 19:**  My name is [name redacted].  I'm from Highland, Utah.  I've lived there for five years.  I'm a high school math teacher at American Fork High School.  I have a bachelor's degree, and I'm currently working on my master's.  I'm married.  My wife's also in education.  She's a teacher at the local elementary.  We're both members of the Alpine Education Association.  I also coach football and basketball at the school as a hobby, and I don't have any subscriptions.  I just get my news from various sources online.

**PROSPECTIVE JUROR NO. 20:**  My name is [name redacted], and I have lived in Lehi for four years.  I'm employed at General Communications, Inc., as a warehouse assistant.  I have my GED.  I am married, and my spouse also works at the same company as a project coordinator.  I'm not a member of any club, civic group, or professional organization.  My hobbies include outdoors, hiking, working on cars, gaming and music.  I am not subscribed to any news sources.

**PROSPECTIVE JUROR NO. 21:**  My name is [name redacted].  I've been living in Ogden again for about fourteen years.  I'm employed as a quality technician for a pharmaceutical manufacturer.  I have some technical college education.  Not currently married or in any kind of clubs or professional organizations.  I do gardening, video games, things like that.  I'm not currently subscribed to any magazines or news outlets or anything like that.

**PROSPECTIVE JUROR NO. 22:**  My name is [name redacted].  I've lived in Centerville for about two and a half years.  I'm self-employed in real estate investment.  College educated.  Not married.  Not a member of any clubs or professional organizations.  My hobby is cooking.  No magazine or newspapers subscriptions.  I watch my news on TV or online.

**PROSPECTIVE JUROR NO. 23:**  My name is [name redacted].  I live in Herriman.  I've lived there a coming up close to three years.  I am employed as a system -- network system admin.  I have a bachelor's degree.  I'm not married. I'm not a member of any clubs or groups or professional organizations.  My hobbies are snowboarding, mountain biking, boating, riding motorcycles.  I don't subscribe to any magazines or newspapers, but I do read suggested news articles from various sources that come up on my phone or YouTube on of the internet.

**THE COURT:**  Thank you.

**PROSPECTIVE JUROR NO. 24:**  My name is [name redacted].  I live in Lehi.  I've lived there for about four years.  I work as an embryologist at the Utah Fertility Center. I have a bachelor's degree.  Not currently married.  I'm engaged to be married at the end of August.  My fiancé works with the Utah Symphony in development.  I'm a member of the American Society for Reproductive Medicine.  I enjoy gaming swimming, reading.  I'm not subscribed to any magazines, newspapers, news outlets.  I read some news online.

**PROSPECTIVE JUROR NO. 25:**  My name is [name redacted].  I have lived in the Ogden area for about thirteen years.  I'm working for Ken Garff as a receptionist.  I have high school diploma.  I am not married.  I'm not a member of any clubs.  Hobbies are plants, outdoors, sports.  And I don't subscribe to anything.  Just the stuff on social media.

**PROSPECTIVE JUROR NO. 26:**  I'm [name redacted].  I have lived in Downtown Salt Lake City for the last nine years. I am employed.  I am a certified public accountant.  I work in tax at Deloittes.  I have a master's degree.  I'm single.  I am a member of The American Institute of Certified Public Accountants.  I enjoy reading fictional books.  And I'm not subscribed to any magazines, newspapers, or news outlets, although I do scroll through the Fox News app every couple of days.

**PROSPECTIVE JUROR NO. 27:**  My name is [name

redacted].  I live in North Ogden, Utah.  I've lived there for twenty-seven years.  I am retired.  I formerly worked for Union Pacific Railroad.  And my education is high school and technical college.  I'm married.  My spouse, she's also retired.  She worked for Westinghouse Corporation.  And I'm not a member of any clubs, civic groups, or professional organizations.  And my hobbies are traveling, riding motorcycles, boating, fishing, hunting.  And I subscribe to no magazines, newspapers, news outlets.  What I view regularly is just what's on the internet.

**PROSPECTIVE JUROR NO. 28:**  My name is [name redacted].  I live in Magna, and I've lived there for four years.  I'm employed.  I work as a catering driver for Red Iguana.  I have a high school level education.  Not married.  And I'm not part of any club or organization.  And my hobbies are fishing, hiking, riding motorcycles, and I'm not subscribed to any magazines.

**PROSPECTIVE JUROR NO. 29:**  My name is [name redacted].  I live in South Jordan.  I've been there for about thirty-five years.  I'm retired.  I retired out of the fire service.  I have a bachelor's degree.  I'm married.  My wife does dental hygienist.  I don't any longer belong to any club, civic groups, or professional organizations.  I did when I was with the fire service, but now that I'm retired, I dropped those memberships.  Hobbies:  I love football, and I ride my

bike, and outside stuff.  Magazines, newspapers, news outlets that you subscribe to?  I don't subscribe to any, but I read KSL about every day.

PROSPECTIVE JUROR NO. 30:  My name is [name redacted].  I've lived in Utah for fifty years.  The last forty in Sandy.  I'm retired right now, retired engineer.  Education: Bachelor's of Science in Engineering from the U.  I'm married.  My wife was an LCSW.  I'm not a member of any clubs right now.  Hobbies: outdoor things, hiking, skiing, climbing, canyoneering.  I subscribe to *The Trib* for local news, and *The New York Times*, *Washington Post*, and *The Atlantic* for world and national news.

PROSPECTIVE JUROR NO. 31:  My name is [name redacted].  My family and I just recently moved from Holladay to Millcreek five months ago.  I am a physician and work for the hospital up in Park City.  I have a graduate degree.  I am married.  My wife is a hair stylist/cosmetologies but no longer works.  I am a member of the American Board of Internal Medicine.  I enjoy trail running and film and trying not to be beat up by my kids.  I'm not -- have any magazines or newspapers outlets.  I get the majority of my news from podcasts.

PROSPECTIVE JUROR NO. 32:  My name is [name redacted].  I've lived in Park City for twenty-six years.  I am employed with Big-D Construction Signature Group as a job cost

**19**

accountant.  I have a master's in accounting.  I am married. My spouse owns his own landscaping construction company and a native plant nursery.  I am not a member of any clubs or civic groups.  Hobbies are playing the piano, watching my kids play sports.  And I'm not subscribed to any magazines, newspapers and/or news outlets.  I get my news online.

**PROSPECTIVE JUROR NO. 34:**  My name is [name redacted].  I live in Pleasant Grove.  I've been there for about five years.  I'm employed by Brigham Young University.  I do information security risk management.  I also have a Master's Degree in Accounting Information Systems from BYU.  I am married.  My wife is a clinical psychologist.  I do -- I am a member of The Information Systems Audit and Control Association.  Hobbies: outdoors, mainly golf, fly fishing, about anything outdoors, I would say.  I subscribe to *Golf Digest,* and probably get most of my news from conservative talk radio.  I do subscribe to Glenn Beck, and that's about it.

**PROSPECTIVE JUROR NO. 35:**  I'm [name redacted].  I live in Herriman, Utah, for -- it's been about four years that we lived there.  I work at UPS as a feeder supervisor.  I have bachelor's degree.  I am married.  My wife is a cosmetologist, self-employed.  I do not belong to any -- I'm not a member of any club, civic groups, or professional organizations.  I enjoy outdoors sports with my family.  Reading and occasional video games.  I do not have any subscriptions from magazines,

newspapers.  I just get my news on the Internet occasionally.

**PROSPECTIVE JUROR NO. 36:**  I'm [name redacted].  I've lived in America Fork, Utah, for the last eight years.  I am employed.  I am a nurse educator at the University of Utah.  I have a Master's of Science in Nursing.  I'm married.  My husband is a structural engineer for his own business.  I am a member of The Association of Women's Health Obstetrics and Neonatal Nurses.  I like to cook and hang out with my family, and I scroll social media for a lot of my news.

**PROSPECTIVE JUROR NO. 37:**  My name is [name redacted].  I live in Murray City.  I've lived there for four years.  I'm a truck driver.  I have a bachelor's degree.  I'm married.  My wife works at an elderly care facility.  I'm not a member of any clubs.  Hobbies:  I like to hang out with my kid.  And I'm not subscribed to any magazines or newspapers.

**PROSPECTIVE JUROR NO. 38:**  My name is [name redacted].  I live in Magna.  I've lived there for around a year now.  I'm a tattoo artist down at Copper Lily Tattoo down in Sugar House, and I have a little bit of college education, and I'm not married.  I'm not a member of any club or civic groups.  I enjoy art, painting, playing the piano, being outdoors.  I'm not subscribed to any magazines or newspapers.

**PROSPECTIVE JUROR NO. 39:**  My name is [name redacted].  I live in West Jordan.  I've been there for about eight years.  I do landscaping full-time with a family

business, and I also do retail at Carhartt part time.  I have my high school diploma.  I am not married.  I am not a member of any clubs.  I like to mountain bike, fly fish, kayak, that type of stuff outdoors.  I'm subscribed to *National Geographic*, and I get a lot of my news on social media.

**PROSPECTIVE JUROR NO. 40:**  My name is [name redacted].  I live in Heber City, Utah.  I've lived there for eleven years.  I'm employed.  My education -- I'm employed.  I am a clinical training lead for aesthetic lasers.  Education: I have a BA in economics.  I'm not married.  I'm not a member of any clubs, civic groups, or organizations.  My hobbies are cooking, hiking with my dog.  Magazines, newspapers:  I do subscribe to satellite radio SiriusXM where I try to listen to various news outlets for different perspectives.

**PROSPECTIVE JUROR NO. 41:**  My name is [name redacted].  I live in Grantsville.  I've lived there for about three months now.  I'm a receptionist at BrightView Landscapes. I'm high school educated with some college.  I am not married. I'm not a member of any clubs, civic groups, or professional organizations.  For hobbies, I enjoy art, music, outdoor activities, ATV'ing, hiking.  And I do not subscribe to any magazines, newspapers, or news outlets.

**PROSPECTIVE JUROR NO. 42:**  I'm [name redacted].  I live in West Valley City.  I've lived there for about a year. I'm employed.  I work as a software admin for a Utah tech

company.  I have some college, education.  I'm married.  My husband works for Western Waterworks in Salt Lake City.  I'm not a member of any clubs.  For hobbies, I read, garden.  For magazines and newspapers, I get my news from *The New York Times*.

PROSPECTIVE JUROR NO. 43:  My name is [name redacted].  I live in Midvale.  I've been there for twenty-one years.  I'm self-employed.  I'm a graphic designer.  I also teach Tai Chi and Qigong.  I have a high school diploma.  I'm not married.  I'm not currently a member of any clubs or civic groups.  My hobbies are snowshoeing, hiking, music, reading.  I'm not currently subscribed to any magazines or newspapers.  And when I'm interested, I'll scroll on the Internet for the news, but I don't do it regularly.

PROSPECTIVE JUROR NO. 44:  My name is [name redacted].  I live in Tooele City, Utah.  I've lived there for about eight years.  I'm employed at Jacobsen Construction as a VDC specialist.  High school education.  I am married.  My wife runs her own small business making children's clothes.  I'm not a member of any clubs, civic groups, or professional organizations.  My hobbies are outdoors, ATVs, boating, video games.  I do not subscribe to any magazines, newspapers, or any news outlets.

PROSPECTIVE JUROR NO. 45:  I'm [name redacted].  I currently live in Millcreek for the last three years.  I work

as an advanced service repair technician for at telecom company, Nettel.  I have some college but no degree.  I am married.  My wife is a life insurance claims specialist.  Not a member of any clubs, civic groups, or professional organizations at the moment.  Hobbies:  When I'm not wrestling my twin toddlers, I play video games or play guitar.  Magazines, newspapers, news:  I piggyback on a family Apple Plus account and kind of read through everything.  If the story is interesting, I'll read like five different versions of the same story, and that's it.

**PROSPECTIVE JUROR NO. 46:**  My name [name redacted].  I live in Cottonwood Heights.  I've lived there for twenty-five years.  I'm retired.  Before I retired, I was a lawyer, Juris Doctor.  [Name redacted], my wife, is also retired.  I'm an enactive member of the Utah State Bar.  My hobbies include golf, learning, gardening.  I subscribe to *The New York Times*, the *Wall Street Journal,* and *The Salt Lake Tribune.*

**PROSPECTIVE JUROR NO. 47:**  My name is [name redacted].  I've lived in Midvale for four years.  I'm employed Amrize.  I make roofing insulation.  High school educated.  My wife works at kW Engineering.  Not a part of any clubs.  Hobbies include table top games, reading, and running.  Not subscribed to any magazines or newspapers, and I get my news from podcasts.

**PROSPECTIVE JUROR NO. 48:**  I'm [name redacted].  I'm

from Eagle Mountain, and I've lived there since January.  I'm employed by Utah Valley University in their IT department.  I have a high school diploma, and I have lots of college, but I haven't finished my degree.  I'm single.  I'm a member of the Timpanogos Game Developers Club and Ascent Chorus.  I like music, game development, hiking, sports.  I have a lot of hobbies.  I'm not regularly subscribed to any magazines or newspapers, but I will browse online sources to get my news.

**PROSPECTIVE JUROR NO. 49:**  My name is [name redacted].  I live in Orem.  I've lived there for about twenty years.  Employed by Axis Steel Detailing as a structural steel project manager.  I got an associate's degree in drafting technologies.  My wife is -- married -- and she works for the Orem School District.  Not a member of any clubs or organizations.  Hobby:  Reading.  Don't have any magazines, newspapers, or outlets.  I'm not subscribed to anything, and don't really view the news regularly, either.

**PROSPECTIVE JUROR NO. 50:**  All right.  Good morning, my name is [name redacted].  I live in West Bountiful.  I've been there for thirteen years.  I'm not employed right now.  I'm working on self-employment.  Let's see here, my education, I have a bachelor's in information systems.  I am married.  My wife is the domestic engineer of our home, so she works hard but doesn't get paid.  I'm not a member of any club, civic groups, or professional organizations.  My hobbies include, I'm

an avid mountain biker, love the outdoors, do a lot of hiking, skiing, traveling.  And as far as magazine, newspaper, news outlet, I am not subscribed to anything.  I generally try to avoid the news outside of financial news.  Occasionally, I stumble across a headline story, but generally I try to avoid the news all target.

**PROSPECTIVE JUROR NO. 51:**  My name is [name redacted].  I live in Spanish Fork, Utah.  I've lived there for eighteen years now.  I'm employed.  I'm an associate professor at Brigham Young University.  I teach physics and astronomy courses there.  I have a Ph.D. in astronomy.  I am married.  My husband is a professor in computer science at BYU, and he contracts part time for NASA.  I'm a member of the American Astronomical Society and the Division for Planetary Sciences, and I'm also a member of Mormon Women for Ethical Government.  My hobbies include hiking, sports, athletics, spend time with my kids, watching movies.  I'm subscribed to *The Salt Lake Tribune* and to KSL, and I also rarely check Internet headlines every day or every two days.  So I'll read occasionally *The New York Times*, *CNN*, and *The Atlantic* to kind of stay on top of news outside of the state of Utah.

**PROSPECTIVE JUROR NO. 52:**  My name is [name redacted].  I live in Cedar Hills.  I've lived there almost three years.  I am employed.  I'm a senior account executive for Savvos Health.  I do have a college education.  I am

married.  My spouse is a president and CFO for Syndicate aka SilencerCo here in Utah.  I'm not a member of any club, civic groups or professional organizations.  My hobbies include baking, reading, yoga, grandbabies, and hosting family dinners.  And I don't subscribe to any magazines, newspapers, or listen to the news.

**PROSPECTIVE JUROR NO. 53:**  My name is [name redacted].  I live in Springville.  I've lived there for the last five years.  I am a senior producer at BBDO San Francisco, which is an advertising agency.  I also own a production company that produces films.  I have a bachelor's degree in advertising and a minor in global business.  I'm married, and my wife is an elementary school teacher.  I am a member of the Sundance Institute, the Boy Scouts of America, and the AICP.  I enjoy golf and cooking and photography.  And I read *The Deseret News*, *The Tribune*, *ESPN*, and I subscribe to *Communication Arts* and the *Lego Magazine*.

**THE COURT:**  The *Lego Magazine*?

**PROSPECTIVE JUROR NO. 53:**  Yes.

**THE COURT:**  Thank you all.

Now, I'm going to ask a series of questions.  You'll meet the lawyers, and you'll learn what the case is about.  If at any time you would prefer to come up privately, we'll have a time where we will bring people up who want -- who the lawyers will want to talk to with me and the reporter privately, or we

will bring up people who want to speak with us privately.  If there's something that they would prefer not to -- not to answer publicly.  That goes for any of these questions.

All right.  I'll ask the lawyers to introduce themselves and the client they represent.

Mr. Kennedy?

**MR. KENNEDY:**  Thank you, Your Honor.

My name is Michael Kennedy.  I work along with Bryan Reeves for the United States of America.  We work in the United States Attorney's Office for the District of Utah.  With us is Emily Gaitin.  She is a paralegal in our office; and Kilie Ruiz, who is a detective with the Salt Lake City Police Department and also part of the FBI Task Force.

**THE COURT:**  Do any of you know these four people or one of them?

Do any of you have a close friends, relatives in the U.S. Attorney's Office or have some beef with the U.S. Attorney's Office that would prejudice you in this case?

**MR. KENNEDY:**  Your Honor, I should mention that the acting U.S. Attorney is Felice John Viti.

**THE COURT:**  Yes.

No hands at this time.

You can be seated.

Mr. Clark?

**MR. CLARK:**  Good morning, folks.  My name is Aaron

Clark, and Jordan Westgate and I are counsel for Mr. Robert MacLean in this case.

THE COURT:  Thank you.

All right.  Do any of you know any of these three?

I see no hands yet.

This is a case that will not have many witnesses, as I understand it.  So what witnesses will be called?

MR. KENNEDY:  Your Honor, we anticipate two witnesses, and their names are Wendi Jay, and she is from Milwaukee, Wisconsin; and Mary Tincher, who lives in Lehi, Utah.

THE COURT:  Do either of you know either of those two people?

(No hands were raised.)

THE COURT:  All right.  Thank you.

Now, this is a criminal case, and I'll read you the indictment, and then explain what an indictment is and is not.

"United States of America, Plaintiff, versus Robert Sutherland MacLean, Defendant.

"The Grand Jury Charges: Count 1, on or about March 1, 2022, in the District of Utah and elsewhere, Robert Sutherland MacLean, also known as Bobby, the Defendant herein, did, in the special aircraft jurisdiction of the United States as defined in 49 U.S.C. § 46501(2), engage in abusive sexual contact, to wit, the intentional touching through the clothing

of the breast of another person, W.J., without that other person's permission, and with the intent to abuse, humiliate, harass, and degrade, and to arouse and gratify the sexual desire of any person, all in violation of 49 U.S.C. § 46506 and 18 U.S.C. 109A, and § 2244(b), and punishable thereafter."

Now, let me explain, an indictment is a charge.  It's not proof of guilt or proof of anything.  And in a criminal case, the Plaintiff, the United States, has the burden of proof beyond a reasonable doubt; and the Defendant is presumed to be innocent until found guilty, if he is, beyond a reasonable doubt.

A defendant has an absolute privilege not to testify, and no assumptions are to be drawn from his not testifying if he decides not to.  He may testify, and if so, his testimony should be treated as a testimony of any witness.

So is there anything about the subject matter of this case that would be problematic for you to dispassionately review the evidence and enter a verdict according to -- under the instructions that I will give you at the end of the case?  You can come up later, but any hands right now?

All right, number?

**PROSPECTIVE JUROR NO. 31:**  31.

**THE COURT:**  31.  Do you want to come up later or talk now?

**PROSPECTIVE JUROR NO. 31:**  Later would be great.

THE COURT:  Later?

PROSPECTIVE JUROR NO. 31:  Thank you.

THE COURT:  All right.

I mentioned that the Defendant does not have any burden of proof.  The burden of proof is on the United States.  And he does not have the duty to testify if he decides not to testify, and nothing should be assumed because he didn't.

All right.  Have any of you sat on a jury before?

All right.  Tell me about it.  What kind of a case?  How long ago?

PROSPECTIVE JUROR NO. 5:  It was about fifteen years --

*(Court reporter requests speaker identification.)*

THE COURT:  Would you say your name and number, please.

PROSPECTIVE JUROR NO. 5:  My name is [name redacted].  I'm No. 5.  It was about fifteen years ago.  It was an assault case.

THE COURT:  In state, federal court?  Where was it?

PROSPECTIVE JUROR NO. 5:  State court.

THE COURT:  Utah?

PROSPECTIVE JUROR NO. 5:  Utah.

THE COURT:  And what was the verdict?  It was a criminal case, then?

PROSPECTIVE JUROR NO. 5:  It was criminal.  From what

I remember, there were two charges.  We found guilty on one, and not guilty on the other.

THE COURT:  Thank you.

Anyone else?  You are number, what?

PROSPECTIVE JUROR NO. 36:  36.

THE COURT:  Thank you.

PROSPECTIVE JUROR NO. 36:  Not really a jury duty, but it was a court-martial.  I sat on the jury of a court-martial about thirty years ago.

THE COURT:  The jury of what?

PROSPECTIVE JUROR NO. 36:  A court-martial in the United States Air Force.

THE COURT:  Court-martial, oh, yeah, okay.  Is there anything about that experience that would make it problematic for you?

PROSPECTIVE JUROR NO. 36:  No.  He stole a golf cart.

THE COURT:  Thank you.

Anyone else?  Was there anybody over here?

MR. KENNEDY:  Your Honor, 16 raised his hand initially, but now he's shaking his head.

PROSPECTIVE JUROR NO. 16:  I misunderstood the question, sorry.

THE COURT:  Misheard the question?

PROSPECTIVE JUROR NO. 16:  Right.

THE COURT:  All right.

32

Have you been a party or a witness in a lawsuit?

*(No hands were raised.)*

THE COURT:  What a non-litigious bunch.

All right.

PROSPECTIVE JUROR NO. 22:  I was a party probably twenty-five years --

*(Court reporter requests speaker identification.)*

THE COURT:  Name?

PROSPECTIVE JUROR NO. 22:  Juror No. 22.

THE COURT:  Name?

PROSPECTIVE JUROR NO. 22:  [Name redacted.]

I was a party to a lawsuit about twenty-five years ago.

THE COURT:  What was it about?

PROSPECTIVE JUROR NO. 22:  Um, it was -- that's kind of a long story.  I would like to tell you about that personally.

THE COURT:  All right.  Well, you're coming up any way.  We already settled that.  All right.

PROSPECTIVE JUROR NO. 22:  Yes.  Yes.

THE COURT:  Thanks.

[Name redacted.]

PROSPECTIVE JUROR NO. 46:  I was a party to a divorce case.

THE COURTROOM DEPUTY:  Juror No. 46.

**THE COURT:** Yes. Thank you.

Was there anything about that experience that would cause you not to want to serve here or be able to serve?

**PROSPECTIVE JUROR NO. 46:** No, Your Honor.

**THE COURT:** Thank you.

**PROSPECTIVE JUROR NO. 48:** Number 48, [name redacted]. I just -- I'm not sure if this counts, so I'm just going to say it. I was part of the class action lawsuit with Kia involving some faulty equipment.

**THE COURT:** Involving what?

**PROSPECTIVE JUROR NO. 48:** Involving basically faulty equipment in the car. I wasn't involved in the court case, just --

**THE COURT:** One of the big, numerous class?

**PROSPECTIVE JUROR NO. 48:** Yes.

**THE COURT:** All right. Thank you.

Number?

**PROSPECTIVE JUROR NO. 36:** Number 36 again. I've been deposed twice for medical litigation for the hospital. Neither case has thus far went to court.

**THE COURT:** Okay. Is there anything about that experience that means you couldn't sit on a jury here in this case?

**PROSPECTIVE JUROR NO. 36:** No.

**THE COURT:** Thank you.

**34**

There was a hand up over here, Elizabeth.

Number?

**PROSPECTIVE JUROR NO. 14:**  14, [name redacted].

**THE COURT:**  Name?

**PROSPECTIVE JUROR NO. 14:**  [Name redacted.]  I was a victim of a sexual assault.

**THE COURT:**  Um, all right.  Thank you.

**PROSPECTIVE JUROR NO. 6:**  I'm not sure, but I was an expert witness for three malpractice cases.  That was my extent of involvement.

**THE COURT:**  And malpractice of what?

**PROSPECTIVE JUROR NO. 6:**  Medical --

**THE COURT:**  Medical malpractice?

*(Court reporter requests speaker identification.)*

**PROSPECTIVE JUROR NO. 6:**  -- hospital situation.

**THE COURT:**  You're number?

**THE COURTROOM DEPUTY:**  Your name and number?

**PROSPECTIVE JUROR NO. 6:**  Oh, I apologize.  [Name redacted], No. 6.

**THE COURT:**  Thank you.

Any other hands?

*(No hands were raised.)*

**THE COURT:**  Do the lawyers want me to ask anything else about that?

**MR. KENNEDY:**  Your Honor, this is somewhat adjacent.

If Your Honor would inquire of  -- sorry.  One second, Your Honor -- of No. 46.  What sort of attorney he is or was before he retired.  I think that would help both sides.

**THE COURT:**  That's [name redacted], No. 46.

Well, I think he's going to say he was a good lawyer.

**MR. KENNEDY:**  That goes without saying, Your Honor.

**PROSPECTIVE JUROR NO. 46:**  I was a corporate lawyer for the law firm Parsons Behle & Latimer for approximately thirty years.

**THE COURT:**  You were not involved in much, if any, litigation, correct?

**PROSPECTIVE JUROR NO. 46:**  That's correct.

**THE COURT:**  Thank you.

**PROSPECTIVE JUROR NO. 46:**  I will say that I had the great pleasure of serving as one of the first summer clerks for a law firm that was then known as Ricker Larson & Kimble -- something like that.

**THE COURT:**  I see.  I remember.  He knows me.  Thank you.  And I know him.

Anything else on this subject?

*(No response from the attorneys.)*

**THE COURT:**  Did I ask about prior jury experience?

**MR. REEVES:**  Yes, Your Honor.

**THE COURT:**  What about -- do any of you have any -- have any experience with law enforcement that would make it a

problem for you to be a fair juror in this case?  Any hands?

(No hands were raised.)

THE COURT:  What about -- did any of you know each other before you got here today?  Besides [name redacted] knowing me, and I know him.

Yes?

PROSPECTIVE JUROR NO. 26:  I'm [name redacted].  I'm No. 26.  I know Juror No. 1.  We both work at Deloitte.

THE COURT:  Okay.  Would that be a problem if you both ended up sitting on a jury?

PROSPECTIVE JUROR NO. 26:  No.

THE COURT:  What about for you, [name redacted]?

PROSPECTIVE JUROR NO. 1:  No.

THE COURT:  You're No. 1, correct?

PROSPECTIVE JUROR NO. 1:  Yeah.  Number 1, [name redacted].

THE COURT:  Now, this case -- here's how I envision it, and the lawyers can correct me, I guess, if I'm wrong.  Today we expect to seat a jury and have opening statements by the lawyers.  And tomorrow we expect to have two or three witnesses, after which time I will instruct the jury, and the jury will go to deliberate.

Does that timetable meet, generally, counsel's expectations?

MR. CLARK:  Yes, it does, Your Honor.

**MR. KENNEDY:** Yes, Your Honor.

**THE COURT:** All right. So we're going to be here probably two days and not longer. So let me ask you, do any of you have non-refundable airline tickets to Paris tomorrow, or some other such comparable kind of commitment or problem if this trial lasts two days? Most of our trials last a lot longer than that, unfortunately.

Yes?

**PROSPECTIVE JUROR NO. 23:** Number 23. I'm supposed to baby-sit a nephew overnight tonight.

**THE COURT:** 23?

**PROSPECTIVE JUROR NO. 23:** Yes.

**THE COURT:** What are you supposed to do?

**PROSPECTIVE JUROR NO. 23:** I'm sorry, what's that?

**THE COURT:** What's your problem?

**PROSPECTIVE JUROR NO. 23:** I'm supposed to be babysitting overnight.

**THE COURT:** Overnight?

**PROSPECTIVE JUROR NO. 23:** Yeah.

**THE COURT:** Nobody else can fill in?

**PROSPECTIVE JUROR NO. 23:** Nobody else, yeah, they're --

**THE COURT:** What about in the daytime?

**PROSPECTIVE JUROR NO. 23:** In the daytime? They're a teenager. They're fine. But my sister is going up to Bear

Lake with her family, and they don't want their teenager home alone overnight.

THE COURT:  Wise parents.

PROSPECTIVE JUROR NO. 23:  Yeah.

THE COURT:  Good parenting.  Well, you can put your hand down.  Probably -- the only way that would be a problem, I guess, is if the jury is out awhile tomorrow late, if they can't reach a verdict very quickly.  All right.  We'll give that some consideration.

Anyone else?

Yes?  Number 16, and your name is?

PROSPECTIVE JUROR NO. 16:  [Name redacted.]  Is this something that I can talk to you in private about --

THE COURT:  Sure.

PROSPECTIVE JUROR NO. 16:  -- afterwards?  Thank you.

THE COURT:  And number...

PROSPECTIVE JUROR NO. 25:  25.  [Name redacted.]  I'm a single mom that is kind of limited on childcare, so.  I can probably --

THE COURT:  Thank you.

PROSPECTIVE JUROR NO. 16:  -- do it, but if it goes late, that's when it's an issue.

THE COURT:  Anyone else?

PROSPECTIVE JUROR NO. 37:  Number 37, [name redacted].  My wife works, and I have a ten-year-old kid, and

we don't really have anyone set up to watch him.

THE COURT:  No. 27?

PROSPECTIVE JUROR NO. 37:  37.

THE COURT:  37.  What's he doing today?

PROSPECTIVE JUROR NO. 37:  Oh, like work times or schedule?  Well, she works like at nighttime, so 7:00 to 5:00 a.m.  So if that works, if I can get home before then, then that's fine.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR NO. 37:  Yeah, thank you.

THE COURT:  Any other hands?

Now, I've mentioned that there are only two or three witnesses in this case.  Do any of you have any preconceived notions about whether a case ought to have a lot more witnesses than that?

Would you be able to decide a case based on what two or three witnesses say, or would you be worried about the fact that there aren't more witnesses?  Is that a problem for anybody?

(No hands raised.)

THE COURT:  So the next question -- here's one I often ask:  Does anyone know me?  Well, [name redacted] knows me, and I know him.  Does anyone else know me?

(One hand raised.)

THE COURT:  You know me?  You're number?

**PROSPECTIVE JUROR NO. 29:**  29.

**MR. CLARK:**  Your name is?

**PROSPECTIVE JUROR NO. 29:**  [Name redacted.]

**THE COURT:**  I know a lot of [name redacted].

**PROSPECTIVE JUROR NO. 29:**  Yes, you do.

**THE COURT:**  Which one are you?

**PROSPECTIVE JUROR NO. 29:**  I's [name redacted] son.

**THE COURT:**  Oh, sure.  I know you.  How are you?

**PROSPECTIVE JUROR NO. 29:**  Sixty-nine.

**THE COURT:**  Good to see you again.  Yeah, [name redacted] son, yes.

Now, if you lawyers think that's a problem, you can exercise a peremptory on [name redacted].  I've known him and his family forever.  Okay.  Thank you.

Both of our hair has changed color since we saw each other last.

**PROSPECTIVE JUROR NO. 29:**  Absolutely.

**THE COURT:**  If you're selected to sit on this case, will you be able to render a verdict solely on the evidence presented at the trial in the context of the law as I will give it to you?  Disregard any other ideas, notions, or beliefs about the law that you may have encountered when reaching your verdict.  If you're going to have trouble doing that, we need to know about it.  Would that be a problem for anybody, do you think?  Again, we'll have a sidebars but ...

*(No hands raised.)*

THE COURT:  What other general questions do you want me to ask before we get to sidebar?

MR. KENNEDY:  Your Honor, may we approach the bench to tell you the question that we sort of have in mind that we think should be asked?

THE COURT:  Yes.

You folks better come up.  You'll want to hear this, I'm sure.

*(Sidebar conference began at 10:00 a.m.)*

MR. KENNEDY:  The only question for the United States that we think that Your Honor should ask is the question with regard to forensic evidence or DNA, and whether any juror would expect that sort of evidence.

THE COURT:  Any objection to that?

MR. CLARK:  I don't have any objection to that, no.

THE COURT:  Do you have something that you want me to ask?

MR. CLARK:  Yes, about the MeToo movement, and the notion from the MeToo movement about believing women.

THE COURT:  Any objection to that?

MR. KENNEDY:  No, Your Honor.

THE COURT:  Thank you.

*(Sidebar conference concluded at 10:00 a.m.)*

THE COURT:  Would any of you believe that there

always has to be forensic evidence or a case can't be made, at least in one of these kinds of cases.

Is that okay, Mr. Kennedy?

**MR. KENNEDY:**  Yes, Your Honor.  Thank you.

**THE COURT:**  Thank you.

No hands.

All right.  Now, the MeToo movement has been raised. I guess the question is, can you judge the testimony on its merits without relevant to the sex of the person who's providing the evidence?

Do you want to ask that question in a different way?

**MR. CLARK:**  Yes.

Folks, some of you may be familiar with the MeToo movement, and the idea of we need to believe women as a default.  Do any of you subscribe to the idea that you should believe women as a default when they make an allegation of sexual assault?

**THE COURT:**  Number?

**PROSPECTIVE JUROR NO. 41:**  Number 41.

**THE COURT:**  41?

**PROSPECTIVE JUROR NO. 41:**  Yes.

**THE COURT:**  Well, we don't need to --

Do we need to say anything about that or ...

**PROSPECTIVE JUROR NO. 41:**  No, Your Honor.

**THE COURT:**  All right.

15? Okay. Thank you.

All right. Let me make sure that there's nothing else that I need to ask.

All right. We're going to --

**MR. KENNEDY:** Your Honor, and I apologize because I said the question was fine, but I do want to make sure that the jurors understand what we're talking about when we talk about forensic evidence.

**THE COURT:** Like DNA?

**MR. KENNEDY:** Yes. DNA, or any sort -- or other sort of physical evidence of proof.

**THE COURT:** Yes.

Does that change anybody's answer to the question that I asked about forensic evidence?

*(No hands were raised.)*

**THE COURT:** All right. Thank you.

Now, what we're going to do -- try to be patient. We're getting there. The lawyers and I and the reporter and my courtroom deputy are going to go over to the sidebar, and we'll -- they will want some of you to come up, and some of you will want to come up, and so we will start doing that.

**THE COURTROOM DEPUTY:** I just learned from the jury administrator, someone needs to move their car, No. 47. Maybe during sidebar would be a good time to move your car and come back.

**THE COURT:**  47.  Where is the car?

**THE COURTROOM DEPUTY:**  It's on the street, apparently, but just come right back.

**THE COURT:**  Yeah, don't be too long.  Do you need to come to sidebar for any reason?

**PROSPECTIVE JUROR NO. 47:**  No, sir.

**THE COURT:**  Okay.  Thank you.

All right.  Michelle, if you'll move over here.

We have to wait for the reporter to get set up.

Tell me when you're ready.

*(Sidebar questioning of individual jurors begins.)*

**THE COURT:**  All right.  Here are the people we know we want to come up.  Here are the ones we know want to come up. And if they come up, we should ask them any questions -- we'll find out what they wanted to come up for, and if you have any questions, we don't want to bring them up again.

**MR. CLARK:**  Okay.

**THE COURT:**  Let's see, 22.

Number 22.

*(Perspective Juror No. 22 joins the bench.)*

**THE COURT:**  You said you wanted to come up.

**PROSPECTIVE JUROR NO. 22:**  Yes.  I actually suffer from chronic Lyme disease so I get brain fog.  It makes it hard for me to concentrate for a long period of time.

The other question was if I was a party of a lawsuit.

**45**

Twenty-five years ago, it was actually a case against a businessman, a glass business, and I was a witness on the prosecutor side.

Well, the guy that was handling the investigation for the postal office -- it was postal fraud -- he wanted to go into the glass business after the case was done.  And I informed the -- we planned on doing it, and then I informed the owner of the other business that I -- the one they were going after, that that was the case.  So they dropped the case, and he sued both of us.  I took out bankruptcy, so it never went to court.

**THE COURT:**  Do you want to ask anything, counsel?

**MR. CLARK:**  No.

**THE COURT:**  Thank you.

**MR. REEVES:**  Thanks.

*(Perspective Juror No. 22 leaves bench.)*

**THE COURT:**  He's out for cause.

**THE COURTROOM DEPUTY:**  22.

**THE COURT:**  31.  31.

*(Juror No. 31 joins the bench.)*

**THE COURT:**  And then 16, if you can just wait to get started.

**PROSPECTIVE JUROR NO. 31:**  My name is [name redacted].  I have a 12-year-old son who deals with self-harm and has been in a residential treatment program for the last

**46**

six months.

In December and January of this last year, he was sexually assaulted by another boy, and we just learned this last week that both CFS as well as Provo Police Department are going to pursue charges against this other boy. So your instructions to us was to judge this case dispassionately, and I don't know if I can do that based on my situation and my family.

THE COURT: Any questions from counsel?

MR. CLARK: No, I'm sorry.

MR. REEVES: Definitely. Sorry.

THE COURT: Sorry about that. Thank you.

PROSPECTIVE JUROR NO. 31: Thank you.

(Perspective Juror No. 31 leaves the bench.)

THE COURT: All right. He's excused for cause, No. 31.

Number 16.

(Perspective Juror No. 16 joins the bench.)

PROSPECTIVE JUROR NO. 16: How are you?

THE COURT: You wanted to come up?

PROSPECTIVE JUROR NO. 16: Yeah. So regarding whether or not my willingness to do the case. I want to do it, but my job involves me delivering medical supplies to dispensaries and pharmacies, and I just can't focus. I have so much deliveries this week to do. We don't have anybody else in

our company.  I'm not going to be focused.  I'm already looking at my work emails this whole morning.  I want to do this, but, yeah, I don't know.  I'm just being honest with you guys.

**THE COURT:**  Any questions?

**MR. KENNEDY:**  No, Your Honor.

**THE COURT:**  Thank you.

**MR. REEVES:**  Thank you very much.

*(Perspective Juror No. 16 leaves the bench.)*

**THE COURT:**  He's excused for cause.

35.

33 is already gone, right?  33 is out.

*(Perspective Juror No. 35 joins the bench.)*

**THE COURT:**  You wanted to come up?

**PROSPECTIVE JUROR NO. 35:**  No.

**THE COURT:**  Didn't you?

**MR. REEVES:**  It's nice to meet you.

**PROSPECTIVE JUROR NO. 35:**  Nice to meet you, too.

**THE COURT:**  Any questions for this guy, Juror No. 35?

**MR. KENNEDY:**  No, I don't believe he answered anything.  It may have been basic information.

**THE COURT:**  All right.

**MR. CLARK:**  Thank you, sir.

**PROSPECTIVE JUROR NO. 35:**  Appreciate it.

*(Perspective Juror No. 35 leaves the bench.)*

**THE COURT:**  I don't know why I wrote that down.

MR. KENNEDY:  Your Honor, you may have been thinking of 36.  I don't know, Your Honor.  She was a court-martial juror and was deposed in a civil case, but I don't know if that's --

THE COURT:  I don't know.  I don't think that's a problem.

All right.  Now --

THE COURTROOM DEPUTY:  Did you want to talk to 14, who said she had been sexually assaulted.

THE COURT:  She did.

14.

MR. REEVES:  Did 37 come to us?  I have that person marked, that he wanted to come up.  37, [name redacted].  He's a truck driver.  His wife works in elderly care.

THE COURTROOM DEPUTY:  I didn't note it.

THE COURT:  37, yes.

*(Potential Juror No. 14 joins the bench.)*

PROSPECTIVE JUROR NO. 14:  [Name redacted.]

THE COURT:  Yes.  You said you had been assaulted. Is that correct?

PROSPECTIVE JUROR NO. 14:  Molested, I guess.

THE COURT:  Molested.  Could you be fair in this case to the Defendant?

PROSPECTIVE JUROR NO. 14:  Um, I think I would say no to be safe because I'm not too sure.

THE COURT:  Any questions?

MR. CLARK:  No.

MR. KENNEDY:  No, Your Honor.

THE COURT:  Thank you.

PROSPECTIVE JUROR NO. 14:  Thank you.

MR. REEVES:  Thank you, [name redacted].

*(Perspective Juror No. 14 leaves the bench.)*

THE COURT:  Cause, she's out for cause.

37, do we want to bring him or her?

MR. REEVES:  Was that correct, he's the one?

THE COURTROOM DEPUTY:  Yes.  Yes.

THE COURT:  37.

*(Perspective Juror No. 37 joins the bench.)*

PROSPECTIVE JUROR NO. 37:  Hello, Your Honor.

THE COURT:  You said there would be some problems if you were on this jury?

PROSPECTIVE JUROR NO. 37:  Yes, sir.  Yes.  Sorry. My wife, she can call off work if we had to, but it would be tough for us.  She works at night, and my daughter would be home by herself, and we don't have anybody lined up.

THE COURT:  Any questions?

MR. CLARK:  No.

MR. REEVES:  Understand.

MR. KENNEDY:  No questions.

THE COURT:  Thanks.

MR. REEVES:  Thank you for coming.

*(Perspective Juror No. 37 leaves the bench.)*

THE COURT:  All right.  Excused for cause.

So that's 22, 31, 16, 14, and 37, correct?

THE COURTROOM DEPUTY:  Uh-huh.

MR. KENNEDY:  Your Honor, there were two.  I believe it was 15 and 41 that answered yes to the question regarding the MeToo movement, and I don't think that's automatically disqualifying.

MR. CLARK:  I would disagree.

THE COURT:  I think it is.

THE COURTROOM DEPUTY:  So not bring them up?

THE COURT:  Yeah.  41 and 15 for cause.

MR. REEVES:  Not ask them to explain?

MR. KENNEDY:  No.

THE COURT:  Well, they basically said, to answer your question, "Could you be fair?"  And they raised their hand and said no.

MR. REEVES:  I thought they may have questions about the question.

THE COURT:  I didn't.  Did you think they did?  I didn't think they did.

MR. CLARK:  They said that their default would be to believe women, which is contrary to the assumption of innocence.

51

**THE COURT:** I thought that's what they said.

**MR. REEVES:** Thank you.

**THE COURT:** All right. Now -- there's too much.

**THE COURTROOM DEPUTY:** They can't hear.

**THE COURT:** They seemed to hear me when I called their number.

Do you want to come up and explain something? Come on up. Two of you?

*(Perspective Juror No. 18 joins the bench.)*

**THE COURT:** You're number, what?

**PROSPECTIVE JUROR NO. 18:** I'm No. 18, [name redacted]. I didn't want to say in front of everybody, but my daughter won a $1 million lawsuit against Dole when they had that fiasco with their spinach.

**THE COURT:** Dole?

**PROSPECTIVE JUROR NO. 18:** Yeah.

**THE COURT:** The spinach?

**MR. REEVES:** Contaminated spinach. So she was a victim?

**PROSPECTIVE JUROR NO. 18:** Uh-huh.

**THE COURT:** Tell me how that's relevant to this case.

**PROSPECTIVE JUROR NO. 18:** Just you asked if we were ever in a litigation, but I didn't want to say in front of them.

**THE COURT:** Thank you.

(*Perspective Juror No. 18 leaves the bench.*)

THE COURT:  She's not excused for cause.

(*Perspective Juror No. 46 joins the bench.*)

THE COURT:  This is number?

THE COURTROOM DEPUTY:  46.

THE COURT:  How are you?

PROSPECTIVE JUROR NO. 46:  Good.

I hope this will remain confidential here, but I'm doing this out of the abundance of caution.

THE COURT:  Remind me of your number.

PROSPECTIVE JUROR NO. 46:  46.  It's been reported in the national press, not widely, a few weeks back, that my daughter-in-law may be appointed by President Trump as the United States Attorney for the District of Utah.  And it hasn't happened, and it may never happen, but if it happened today or tomorrow, I could see how that --

MR. KENNEDY:  Would that influence you in any way at all?

PROSPECTIVE JUROR NO. 46:  Me?

MR. KENNEDY:  Yeah.

PROSPECTIVE JUROR NO. 46:  No.  I think I can be -- but I wanted everyone to know that.  No, I don't think it would.

MR. KENNEDY:  I did recognize the name, Your Honor, and I'm aware that [name redacted] is in the running and to be

vetted.

THE COURT: Maybe more than the running.

Mr. Clark?

MR. CLARK: [Name redacted], first, congratulations if that happens. Would there be any chance that you might -- regardless of the evidence -- want to convict the client?

PROSPECTIVE JUROR NO. 46: No.

MR. CLARK: To give a win to your daughter-in-law's potential future office?

PROSPECTIVE JUROR NO. 46: No.

MR. CLARK: Okay. Very good. Thank you.

(Perspective Juror No. 46 leaves the bench.)

THE COURT: What do you think?

MR. KENNEDY: I don't see a conflict, Your Honor. She's a potential nominee, and that's his daughter-in-law.

THE COURT: What?

MR. KENNEDY: I said she's a potential nominee who's his daughter-in-law, and I don't see a conflict.

MR. CLARK: I don't see a challenge for cause either.

THE COURT: I'm not going to strike him for cause. Probably be a really good juror. All right.

MR. REEVES: Yeah.

(Perspective Juror No. 20 joins the bench.)

THE COURTROOM DEPUTY: No. 20.

THE COURT: Who is this?

**THE COURTROOM DEPUTY:**  20, [name redacted].

**PROSPECTIVE JUROR NO. 20:**  Yes.  I have personal experience with sexual assault, and I don't believe -- I guess I feel very strongly about it, and it was a mutual friend as well, so I don't think I would be able to be unbiased, especially with the second question of lack of forensic evidence.

**THE COURT:**  Do you have any questions you want to ask?

**MR. CLARK:**  Help me understand what you mean by lack of forensic evidence causing an issue.

**PROSPECTIVE JUROR NO. 20:**  I think I come in with the feeling of just overwhelming negativity from personal experience.  And I don't think I would be able to look at it in a certain away, especially with few witnesses and the lack of evidence to be able to make like a valuable opinion of guilt or innocence.

**MR. CLARK:**  So without forensic evidence, you would have a hard time convicting someone of sexual assault?

**PROSPECTIVE JUROR NO. 20:**  In this scenario, yes.

**THE COURT:**  Any questions?

**MR. KENNEDY:**  No.

**MR. REEVES:**  No.

**THE COURT:**  Thank you.

*(Perspective Juror No. 20 leaves the bench.)*

THE COURT:  I think he's out.

MR. CLARK:  Okay.

THE COURT:  Well, you can put it on the record.

MR. CLARK:  No, there's nothing to object to.

MR. REEVES:  That was number 20.  He's out for cause, okay.

THE COURTROOM DEPUTY:  Should I ask if --

THE COURT:  Let me ask.

Anyone else want to come up?

No hands.  Thank you.

All right.  So for cause we've got --

THE COURTROOM DEPUTY:  I have to hear this.  For cause we have 14, is that right?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  14, 16.

THE COURTROOM DEPUTY:  15 also.

THE COURT:  Yes, 15.  That's --

THE COURTROOM DEPUTY:  That was the MeToo.  She was the one who raised her hand.

THE COURT:  Oh, yes, 15.  So 15, 16 -- 14, 15, and 16.

THE COURTROOM DEPUTY:  Uh-huh.

THE COURT:  22.

THE COURTROOM DEPUTY:  Also 20.

THE COURT:  20, we just saw, that's right, 20.

MR. REEVES:  22.

THE COURTROOM DEPUTY:  Uh-huh.

THE COURT:  20 and 22, and 33.

MR. KENNEDY:  31, Your Honor, also.

THE COURT:  31, that's correct, 31, 33, 37.

THE COURTROOM DEPUTY:  Uh-huh.

THE COURT:  And 41 and 45.  Correct?

THE COURTROOM DEPUTY:  I don't have 45.

MR. KENNEDY:  I don't have 45, Your Honor.

THE COURT:  Oh, no, forty-one.  Oh, that's a one.
That one looked like a five -- forty-one.

MR. REEVES:  41.

THE COURT:  Do we need an alternate for a two-day
trial?

MR. KENNEDY:  Your Honor, I'm extremely belt and
suspenders.  I think it's a good idea to do that.  Anything can
happen.

MR. CLARK:  I'm not opposed to that.

THE COURT:  Okay.  We need thirteen, and we have how
many causes gone?

THE COURTROOM DEPUTY:  One, two, three, four, five,
six, seven, eight -- nine causes.

THE COURT:  So that is 13 and 9 is 22.  That takes us
down to -- let's see, we lost -- 33 was out, too.

THE COURTROOM DEPUTY:  Yeah.

**THE COURT:** I'm trying to figure out where you should not waste your peremptory, above what number.

**MR. KENNEDY:** Well, again, 14, 15, and 16 are out.

**MR. CLARK:** I'm sorry. Something that we need to raise, Your Honor, that's come up just with what they brought up. I don't remember, did the Court specifically ask if anyone had been the victim of sexual assault or had any close friends or loved ones? We had someone come up and mention who was a close friend of a sexual assault, but I don't know if we asked that broadly of folks, and I don't know.

**THE COURT:** I thought I asked, "If you had been a victim."

**MR. REEVES:** I thought you had said something about a victim, but I don't know if you asked if you have a friend or a colleague that was a victim, and would that effect you.

**MR. CLARK:** Right.

**MR. REEVES:** I think that's what I heard.

**THE COURT:** All right.

*(The following question was directed to the jurors.)*

**THE COURT:** I may not have asked this. I asked if anyone had been a victim of sexual assault, but if you have a friend or relative or someone close to you that's been a victim of sexual assault, would that impair your judgment, impair your objectivity about the evidence in this case? I think some of you already have come up and talked about that, but any hands?

*(No hands were raised.)*

THE COURT:  All right.

MR. KENNEDY:  Your Honor, could we ask the reversal of that question, that -- whether they've been accused of sexual assault?

MR. REEVES:  Been accused -- whether they or their family or friends were ever accused of sexual assault?

THE COURT:  All right.  The question again relates to sexual assault.  What about an accusation against you or someone close to you that might affect your judgment in this case, your objectivity in this case?

*(One hand raised.)*

THE COURT:  Come up.

Has he been up before?

MR. CLARK:  I don't think so.

*(Perspective Juror No. 53 joins the bench.)*

THE COURT:  What number are you?

PROSPECTIVE JUROR NO. 53:  53.

MR. REEVES:  Thank you.

PROSPECTIVE JUROR NO. 53:  This was -- my best friend was accused by his wife -- during their divorce -- of sexually assaulting his children, tried to destroy him and his life falsely.  And he was acquitted, or he was proved -- they found him not guilty, not in trial, but it was just really close and it messed him up for about four years.  And a lot of his

friends and family kind of -- it was a tricky situation.

THE COURT:   And can you be fair here or not?

PROSPECTIVE JUROR NO. 53:   I think I -- I would want more than just he said-she said, I feel like.

MR. REEVES:   Meaning?

PROSPECTIVE JUROR NO. 53:   I feel like I can be fair, but I might lean to question the motives of someone -- if there other motives -- if there was something to be gained from accusing somebody alone.

MR. KENNEDY:   If we're talking about two strangers and adults.

PROSPECTIVE JUROR NO. 53:   Yeah, then I don't think --

MR. KENNEDY:   Would you still require forensic evidence, DNA, or something like that?

PROSPECTIVE JUROR NO. 53:   No, I would not.

THE COURT:   Mr. Clark?

MR. CLARK:   Sir, it sounded to me like you feel like you could be fair and impartial in the circumstances described to you.

PROSPECTIVE JUROR NO. 53:   Yes.  I think so.  I just thought it was worth bringing up.

THE COURT:   Thank you.

MR. KENNEDY:   Appreciate that.

*(Perspective Juror No. 53 leaves the bench.)*

THE COURT:  I'm not going to strike him.

MR. CLARK:  I like him.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  So you're not going to?

THE COURT:  No.

MR. KENNEDY:  He's at the very end of the list, anyway.

THE COURT:  We have somebody else coming up.

MR. REEVES:  Number 36.

(Perspective Juror No. 36 joins the bench.)

PROSPECTIVE JUROR NO. 36:  I'm 36.  My niece's daughter was molested by her significant other.  It never went to court.  He drove his motorcycle into the wall of Ogden Canyon and committed suicide.

THE COURT:  What kind of a juror would you be here today?  Could you be fair?

PROSPECTIVE JUROR NO. 36:  I can tell you based on my court-martial I'm a tough juror but objective.

THE COURT:  Questions?

MR. KENNEDY:  Your niece's daughter was a juvenile?

PROSPECTIVE JUROR NO. 36:  She was a juvenile.

MR. KENNEDY:  And the parties knew each other?

PROSPECTIVE JUROR NO. 36:  Yes.  Yes.

MR. KENNEDY:  Would you have any trouble dealing objectively on the fact that the people here were adults and

strangers?

**PROSPECTIVE JUROR NO. 36:**  I don't think so because it didn't cross my mind until recently.

**MR. KENNEDY:**  Would you require forensic evidence or DNA or something like that to convince you?

**PROSPECTIVE JUROR NO. 36:**  No.  I've been a labor and delivery nurse for thirty years.  I've heard a lot of stuff.

**THE COURT:**  Anything else?

**MR. CLARK:**  No.

Thank you, ma'am.

**MR. KENNEDY:**  Thank you.

**MR. REEVES:**  Thank you.

*(Perspective Juror No. 36 leaves the bench.)*

**MR. REEVES:**  I like her.

**THE COURT:**  I'm not sure she's for cause.

**MR. KENNEDY:**  I don't see cause.

**MR. REEVES:**  Oh, that was the last one.

**THE COURT:**  Do you have -- so we've got -- if we're going to have an alternate, we have to have 13, and there's 16 challenges.

**THE COURTROOM DEPUTY:**  Uh-huh.

**THE COURT:**  That means we need 20 more people, correct?

**THE COURTROOM DEPUTY:**  Let me count up.

**THE COURT:**  So the number that's there, and the

number of where you exercise peremptory challenges beyond that is wasting time.

THE COURTROOM DEPUTY:  So Juror No. 36 is the 29th non-stricken juror, so I don't think beyond 36.

THE COURT:  We can get --

THE COURTROOM DEPUTY:  Yes, so I counted 29, but obviously not those who have been stricken.

MR. REEVES:  Twenty-nine, not including the cause?

THE COURTROOM DEPUTY:  And we get to 30.  She's the 29th.

MR. REEVES:  She's included.

THE COURTROOM DEPUTY:  Yes.

THE COURT:  So exercise peremptory --

THE COURTROOM DEPUTY:  37 is already gone, so don't exercise peremptory on 38 or above.

MR. KENNEDY:  Cut off is at the bottom of page 4.

THE COURT:  All right.

And counting 2, 2, 3 --

THE COURTROOM DEPUTY:  Yes.  We're going to have six rounds.

You guys get one every round.

You get two for the first four rounds, and then the last round you'll get one.

And here's how I did the cause.  You guys will initial under the correct column, and strike their name and

just do it really careful.  You may want to use a paper to do a line there.  So we're just making sure it's all correct.

MR. CLARK:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  And we'll start with Defense.

MR. KENNEDY:  Okay.  Great.

*(Sidebar questioning of individual jurors ends.)*

THE COURT:  The lawyers -- you will see the papers going back and forth.  They're exercising their peremptory challenges.  The Defense has ten; and the Government, six.  When that's done, we'll have a jury of twelve and one alternate, thirteen.  We'll then excuse the rest of you, swear in the jury panel, take a break, and then come back for opening statements.

THE COURTROOM DEPUTY:  Okay.  We'll begin over here.  You have two.

MR. CLARK:  Okay.

THE COURT:  Again, thank you for being here, and thank you for your patience.

*(Peremptory challenges take place.)*

THE COURTROOM DEPUTY:  I'm going to number them, and then you'll switch off.

MR. KENNEDY:  Okay.  Thank you.

THE COURT:  The courtroom deputy will now read off the thirteen people who will be the jurors in this case, twelve jurors and one alternate.  You'll get a new number if you're

selected, one through thirteen.

Go ahead.

**THE COURTROOM DEPUTY:**  Juror No. 1, [Perspective Juror No. 1]

Juror No. 2, [Perspective Juror No. 5].

Juror No. 3, [Perspective Juror No. 7].

Juror No. 4, [Perspective Juror No. 10].

Juror No. 5, [Perspective Juror No. 11].

Juror No. 6, [Perspective Juror No. 12].

Juror No. 7, [Perspective Juror No. 13].

Juror No. 8, [Perspective Juror No. 18].

Juror No. 9, [Perspective Juror No. 19].

Juror No. 10, [Perspective Juror No. 23].

Juror No. 11, [Perspective Juror No. 27].

Juror No. 12, [Perspective Juror No. 29].

Juror No. 13, [Perspective Juror No. 35].

**THE COURT:**  If the thirteen of you will stand up and be sworn in as the trial jury.

**THE COURTROOM DEPUTY:**  Please raise your right hand.

You and each of you do solemnly swear that you will well and truly try the issues in the case now on trial, and a true verdict render according to the evidence and the instructions of the Court.

**ALL JURORS 1 THROUGH 13:**  I do.

**THE COURT:**  Okay.  Now, the thirteen of you will come

up.  We'll take a break in a minute, but sit in the number assigned.  One through seven on the bottom row, eight through thirteen on the top.

The rest of you are excused.  Thank you very much for coming in.  Do not be disappointed that you weren't selected.

*(Remaining perspective jurors exit the courtroom.)*

THE COURT:  One through seven on the bottom row, and eight through thirteen on the top.

JUROR NO. 7:  Sorry, can you tell me again what my number was, [name redacted].

THE COURTROOM DEPUTY:  What's that?

JUROR NO. 7:  [Name redacted].

THE COURTROOM DEPUTY:  You're No. 7.  You're the last person on the first row.

JUROR NO. 11:  [Name redacted], what was my number?

THE COURTROOM DEPUTY:  Okay, um, you're No. 11.

JUROR NO. 12:  [Name redacted.]

THE COURTROOM DEPUTY:  You're No. 12.

JUROR NO. 12:  Okay.

JUROR NO. 4:  [Name redacted].

THE COURTROOM DEPUTY:  And you are No. 4.

JUROR NO. 4:  Okay.

THE COURT:  Everybody there?

THE COURTROOM DEPUTY:  Yes.

THE COURT:  All right.  We're going to break until

11:30.  And when we come back, I'll give the preliminary jury instructions, which won't take very long.  The lawyers will do their opening statements, and I don't know how long that will take.  That's up to them.  But you probably need a bathroom break and a drink and so on.  So you'll get out of here pretty early today.  And tomorrow you'll come in at 9:00, and we will give you -- we'll start with the evidence.  All right.  So I'll see you at 11:30.  We'll be in recess.  Thank you.

THE COURTROOM DEPUTY:  All rise, please.

*(Jurors exit the courtroom at 11:09 a.m.)*

THE COURT:  How long will your opening statements take?

MR. REEVES:  Your Honor, between ten and fifteen.

MS. WESTGATE:  Probably ten.

THE COURT:  Pardon me?

MS. WESTGATE:  Probably ten, ten minutes.

THE COURT:  Well, that's pretty efficient.  See you at 11:30.

MR. CLARK:  Thank you, Your Honor.

MR. KENNEDY:  Thank you, Your Honor.

*(Recess taken from 11:10 a.m. to 11:31 a.m.)*

THE COURTROOM DEPUTY:  All rise, please.

Court will resume.  You may be seated.

THE COURT:  Are you ready to proceed?

MR. KENNEDY:  Yes, Your Honor.

**MR. CLARK:**  Yes, Your Honor.

**THE COURT:**  We'll get the jury, and I'll give the preliminary instructions, and then you can give your opening statements.

**THE COURTROOM DEPUTY:**  All rise, please.

*(Jurors enter the courtroom at 11:34 a.m.)*

**THE COURTROOM DEPUTY:**  Court will resume session. You may be seated.

**THE COURT:**  Members of the jury:

Now that you've been duly sworn, I will give you some preliminary instructions to guide you in your participation of this trial.

It will be your duty to find from the evidence what the facts are.  You and you alone will be the judges of the facts.  You will then have to apply to those facts the law as the Court will give it to you.  You must follow that law whether you agree with it or not.

Nothing the Court may say or do during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be.

The evidence from which you'll find the facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits, and any facts that the lawyers agree on or stipulate to or that the Court may instruct you to find.

Certain things are not evidence, and must not be considered by you as evidence.  Statements, arguments, and questions by lawyers are not evidence.  Objections to questions are not evidence.

Lawyers have an obligation to their clients to make objections when they believe evidence is being offered, and when they believe evidence being offered is improper under the rules of evidence.  You should not be influenced by the objection or the Court's ruling on it.  If it is overruled, treat the answer like -- excuse me.  If the objection is sustained, ignore the question.  If it is overruled, treat the answer like any other.

If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that the Court has excluded or told you to disregard is not evidence, and must not be considered.  Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence: direct and circumstantial.  Direct evidence is the direct proof of the facts such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.  I will give you further instructions

on these as well as other matters at the end of the case.  Keep in mind that you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.  I will give you some guidelines for determining the credibility of witnesses at the end of the case.

As you know, this is a criminal case.  There are three basic rules about a criminal case that you must keep in mind:

First, the Defendant is presumed innocent until proven guilty.  The indictment against the Defendant brought by the Government is only an accusation, nothing more.  It is not proof of guilt or anything else.  The Defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case.  The Defendant has no burden to prove his innocence or to present any evidence or to testify.  Since the Defendant has the right to remain silent, the law prohibits you from arriving at your verdict by considering that the Defendant may not have testified.

Third, the Government must prove the Defendant's guilt beyond a reasonable doubt.  I will give you further instructions on this point later, but bear in mind that in this respect a criminal case is different from a civil case.

Now, now a few words about your conduct as jurors:

First, I instruct you that during the trial you are not to discuss the case with anyone or permit anyone to discuss it with you.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about this case.

Second, do not read or listen to anything touching on this case in any way.  If anyone should try to talk to you about it, bring it to the Court's attention promptly.

Third, do not try to do any research or make any investigation of the case on your own.

Now, in that connection, you should not use anyone -- any electronic communications, you may not communicate with anyone on your cellphone, through email, or any other messaging device or any social -- use any social service media.

Do not form an opinion in this will all the evidence is in.  Keep an open mind until you start your deliberations at the end of the case.  If you wish, you may take notes, but if you do leave them in the jury room when you leave, and remember that they are for your own personal use.

The trial will now begin.  First the Government will make an opening statement, which is simply an outline to help you understand the evidence as it comes in.  Next the Defendant's counsel will make an opening statement.

Correct?

**MR. CLARK:**  Yes, Your Honor.

**THE COURT:**  Opening statements are neither evidence nor arguments.  The Government will then present its witnesses, and counsel for the Defendant may cross-examine.

Following the Government's case, the Defendant may present witnesses or not.  If it does, the Government may cross-examine them.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and the Court will instruct you on the law, and then you will retire to deliberate on your verdict.

Mr. Kennedy, or Mr. Reeves, you may make your opening statement.

**MR. REEVES:**  Thank you, Your Honor.

### OPENING STATEMENT

**BY MR. REEVES:**  I begin with four statements:  You're beautiful.  You're sexy.  You're my type.  I'm attracted to you.

Now, some may find those statements flattering, compliments, even exciting to hear, but it depends on the context in which those statements are spoken.

Let's add detail.  Those four statements were made by the Defendant, Mr. Robert MacLean, to Ms. Wendi Jay, a total stranger sitting next to him on a flight from Chicago to Salt Lake.

Let's add another detail.  Those statements were said while the Defendant grabbed and groped her breasts throughout that flight without her consent.  Context matters.  Details matter.

Ladies and gentlemen, the evidence in this case will show that Mr. Robert MacLean sexually assaulted Ms. Wendi Jay not just once, not just twice, but at least six times.  Six times he harassed and humiliated her.  Six times he breached her personal space, and six times he crossed that line by groping and grabbing her breasts over and over and over again on that red-eye flight to Salt Lake.

Simply put, this is a case about one man imposing his will on another person.  What he did was illegal, and it was unlawful, and that's why we're here today.

I'm going to take you back to the evening of March 1, 2022.  Ms. Jay boards her plane.  She was excited.  The airlines bumped her up to first class.  It's a red-eye flight, and she's expected to arrive around 11:30 at night.  She's traveling for business in support of her career as a director of human resources.  It's a national responsibility.  She has a 8:00 a.m. Teams call or a 8:00 a.m. work call the next day.  That's why the red-eye.

She was assigned to seat 3D.  That was next to the window.  Mr. MacLean was assigned 3C, next to the aisle.

A few minutes into the flight, a polite conversation

begins.  Mr. MacLean himself as Bobby, that he's in software, and that he's divorced.

Then the conversation takes a total U-turn.  It gets very intimate, overly personal.  Mr. MacLean tells Ms. Jay that he had a previous drug addiction, cocaine, but that God helped him get over it.  Then he asked Ms. Jay, "Do you use cocaine?"

Not knowing how to quite respond to that, she simply replied, "No, I haven't used cocaine.  I'm more of a rule follower."

Mr. MacLean then says, "I like that answer.  You're my type.  I'm very attracted to you."

Ladies and gentlemen, it's late at night.  Passengers want to sleep.  The ceiling light dims.  Most of the reading lights go off, except for one in 3D, Ms. Jay's light.  It's quiet.  And remember, in order for Ms. Jay to get to the aisle or anywhere, she has to traverse in front of Mr. MacLean.  As with window seats, you're trapped.  Sometimes you think, "Do I really want to get up?"  Because he is directly in her way from her seat to the aisle.

Mr. MacLean enters her personal space at this point. He puts his arm under hers almost pressing against her left shoulder, and that's when he -- when she feels him touch her breast.

Now, Ms. Wendi Jay, she gives Mr. MacLean the benefit of the doubt.  Maybe it was an accident that first time.  Then

he moves in closer, and he grabs and he gropes her for the second time.  Now the red flags are going off, if they didn't already.  But you want to think the best of people.

He's undeterred.  His statements get sexual:  You're sexy.  I am attracted to you.  You're my type.  Context matters.  Then he poses a question:  "Can I tell you you're sexy?"

So Ms. Jay, trying to navigate an already embarrassing and uncomfortable situation, replies, "Well, you just did, so let's not say it again."

Still undeterred, Mr. MacLean reaches over and grabs Ms. Jay's breast for the third time.  Now she swats his hand away.

"Okay.  I'll leave you alone.  I guess I should leave you alone.  I guess I should leave you alone.  Can I tell you you're sexy?"  Is it a question or a statement?

Ms. Jay is now leaning forward in her seat.  She turns her body, turns her torso towards the window.  She's pressed up against the window for protection.  Her head is almost touching the seat in front of her.  Remember, this is first class.  She's all the way against the window.

Mr. MacLean leans so far over, his face, the space between the two seats, and to where she is now located, that he brazenly inserts his arm under hers and grabs her breast for the fourth time.

Ms. Jay, "Stop.  Please don't touch me.  Keep your hands to yourself."  All the while that first class cabin is full.  Everyone is sleeping.  It's quiet.

Mr. MacLean attempts to excuse his behavior, "I'm sorry.  I'm just attracted to you."  Mr. MacLean stands up and goes to the bathroom, and then in that process turns around and says, "I guess I should leave you alone now."  Is that a question?

Ms. Jay immediately rings the flight attendant call button.  This is her first attempt to try to get some help so she's not alone because she's feeling really alone right now.  She is stunned.  She is overwhelmed.  She is bewildered.  "Is this happening to me?"

Mr. MacLean returns from the bathroom, nothing changes.  He again reaches to her, gropes and grabs her breasts without her consent.  Ms. Jay, she's mad.  She's upset.  She pushes his hands away from her breast, and she admonishes him, "That's it.  You need to keep your hands to yourself."

The same stock apology, the same broken promise.  "I guess I should leave you alone now.  I'm sorry."

She is scared.  She is fearful.  And she is as far as you can probably get against the window of that plane in the middle of the night with the lights out and no one to help her.

What does Mr. MacLean do?  Leans back in that comfortable seat.  Closes his eyes, and appears to go to sleep.

Ms. Jay is physically manifesting her emotions right now. The flight attendant observes her and approaches her. She is turned into herself, arms folded, and she's crying. And the two exchange handwritten notes about what the Defendant, Robert MacLean, has been doing to her. Handwritten notes so as not to awake him if he's asleep.

The aircraft, ladies and gentlemen, is preparing for landing, that period just before. The warning indicator goes on. The announcement, "You need to put on your seatbelt." At that moment, the Defendant opens his eyes, and with both hands reaches over and grabs both of her breasts while saying, "I need to put you in your seatbelt right away."

For the sixth time he has groped and grabbed her breasts without her consent. Six times. All the while leering with what he may think is flattering comments: You're my type. You're beautiful. I find you so attractive. I'm sorry. I'm just attracted to you.

Remember, Ms. Jay is in a steel tube thousands of feet in the air. MacLean sits between her and the aisle. All twelve seats of that cabin are full. She's humiliated, embarrassed, wondering how to act. You never think this moment will happen to you. And she doesn't want to create a scene. She didn't want to create a scene.

Trying to excuse away his actions, Mr. MacLean provides his stock apology and again that empty promise. I'm

sorry, I think you're really sexy.  I'm going to leave you alone.  This is the last time that Mr. MacLean touches Ms. Jay. He appears to go back to sleep for a few minutes until they land.  And when they land, Mr. MacLean opens his eyes, and starting to exit, turns around and says, "It was nice to talk to you."

Ms. Jay is shattered.  She is left to pick up the pieces while the Defendant scurries out of the plane.

Based upon his criminal actions, Mr. MacLean is charged in a one-count indictment:  Abusive sexual contact on an airplane.  During this trial, you will hear from Ms. Wendi Jay, and she will tell you everything that she went through that night from her perspective.  What she saw.  What she felt. What she heard.

You'll also hear from Ms. Wendy Tincher [*sic*], a seasoned flight attendant who was assigned to that first class cabin, and she observed and interacted with both Mr. MacLean and Ms. Wendi Jay.  She will tell you that when the first drink service was offered, Ms. Jay ordered a drink.  Mr. MacLean ordered the same drink.

She observed Ms. Jay growing increasingly quiet, physically turning herself away from the Defendant, and her body was pressed up against the window.

She also observed Mr. MacLean put his hand on her knee at one point.  According to her, he was encouraging her to

have more drinks with him.  She refused.

Ms. Tincher also observed Mr. MacLean twisting or contorting his body so far over to get into her personal space, and she observed Ms. Wendi Jay trying to ignore him.

At one point, Ms. Tincher will testify that she saw Ms. Jay so physically upset, the old adage, the straw had broke the camel's back.  Her arms from folded.  She was inward, and she was crying.  At the same time, Ms. Tincher will tell you that she saw the Defendant peaceful, eyes closed, appearing to be asleep.

Witnessing this, Ms. Tincher approached her.  And as I said before, the two women exchanged notes in an attempt not awake Mr. MacLean.  We will show you those hand-written notes. We have them.  They were written by Ms. Tincher and Ms. Jay on that red-eye flight in the middle of all of this.

The facts in this case will show that Mr. MacLean, he made intentional, deliberate, and calculated statements before and while he repeatedly groped and grabbed her breasts, not just or twice, remember, six times over and over and over again.

I conclude where we began.  This case is about one man imposing his will on another human being, and that is why we are here today.

At the end of this trial, my co-counsel, Michael Kennedy, will have a chance to address you; and at that time,

Mr. Kennedy will ask you to find the Defendant, Robert Sutherland MacLean, guilty of abusive sexual conduct in the special jurisdiction of the United States.  Thank you.

**THE COURT:**  Thank you, Mr. Reeves.

Mr. Clark, you may make your opening statement.

**MR. CLARK:**  Ms. Westgate.

**THE COURT:**  Ms. Westgate, you may make your opening statement.

**MS. WESTGATE:**  Before I begin, I just want to make sure -- am I going to be getting feedback if I'm using both this and sometimes that?

**THE COURTROOM DEPUTY:**  Yes. You'll have to stand away from one -- choose one or the other, and stand away from it.

**MS. WESTGATE:**  Okay.

<u>**OPENING STATEMENT**</u>

**BY MS. WESTGATE:**  Good afternoon, ladies and gentlemen, my name is Jordan Westgate, and I have the privilege of representing Robert MacLean, along with my co-counsel Aaron Clark.

Jury service is a serious responsibility, and we recognize that each one of you have made personal sacrifices to be here today.  While some of you were probably excited or welcome the opportunity to serve, others were more hesitant. Either way, we're really grateful that you're here today because your role is essential.

Our constitution guarantees each person accused of a

crime the right to a trial by a jury of his or her peers, and that right exists only because of people like you.

Ladies and gentlemen, the Government wants you to believe that this is a straightforward case. But if it were truly as straightforward as they wanted you to believe, then there would be clear and compelling evidence to back up the allegations that Ms. Jay has made against Mr. MacLean, evidence that just simply does not exist.

Instead, you'll find that the evidence or more importantly, the lack of it, will show that Mr. MacLean did not grope her. It's an accusation that simply won't withstand under careful scrutiny.

Ms. MacLean has alleged -- or Ms. Jay has alleged that Mr. MacLean touched her inappropriately up to six times on a commercial airline flight, just nearby to ten other passengers and a flight attendant, who had already been alerted to the alleged misconduct, and who had supposedly positioned herself in a manner so that she could see it.

You'll also hear that according to the accusations, that Mr. MacLean, he was speaking loudly, and perhaps offensively, and that he was otherwise engaging in a manner that would be disruptive on a late-night flight that's dark, and there's plenty of people around.

You may also hear from Ms. Jay that because of this alleged behavior, that she was concerned that other people

would hear them, and it would be drawing unwanted attention to them.

We understand that sexual assault is a serious and an emotional topic.  It's one where the accusation alone stirs up powerful reaction.  It's a reaction that's based off of our own personal experiences, our values, and the society that we live in today.

In the wake of the MeToo movement, we have been told that you are to believe women at all costs and under all circumstances, but in this court of law, we demand more.  An accusation alone, whether it be a sexual assault or another crime, that's never enough.  Instead, we require proof beyond a reasonable doubt.  The decision that the Government is asking you to make at the end of this case is one that can't be based off of instinct or feeling.  It needs to be based off of the evidence, and it needs to be based off the law.

Mr. MacLean is presumed innocent until -- he's presumed innocent at the beginning of this trial, and that presumption stays with him throughout the trial unless and until the Government proves his guilt beyond a reasonable doubt.  This is the standard that matters in this courtroom.  As a reminder, the Government bears the entire burden.  Mr. MacLean, he doesn't need to prove or explain anything.

You might be asking yourself what is reasonable doubt?  Reasonable doubt -- it's not a possible or a

speculative or imaginary doubt.  It's the kind of doubt that would make you pause before making your most important life decisions.

A conviction can't withstand because maybe something happened or it seems like something happened or it kind of feels like it, it's possible.  The Government has to prove its case with real evidence.  It has to be solid, consistent, reliable proof.  If there's a reasonable doubt at the end of this trial, your verdict must be not guilty.

This high standard, it's the highest in our judicial system, and it's imperative because it protects against wrongful convictions, and it ensures that a person's liberties are not stripped unless and until their guilt is nearly certain.

Consider this:  When you visit a doctor, and you have a potential health concern, you would expect a thorough examination before the doctor were to recommend a potentially risky --

**MR. REEVES:**  Your Honor, we need to approach.

**THE COURT:**  Sure.

*(Sidebar conference begins at 12:08 p.m.)*

**MR. KENNEDY:**  This is turning into argument.  Your Honor, we're not inclined to interrupt someone in their opening statement, but it's going into --

**MS. WESTGATE:**  We're just presenting what the

evidence will show, Your Honor.

THE COURT:  You think this is argument?

MR. KENNEDY:  This whole part about starting with the burden of proof, and then going through the burden of proof, and about what is happening, and it's just -- it's -- we would not object, but we now think its turning into argument, and that's --

MS. WESTGATE:  I can't hear what Mr. Kennedy said.

MR. KENNEDY:  What I said was we've been -- we tried to not object, but it's turning into argument.  We're now at the point where you're talking about what happens when you go to a doctor's office, and that you're not really talking about the facts of the case, and we think its turning into argument.

MS. WESTGATE:  I'm just giving them an analogy to understand on a more personal level what reasonable doubt is.

THE COURT:  What more are you going to say about that?

MS. WESTGATE:  Just comparing that when there's conflicting evidence or missing proof of a medical diagnosis, you wouldn't make a serious medical decision.

THE COURT:  That is argument rather than stating what did or didn't happen.

MS. WESTGATE:  Well, I'm saying -- the analogy would then follow up with saying that there's omissions in the evidence here that there's missing: witnesses, documents, those

sorts of things.  It's a way to sort of understand --

THE COURT:  That's different than wandering into the medical field as an analogy.

MS. WESTGATE:  I think the analogy is a good way to illustrate sort of what's happening in this case, and what the evidence will and won't show.

THE COURT:  Can you respond to that?

MR. KENNEDY:  Your Honor, she's wanting to wrap up. Again, we do not want to interrupt unnecessarily what she's doing, but we just don't want the case to be argued before the evidence comes out.

THE COURT:  Well, I don't either.

MS. WESTGATE:  I'm going to just be showing that the evidence is not going to show x, y, and z.

THE COURT:  All right.  Do that.

MS. WESTGATE:  Okay.  Do you want me to skip the medical analogy?

THE COURT:  Yeah, I think you should.

MS. WESTGATE:  Okay.

MR. KENNEDY:  Thank you, Your Honor.

*(Sidebar conference concludes at 12:11 p.m.)*

MS. WESTGATE:  Ladies and gentlemen, it's important to have complete and trustworthy information before you're making a serious decision.  The stakes in this case for Mr. MacLean are just as high as they would be when you're

facing any serious decision.  And if the Government's evidence is incomplete, if the witnesses differ, or if they disagree on key facts, or if there are other reasonable explanations that explain the events beyond a reasonable doubt, then that's what you -- then that means there is a reasonable doubt in this case.

As you listen to the Government's case, I encourage you to focus closely on the details.

First, listen to the witness's accounts, and consider whether or not they match up, both with each other, and what they may have said in the past.  In a case like this, memory and consistency, they matter.  Even small variations or contradictions may be important.

Second, ask yourself, "What's missing?"  Are there documents -- are there documents, recordings, or surveillance footage that you would expect to see but that you never do.

Finally, consider who is not here.  Based off the allegations and the testimony of the witnesses that you'll hear later on, are there people who were in a position to see or hear something but whom the Government has chosen not to call?

Your job is to evaluate whether the Government has provided the full and the complete picture, a reliable picture. At the end of the case, we expect that you'll see that that picture is incomplete, that there are going to be conflicts, gaps, and doubts.

Remember, the alleged events you'll hear about in this trial, they didn't happen behind a closed door. They didn't happen in a dark alley. They happened in one of the most public, visible, and confined spaces imaginable. They happened, if they happened at all, they happened on a commercial flight in the first class cabin, where there were rows of passengers, some of whom probably stood up to use the restroom. There was a flight attendant who was walking up and down the aisle. There were people who were nearby within feet of Mr. MacLean and Ms. Jay.

And yet, despite all of this, Wendi Jay's story -- we anticipate her story will not be corroborated by a single other person who was on the flight that night. Why? Because it didn't happen.

The law doesn't ask you to fill in the blanks, and if that's what you must do at the end of the Government's case, then that requires only one thing, and that's a verdict of not guilty. Thank you.

**THE COURT:** Thank you, Ms. Westgate.

Tomorrow morning we'll convene at 9:00 a.m. and hear the witnesses, then we'll hear the closing arguments -- well, I'll instruct you as to the law, then you'll hear the closing arguments, and then you'll go into the jury room to decide upon a verdict.

Remember not to talk to anybody about this case or

communicate in any way, and we'll see you at 9:00 in the morning.  Thank you.

THE COURTROOM DEPUTY:  All rise, please.

*(Jurors exit the courtroom at 12:15 p.m.)*

THE COURT:  You can be seated.

Preliminarily -- people can go if they want.  I just want to talk to the lawyers about something here.

Preliminarily, I'm inclined to deny your motion for lesser included offense.  The authorities cited on page 5 and 6 of the Government's response to that is, I think, reasonably persuasive.  But I haven't decided that final yet.  I'll give a final ruling on that in the morning.

Are there any other questions?

MR. KENNEDY:  Only with regard to that, Your Honor. Would it be wise for us to prepare an alternative instruction that conforms with your stock instruction on that, to have that ready?

THE COURT:  Yes.  Yes.

Mr. Clark?

MR. CLARK:  Well, Your Honor, if the Court is going to be ruling in the morning, is it after the testimony or prior to the testimony?

THE COURT:  Well, I'd hoped to do it prior.  You don't want me to do that, I take it.

MR. CLARK:  Well, let me just offer a thought on

**88**

this.  It's going to be our position, Your Honor, that the only corroborated touching of Ms. Jay is him touching her knee earlier.  If that's the testimony that comes in, Your Honor, I think that there's ample grounds for the lesser included instruction.  That's largely why we're asking for it here.

**THE COURT:**  All right.  I'll give that some thought.

**MR. CLARK:**  Thank you, Your Honor.

**THE COURT:**  Thank you.  We'll be in recess until 9:00 in the morning.

*(The hearing was adjourned at 12:17 p.m.)*

C E R T I F I C A T E

STATE OF UTAH        )
                     )
                     )   ss.
                     )
COUNTY OF SALT LAKE  )


        This is to certify that the proceedings in the foregoing matter were reported by me, Michelle Gonsalves, RPR, CRR, CBC, CSR, in stenotype and thereafter transcribed into written form;

        That said proceedings were taken at the time and place herein named;

        I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

        In witness whereof I have subscribed my name this 12th day of August 2025.




*Michelle Gonsalves*
_____

Michelle Gonsalves, RPR, CRR, CBC, CSR