IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| UNITED STATES OF | ) | |
| AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 2:23-CR-00153DAK |
| ROBERT SUTHERLAND | ) | |
| MACLEAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

BEFORE THE HONORABLE DALE A. KIMBALL

July 22, 2025

Jury Trial

Volume II

**Appearances of Counsel:**

For the Plaintiff:          Michael P. Kennedy
                            Bryan Reeves
                            Attorneys at Law
                            US Attorney's Office
                            111 S. Main Street
                            Suite 1800
                            Salt Lake City, Utah 84111

For the Defendant:          Aaron Clark
                            Jordan Westgate
                            Attorneys at Law
                            Dentons Durham Jones Pinegar
                            111 S. Main Street
                            Suite 2400
                            Salt Lake City, Utah 84111

Court Reporter:

            Laura W. Robinson, RPR, FCRR, CSR, CP
              351 South West Temple, Room 3.303
           Orrin G. Hatch United States Courthouse
                Salt Lake City, Utah 84101
                      (801)201-9731
              Laura_Robinson@utd.uscourts.gov

91

```
                    I N D E X

Examinations                                          Page

  WENDI JAY                                            109
  DIRECT EXAMINATION                                   110
  BY MR. REEVES
  CROSS-EXAMINATION                                    167
  BY MS. WESTGATE
  REDIRECT EXAMINATION                                 209
  BY MR. REEVES
  KYLIE RUIZ                                           221
  DIRECT EXAMINATION                                   221
  BY MR. KENNEDY
  CROSS-EXAMINATION                                    226
  BY MR. CLARK
  REDIRECT EXAMINATION                                 240
  BY MR. KENNEDY
  MARY TINCHER                                         245
  DIRECT EXAMINATION                                   246
  BY MR. KENNEDY
  CROSS-EXAMINATION                                    289
  BY MR. CLARK
  REDIRECT EXAMINATION                                 308
  BY MR. KENNEDY
  KYLIE RUIZ
  DIRECT EXAMINATION                                   311
  BY MR. CLARK
  CROSS-EXAMINATION                                    313
  BY MR. REEVES
  REDIRECT EXAMINATION                                 321
  BY MR. CLARK



                  E X H I B I T S


 Description                                           Page

 Plaintiff's Exhibit 5                                 109
 Plaintiff's Exhibits 1, 3 and 4                       109
```

**Salt Lake City, Utah**                      **July 22, 2022**

**(8:30 a.m.)**

(Conference held out of the presence

of the jury.)

THE COURT:  All right.  Let's talk about this lesser included offense business for a minute. Your response and suggestion is that the 18 USC blah, blah, blah (a)(4) but you asked for (a)(5).

MR. CLARK:  Yeah.

THE COURT:  They didn't ask for (a)(4), they asked for (a)(5).

MR. KENNEDY:  They're very similar, Your Honor.  They do have different penalties; (a)(5) is a six-month misdemeanor; (a)(4) is a one-year maximum misdemeanor.  The reason I chose (a)(4), though, in the suggestion is because --

THE COURT:  He didn't ask for (a)(4).  I mean that is the motion in front of me.

MR. KENNEDY:  But I think either one of them on the elements might be close on the lesser included offense on the elements.  I think the elements both would sort of meet the criteria.  I -- I took (a)(4) because the elements that I provided to the Court come directly out of Tenth Circuit law.  And frankly, I don't know where the (a)(5) elements come from.

That is the primary reason I suggested the different subsection.

THE COURT:  All right.  Mr. Clark?

MR. CLARK:  We got either of them, great. We think that (a)(5) would fit.  And yes, it makes it a little more complicated because there is not a Tenth Circuit pattern instruction on simple assault, but if it is in the code section, then it would fit.

THE COURT:  Is your client going to testify? Do you know?

MR. CLARK:  I would say --

THE COURT:  If he doesn't --

MR. CLARK:  There is a one percent chance.

THE COURT:  Well, then, where does the evidence come from that -- where is the testimony that if there is a touching, it is an -- it is an accidental or, you know, slight on the knee?

MR. CLARK:  From what we heard from Mr. Reeves yesterday, it is going to come from the flight attendant who said she saw Mr. MacLean touch Wendi Jay's knee.

MR. KENNEDY:  And frankly, Your Honor, if that is the defense then.  That none of the touchings happened other than what the flight attendant will testify that she saw on the knee, that is not an

offense.  I don't even think that is offensive touching under the misdemeanor, but it certainly doesn't fit the offense as charged.  And if the defense says nothing else happened, frankly, Your Honor, I don't think that they can get the instruction at all, because if it didn't happen at all, then neither offense is made out.

MR. CLARK:  Well, look, I'm not going to disagree with him that it should not be a not guilty if none of those happened, but as we were looking at the definition of simple assault, it was a forcible offensive touching.  And offensive is defined under the Tenth Circuit and it seems plausible a jury could potentially conclude that touching her knee unwanted was an offensive touching.  That is why we're requesting it, Your Honor.

THE COURT:  Anything else?

MR. KENNEDY:  No, Your Honor.  I think we said it all in our papers.

THE COURT:  Well, I think we'll give the (a)(5) instruction unless Suzie talks me out of it later.

Do you have anything you want to ask them or say, Suzie?

THE LAW CLERK:  No, I think we will probably

95

do, though, some sort of mix between the two proposed instructions.

MR. CLARK:  That makes sense.

THE LAW CLERK:  Do we want to reconvene later after I have done that?

THE COURT:  Yeah, probably have to.  How long do you think these witnesses will take today?

MR. KENNEDY:  It is really hard to tell. One of the things I have the hardest time doing is judging how long any particular witness will take.

Do you have a sense on Ms. Jay?

MR. REEVES:  We just want Wendi to be able to tell her story, her emotion or other things.  I just can't -- you know, at least an hour, but --

MR. CLARK:  For Ms. Jay?

MR. REEVES:  Ms. Jay.

MR. CLARK:  On your direct, you're saying?

MR. REEVES:  Yeah.

THE COURT:  But the other two won't take --

MR. REEVES:  Ms. Tincher could take 45 minutes on direct.

Detective Ruiz will be really short, five to ten minutes on direct at most.

THE COURT:  Normally, we couldn't get a jury picked as quickly as we did.  Had I known your

openings were going to be so short, we would have done the evidence yesterday.  But nothing we can do about that.

THE LAW CLERK:  On the mechanics of the instructions, can I talk to them for a second about that?

THE COURT:  Yeah.

THE LAW CLERK:  So to make it go more quickly, when the evidence comes in today, okay, I am going to do an Instruction 12 like that and I'm going to do an Instruction 12 for if he testifies.  So we can literally just yank out this Instruction 13, about a prior inconsistent statement, which we also won't know about until everyone is done testifying.

MR. CLARK:  Right.

MR. KENNEDY:  Right.

THE LAW CLERK:  Here is my proposal, is to actually make it just a paragraph that would come on. Instruction 9 talks about how you weigh the testimony of witnesses and it goes to the bottom of the page. So my proposal is to just take this paragraph and have it be its own page after 9, so that it looks like it is just the second page of No. 9.  So that if it is not necessary, we also can just yank it out.

MR. KENNEDY:  That makes sense to me.  And,

97

frankly, I think that the concept is already covered in 9 so --

THE LAW CLERK:  Yeah.  It is, yeah.

MR. CLARK:  That sounds great to us, too.

THE LAW CLERK:  And then if the lesser included offense comes in, I guess it is coming in, we will put it in right after the abusive contact instructions.  So as it is now, it would be 22, and then all of these will be renumbered after.

MR. CLARK:  Great.

THE LAW CLERK:  Does that sound okay?

MR. KENNEDY:  Yeah.

THE COURT:  Anything else?

MR. KENNEDY:  No, Judge.  Depending on how direct goes and what defense perceives as possible inconsistent statements from the witnesses, I think particularly with regard to Ms. Jay, but also with regard to Ms. Tincher, we may need a little bit of a break between direct and cross.

There are some questions about whether they can, they will be playing -- want to play audio clips of an interview.  And if they do, exactly what that looks like, whether the audio needs to be admitted and whether it is fair to admit the entire audio, rather than just leave the jury with a clip.  So --

MR. CLARK:  We've been talking about this a fair bit, Your Honor.  We haven't brought it to the Court's attention.  We don't know that it is going to come up.  It is going to depend on what Ms. Jay says on the witness stand today.  And if she says something contrary to what she has said before, we plan to impeach her about her prior inconsistent statement.

Now, if she happens to deny one of these prior inconsistent statements that happened to be on recorded audio with the FBI, it would be our intention to play for impeachment purposes only a portion of that interview that reflects that actually she did make that statement.  That is all.

THE COURT:  Okay.

MR. KENNEDY:  And, Your Honor, I believe under Rule 16 that we would have the opportunity to question her about that first, before she is confronted with it.  And --

THE COURT:  What do you mean?

MR. KENNEDY:  I don't have Rule 16 in front of me, but it does say that the party opponent has the opportunity to question the witness about the statement before the defense does.

MR. CLARK:  I'm not sure it says before,

Mike.  We would certainly be -- but you would certainly get the chance to do that on redirect.  I'm just trying to see if I can pull it up here quickly.

MS. WESTGATE:  Has opportunity to explain or deny it before.

MR. CLARK:  Okay.  Extrinsic evidence offered prior inconsistent statement, unless the Court orders otherwise, extrinsic evidence of witness's prior inconsistent statement may not be admitted until after the witness is given an opportunity to explain or deny the statement.  This adverse party is given an opportunity to examine the witness about it again.

MR. KENNEDY:  We would be the adverse party.

MR. CLARK:  You are the adverse party.  We would not be asking to admit it into evidence, we would just be playing it for impeachment.

MR. KENNEDY:  And, Your Honor, if this were like a transcript, I would have a lot less problem with it, but once you play something for the jury, it is out there in the ether, it can't be unheard.  That bell can't be unrung.  And so I would say that audio is different than a written transcript.

We have a transcript prepared of that recorded report to the FBI.  If they want to examine

her from that, we would have no problem with that. But if they want to play the audio, we think especially given the fluid nature of conversations, that we say something at one point and then you say it, is slightly different at another point. We think under Rule 106, if the audio or any part of it is in, then the whole thing should come in.

THE COURT: Mr. Clark?

MR. CLARK: It is odd to me, Your Honor, that the government would get more insulation because we have a recorded statement where we have the audio, as opposed to just using a transcript.

I think Mr. Kennedy is right. If we play a portion of that audio as impeachment and he thinks there is something else in that audio that completes that statement, then we agree that they should be able to play that, too, if that fits. But we're not asking for it to be admitted into evidence, Your Honor. We're just asking to be able to confront the witness with her audio recording of what she said.

THE COURT: I think they're entitled to do that.

MR. KENNEDY: Okay. And I am not saying that they're not entitled to do it, I'm just -- I am arguing the mechanics is all.

101

THE COURT:  Well, you play part of it or you don't.  I mean --

MR. REEVES:  Excising of a snippet and where that start and stops and the context before and after context matters.  And again, the fluid nature of an interview from start to finish is 19 minutes.  It is not a long interview.  It is 19 minutes.

There is one interview with the FBI tipline that is recorded.  We have a transcript.  So if we're going to excerpt seven words and not have ten words before and 20 words prior, to sandwich that or even the whole context, it's only 19 minutes.  It is not lengthy.

THE COURT:  They're entitled to put parts or maybe all of it if it goes to --

MR. REEVES:  We would move to admit the whole thing.  It is only 19 minutes.

MR. CLARK:  I think as this comes up, Your Honor, we're not going to be playing hide the ball here.  If they have a transcript, if we can point them to exactly what we're looking to play.

MR. REEVES:  We have given you the transcript.

MR. CLARK:  And they have the chance to see it there.  If there is something in the ten words

102

before or ten words after that they feel adds necessary context to that particular statement, and then we play that part, too, if needed.  I don't see a difference here between whether it is audio or whether it is the transcript that we're using.  Your Honor, it is the same thing either way.

THE COURT:  I don't see much difference, if any.

MR. REEVES:  Tone of voice, it goes to the interaction between the two, I think that you learn a lot.  And I think tone of voice and --

THE COURT:  Well, that argument is a transcript may be more helpful.

MR. REEVES:  Again, that may be the solution.  And I will have to correct myself.  A lot of stuff has been back and forth with us.  I need to confirm that you have the transcript or not.

MR. CLARK:  I don't think we have seen it.

MR. KENNEDY:  We actually made that just for our own purposes.

MR. CLARK:  My apologies.

MR. KENNEDY:  Assume you had done the same.

MS. WESTGATE:  We have a transcript.  I have highlighted that.  I could hand it to you before any audio is played.

MR. REEVES:  We're both doing it on the same sides.

THE COURT:  You both have the audio?

MR. REEVES:  Both have audio.

THE COURT:  Complete audio?

MR. REEVES:  Complete audio.

THE COURT:  Anything else I should ask these people?

MR. REEVES:  Good question, Your Honor.

MR. KENNEDY:  This is not one that there is an easy answer to, so we'll do whatever the Court wants us to do.

THE COURT:  All right.  Well, we'll see in a few minutes.

MR. KENNEDY:  All right.  Thank you, Judge.

MR. REEVES:  Thank you, Your Honor, very much.

(Conference concluded.)

(Out of the presence of the jury.)

THE COURT:  Juror Number 11, [name redacted], has just advised us that he has to take frequent breaks, eat frequently.  I don't mean we can't deal with that, we would be taking breaks all of the time, we would never get anything done.  So I think we ought to excuse him now.

104

MR. REEVES:  Juror No. 11?

THE COURT:  Do you know him?

MR. REEVES:  I just know them by their jury number.

THE COURT:  He should have him come up.  He did come up.

MR. REEVES:  It seemed like he handled all of yesterday's events without interruption.  He didn't leave the courtroom once.  I don't know.

THE COURT:  Where is Elizabeth?

THE CLERK:  Do you want me to go get him?

MR. REEVES:  He was stuck in that courtroom for what, 22 hours?

THE COURT:  Maybe he was eating and we didn't know it.

MS. WESTGATE:  I might, too.

MR. REEVES:  If it is not urinary or blood sugar that can be managed by small meals and breaks versus having to interrupt the Court.

THE COURT:  He should have told us.

THE CLERK:  I'll come on this side.

THE COURT:  (Juror No. 11), you said you have to take frequent breaks?

JUROR NO. 11:  No.

THE COURT:  For diabetes?

JUROR NO. 11:  I am just a diabetic.  An apple, meal, or something, and I take my stuff in the morning.  All right.

THE COURT:  So you -- you can go on normal?

JUROR NO. 11:  I can.  I really don't have to do it until this evening.  I'm done for the day.  I'm good.

THE COURT:  Thank you.

JUROR NO. 11:  I don't need to have sugar during the day and stuff, so --

THE COURT:  And the lunch break, that would facilitate it, that would require --

JUROR NO. 11:  No.  Doing pretty good.  I take two medications, one is long-lasting and the other one is just a short one.

THE COURT:  So you feel confident that you can sit for an hour-and-a-half or two?

JUROR NO. 11:  Yeah, I could sit for the whole day now.

THE COURT:  All right.  Thank you.

(Juror No. 11 returns to the jury room.)

THE COURT:  False alarm.  You can go back in.

(Sidebar conference in hallway, out
        of the presence of the jury, concluded.)

106

(9:05 a.m.)

THE COURT:  Good morning, everyone.  We're prepared to proceed.  We'll get the lawyers -- or the jury.

MR. KENNEDY:  We are ready, Your Honor.  Before -- after the jury comes in, but before we call our first witness, we are going to ask the Court's permission to read a stipulation into the record and offer three stipulated exhibits.

THE COURT:  Offer what?

MR. KENNEDY:  Three stipulated exhibits.

THE COURT:  All right.  After they come in?

MR. KENNEDY:  Yes, Your Honor.

THE CLERK:  All rise for the jury.

(Jury entered the courtroom.)

THE COURT:  Ladies and gentlemen of the jury, thank you for being on time.  We appreciate your work and your service.

Mr. Kennedy?

MR. KENNEDY:  Thank you, Your Honor.

Your Honor, with the Court's permission, before we call our first witness, we would like to read a stipulated fact into the record.

THE COURT:  Go ahead.

MR. KENNEDY:  The United States of America

107

and the Defendant, Robert Sutherland MacLean, hereby jointly stipulate and agree to the following facts to be considered by the jury in this case as proven.

One, on March 1st, 2022, United Airlines Flight 5433 from Chicago O'Hare Airport to Salt Lake City was an aircraft in flight for the purposes of federal law. And any events found by the jury to have occurred on that flight occurred within the special aircraft jurisdiction of the United States.

Two, Robert Sutherland MacLean and Wendi Jay were both passengers on United Airlines Flight 5433 from Chicago O'Hare to Salt Lake City on March 1st, 2022.

Three, Robert Sutherland MacLean was seated in seat 3C aisle, and Wendi Jay was seated in seat 3D window in the first class cabin.

Four, all 12 seats in the first class cabin were occupied with passengers on United Airlines Flight 5433 from Chicago O'Hare to Salt Lake City on March 1st, 2022.

THE COURT: Thank you.

MR. KENNEDY: Your Honor, we have marked this as Government Exhibit 5 and move to admit.

MR. CLARK: No objection to that, Your Honor.

108

THE COURT:  Exhibit 5 is received.

(Plaintiff's Exhibit 5 received

into evidence.)

MR. KENNEDY:  And, Your Honor, we also, with the stipulation of the defense, move the admission of three stipulated exhibits, Government Exhibit No. 1, Government Exhibit No. 3, and Government Exhibit No. 4.

MR. CLARK:  That's right.  No objection, Your Honor.

THE COURT:  Exhibits 1, 3 and 4 are received into evidence.

(Plaintiff's Exhibits 1, 3 and 4 received

into evidence.)

MR. KENNEDY:  Thank you, Your Honor.

And, Your Honor, the United States calls Wendi Jay.

THE COURT:  Come forward and be sworn, please, right here in front of the clerk of court.

MR. REEVES:  May I approach, Your Honor?

THE COURT:  Yes.

MR. REEVES:  Go through the double doors.

THE CLERK:  Come forward and be sworn, please.  Please raise your right hand.

**WENDI JAY,**

called as a witness at the request of the Government,

having been first duly sworn, was examined

and testified as follows:

THE WITNESS:  I do.

THE CLERK:  Please come around to the witness box here and have a seat.

And then if you will please state your name and spell it for the record.

THE WITNESS:  Sure.  It is Wendi, W-E-N-D-I, last name is Jay, J-A-Y.

THE COURT:  You may proceed, Mr. Reeves.

MR. REEVES:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. REEVES:

Q.   Good morning.

A.   Good morning.

Q.   Ms. Jay, where were you born?

A.   Milwaukee, Wisconsin.

Q.   And were you raised in Milwaukee?

A.   Either in the area, either the suburbs or in the city.

Q.   Brothers and sisters?

A.   I have one sister.

Q.   Okay.  What level of schooling did you complete?

A.   High school and some college.

THE COURT: Could you just try to speak up just a little.

THE WITNESS: Yup. You got it.

THE COURT: Thank you.

Q. (By Mr. Reeves) During that time or after high school and college, what types of jobs or employment did you seek?

A. My first job was at a manufacturing company and I was a production control assistant. So I helped pull orders to get them out for the day.

Q. Okay. What next?

A. I went to a plastics company, started as a customer service rep, took some college classes on human resources, some certificate programs on human resources, and became their human resources and accounting person for a period of time.

Q. And more specifically, did you have to supervise any --

A. Yeah. So as time went on there, I rose a little bit. And we ended up acquiring other facilities throughout the United States, and I was made the director of human resources. And I was in charge of the people, the human resource departments, in each facility around the U.S.

Q. So it is correct that you supervised the national

111

program of human resources for your company?

A.    At that time I did, yes.

Q.    And not being a human resource director, do you have to learn how to manage what could be sometimes volatile situations?

A.    Sure.  And I've been at terminations.  I've never guessed right how someone is going to react, right?  The people I think will be calm are angry.  The people I think will be angry will be calm.  So it's always going into an unknown situation and just trying to handle it as it comes.

Q.    And are these sometimes also emotional situations?

A.    For sure.  For sure.  I have had to do investigations on harassment and such.

Q.    And you had to train these principles to others?

A.    Yes, in the other facilities.

Q.    Where are you living now?

A.    Jackson, Wisconsin, a suburb of Milwaukee.

Q.    Suburb of Milwaukee.  Was that your residence on March 1st, 2022?

A.    It was.

Q.    Were you working on March 1st, 2022?

A.    I was.  I had worked almost the entire day.  And then towards the end of the day, we started

112

discussing a potential conflict for the next day, when I was supposed to fly to Salt Lake City.

I was presenting for our private equity company some best practices in HR for some of their other portfolio companies so I was doing a webinar the next morning. We couldn't figure out exactly how I could assure the layover gave me time to do that.

So it was decided that afternoon that maybe I should just fly out that night. So I changed my flight to fly out that night. So after work, I went home, grabbed my stuff, and went to the airport.

Q. So this was a last-minute change?

A. It was.

Q. And that last-minute change, did it change the nature of your tickets in terms of also the cabins?

A. Yes. So what I didn't know, that I flew from Milwaukee to Chicago, it's just a quick 30-minute flight. And then in Chicago, while I was making my way to the gates, I got an alert on my phone from United that they had bumped me to first class.

Q. Okay. And again, if I can ask you, what was your itinerary that day for travel? Where were you starting?

A. I started in Milwaukee, layover in Chicago, and then Chicago to Salt Lake City, maybe landing in Salt

113

Lake City around 11:35 p.m.

Q.   Okay.   So hopefully before midnight?

A.   Yes.

Q.   I would like to ask a few questions about boarding the airplane.

As you're approaching your seat, what seat were you assigned?

A.   3D, it was a window seat in first class.

MR. REEVES:   Your Honor, permission to publish what has previously been admitted as Government Exhibit 1.

THE COURT:   Go ahead.

Q.   (By Mr. Reeves)   Ms. Jay, do you see the image on your screen?

A.   I do.

Q.   I will ask the assistance of Ms. Gaitin -- Gaitin, our paralegal, to signify.   Again, your seat was what?

A.   3D.

Q.   And how many seats are in your row -- in your row?

A.   Two.   And then an aisle and then another one.

Q.   When you took your seat, was there someone else sitting next to you in 3C?

A.   There was not.

114

Q.   About how much space was -- is it -- how much space was there between the two seats?

A.   Approximately eight inches would be my best estimation.

Q.   Okay.  Did someone enter the plane and take seat 3C?

A.   Yes.  At almost the very end of boarding, a gentleman came on and took seat 3C.

Q.   Have you ever seen that man before?

A.   I have not.  I had not.

Q.   Did you -- just initially, did you greet him or did he greet you?

A.   He greeted me.  He put out his hand to shake my hand and told me that his name was Bobby.

Q.   What -- did he say anything next, just initially?

A.   No.

Q.   Did you reply with your name or --

A.   I did.  I said, "I'm Wendi."

Q.   What happened next?

A.   He got seated, and I guess we just made small talk for a little bit, why each of us was going to Salt Lake City, you know, that I was traveling for work.  He was traveling to do skiing or snowboarding or something along those lines.

        And I remember we talked about -- the

115

Ukraine invasion had just happened and so we talked a little bit about that.  He told me that his parents were missionaries and that he had been to Ukraine.

We talked about our kids.  He told me he was divorced, that his wife had cheated on him, and that he had four children.  Something we had in common, we both had daughters in law school or already in the profession.  I'm not sure where his daughter was at. My daughter was just finishing law school.

Q.   Did he say anything about politics?

A.   He had some choice words about Putin that he used, and he was definitely aggravated or loud at that point.  And I remember thinking, I hope no one thinks we're together.

Q.   Thank you.

Going back to the initial meeting and putting some context into this time period, 2022, were Covid precautions still in place, meaning were masks required?

A.   They were required on the aircraft and in the airport.

Q.   And when he approached you, was he wearing his mask?

A.   He was.

Q.   Was there any physical contact between you two at

the initial greeting?

A.    Just the shaking of hands.

Q.    Did you reach out your hand to him or did he to you?

A.    He did to me.  And I did take his hand, shake it, and say I was Wendi.

Q.    Going back to that initial meeting, if I may, when the man approached you, known as Bobby, was he staggering in his walk?

A.    No.

Q.    Bumping into anything?

A.    No, not at all.

Q.    Was he slurring his words?

A.    No.

Q.    When you had the initial conversation and you talked about various things including Putin, was it intelligible?

A.    Yes.

Q.    You used the word "loud."  Are there any other adjectives that you would describe that initial conversation or --

A.    The beginning conversation was fairly normal for sitting on an airplane next to someone, so no.  But I do remember it being loud and a little bit -- I was a little bit uncomfortable that other passengers would

117

be irritated.

Q.   Ms. Jay, do you recognize the man that greeted you as "Bobby" in the courtroom today?

A.   I do.

Q.   And why do you recognize him?

A.   His image is burned in my head.

Q.   And do you recognize the person you flew back with to Wisconsin at the end of your trip?

A.   I remember him because he had Tourette Syndrome. And I had just been through all of this and I was flying home and I was like, "You've got to be kidding."

But it was completely fine.  He was yelling stuff out occasionally and had kind of a weird tick, where he would throw his arm out, but he never touched me.  We were in regular class.  There was nothing scary about him.  Once the flight started, he --

Q.   But you --

A.   -- he had this thing, yeah.

Q.   -- remember -- you remember --

A.   I remember thinking you've got to be kidding.

Q.   Can you point out the man who you know as -- who introduced himself as "Bobby" in the courtroom?  Can you point to him and describe an article of clothing

that he is wearing?

A.   He has a blue tie and he is in between the two people at that table (indicating).

MR. REEVES:  Your Honor, may the record reflect that the witness has identified the defendant, Mr. Robert MacLean.

THE COURT:  Yes.

Q.   (By Mr. Reeves)  In your testimony, you said that he informed you that he was divorced.

A.   He did.

Q.   Did you -- did you provide him any information about your family?

A.   I believe I did.  I believe I told him that I was married and I had the two daughters, which is how we got on the law school topic.

Q.   How long have you been married?

A.   Thirty years.  Almost thirty-one.

Q.   As you're taking your seat there, how do you occupy your time when you're on a flight?

A.   I'm a knitter so I usually have at least one project in my purse at all times.  Wherever I go, I have knitting.  And so I have found that I can be very productive on an airplane.

Q.   And did you have a project that day?

A.   I did.  I was knitting my youngest daughter a

119

sweater.  It was my first adult garment.

Q.  Okay.  You described the initial conversation as, I believe, polite; is that correct?

A.  Correct.

Q.  Did that conversation take a turn?

A.  I felt it got a little bit weird after that.

Q.  Tell us what you mean by "weird."

A.  He told me that he was a drug addict at one point and that cocaine was his drug of choice.  And that God had got him through it.  But then he said to me, "Are you a drug user?"  And I was taken aback by that.  No one has ever asked me that.

Q.  Did he ask you if you used any drugs?

A.  He did.

Q.  What drug did he ask?

A.  He just said, "Do you use any drugs?"

And I said, "No, I have never even smoked a cigarette.  I'm really a rule follower," to which he replied, "That's my type, I like that."  That felt weird to me.

Q.  How did you react physically?  Did that change your posture?

A.  I don't recall if it changed my posture.  I recall feeling a little bit aware or like the hair on the back of my neck stood up a little bit.  Not

terribly, but I thought it was weird.

Q.   Had you ever encountered a conversation like this on another flight?

A.   I had not.

Q.   I should have asked for your role in various jobs.  Have you flown before?

A.   Yeah.  So since we had facilities that I was in charge of in North Carolina and Utah, I flew almost every week.  Around that time, I was going to one of the facilities.

Q.   So going back to your reply that you were a rule follower; is that correct?

A.   Yeah.

Q.   And he indicated, according to your testimony, that he liked that answer?

A.   That I was his type.

Q.   And did he say anything more about you?

A.   That he found that attractive.

Q.   What happened at that point?  Did you go back to your project?

A.   Yeah.  Multiple times on the flight I would try to concentrate on my knitting, or at least make it look like I was concentrating on my knitting, hoping the conversation would end.  And for a brief period, it did.  He put on headphones and he was sitting in

121

his seat quietly, listening to headphones, and I was knitting.

Q.   You said that you were hoping the conversation would --

A.   End.

Q.   Why?

A.   It was uncomfortable.  He was fairly loud.  He was a little bit off.  Something felt off to me.

Q.   As part of the first cabin services, was a drink service offered at some point?

A.   It was.  So drinks are free in first class.  And so the flight attendant came and asked if we had drink orders.  I ordered a Vodka and cranberry.

Q.   And did Mr. MacLean order a drink?

A.   Yes, he ordered the same thing.

Q.   The same drink as you?

A.   A Vodka and cranberry.

Q.   What did you make of that, if anything?

A.   I thought it was weird.  I just didn't think that that was something -- no one has ever ordered -- no man has ever ordered that around me before.  I was just a little surprised.  But again, I was like it's not a big deal, it's fine, don't worry about it.

Q.   Were there subsequent drink services offered --

A.   Yeah.

122

Q.   -- to you and Mr. MacLean?

A.   Yes.

Q.   And what happened at the second drink service, if you can remember?

A.   I declined.  That's typically what I would do. If I had a drink, I was going to have one drink.  I declined.  He ordered another and encouraged me to order another, but I did not.

Q.   How did he encourage you to do this?

A.   I think it was like, "Oh, come on, you can have one, too."

Q.   Just casually, or was he moving towards you?

A.   No, just casually.

Q.   Again, at this point, after the first drink service, was the defendant, Mr. MacLean, slurring his words?

A.   He was not.

Q.   Was any of the conversation or the questions that he posed to you, were they intelligible?

A.   They were.

Q.   Now that you've had that second drink service, what happens next?

A.   So he has his headphones on.  He's in his seat, I'm in my seat.  Seemingly, everything is fine.  And then he leans over the armrest which, again, I think

to be about eight inches, and slides one arm under my left arm that is knitting.  So my hands are in front of me knitting, and he slid his hand underneath my arm.

Q.   And I apologize I have to ask you, could you describe or even show how that -- his hand went underneath?

A.   So his arm went under mine, his -- that hand was up here (indicating).  That would have been his right hand.  And then his left hand, he grabbed my arm.  I would say he snuggled up to my arm.  That's what I felt like in that moment, and I definitely tensed.

It felt like something I would do to my husband on an airplane, like, "Aren't you excited? We're going on a vacation," or something.  I never expected the person next to me to do it.

Q.   You used the word "snuggle"?

A.   He snuggled into my arm.  That's what it felt like.

Q.   And is it correct you were pointing and pressing on your left shoulder?

A.   Correct.

MR. REEVES:  May the record reflect that the witness was signaling to her left shoulder?

THE COURT:  Yes.

124

Q.   (By Mr. Reeves)  And again, was his -- what was pressed up against your left shoulder?  Where was his head?

A.   Close, but not on me.

Q.   Is it well -- is this all well beyond the eight inches of space that you have between --

A.   We're certainly more in my seat, our arms.  He's still seated in his seat, but definitely we are -- he is leaned into my seat and we are definitely in my perceived space.

Q.   Does he say anything to you at that point?

A.   He does.  So he like snuggles in and then says, "What are you doing?  Teach me how to knit."

Q.   How did you respond to that, or what were you thinking with that question?

A.   I was thinking there's no way he wants me to teach him how to knit.  That is weird.

Q.   Then what happened?

A.   I didn't know what to do.  I didn't -- I'm not really going to teach this man how to knit.  And so I think I just said, "Well, I'm making this sweater for my daughter, my youngest daughter," and kind of just left it at that.  I didn't give knitting instructions or anything.

          And he stayed there for a couple more

125

seconds.  And then when he took his arms away, it slid with a little bit of pressure down my breast.

And at this point, I know I was tense.  I know the hair on the back of my neck stood up.  It was like, Well, it might have been an accident, right?  He is very much in my space.  And to pull his hand away, maybe he didn't mean to do that.  I am not a small chested person.  It has happened where people bumped me.  So I just gave him the benefit of the doubt.  I didn't say anything.

Q.  So what words or adjectives would you use to describe the pressure that you felt at that particular moment of contact?

A.  It felt like more than a brush, but it wasn't a grab.  But it felt like he pushed down on my breast with the back of his hand as he removed it.

Q.  What were you thinking?  What were your thoughts mentally at that point?

A.  That there's a lot of red flags here.

Q.  Okay.  Did the contact -- did the contact happen again?

A.  It did.

Q.  Can you tell us about that?

A.  A little bit -- a little time would pass and he just reached over and grabbed my breast, and he

126

definitely closed his fingers around it.  It didn't hurt per se, but it -- there was no thinking again like that was an accident.  There was -- there was -- I was in my seat.  I was in my space and he had invaded my space.  And it wasn't a brush.  He had no reason for his hands to be over there.  And he definitely tightened his fingers when he did it.

Q.   So he has moved in closer, according to your testimony, and he's grabbed your breast?

A.   Yes.  And so --

Q.   What did you say?

A.   I said, "Listen, pal, keep your hands to yourself."  And I pushed his hands away.  He might have been taking them back at that point, I don't really know.  I know that I pushed away and that is when I said, "Listen, pal, keep your hands to yourself."

Q.   Can you show the members of the jury how or the speed at which you pushed it away at that point?

A.   Like fairly fast.  Like as soon as I felt it, I was pushing him back.  And yeah, I just remember saying, "Listen, pal, keep your hands to yourself."

Q.   How did he respond?

A.   He said, "Sorry, sorry, sorry.  I should leave you alone.  I find you very attractive.  I think

you're sexy," and then, "I'm sorry.  I should leave you alone."

Q.   Did he stop talking to you at that point or did he ask you anything else?

A.   No.  There's no -- there's no conversation between us during this time, other than him saying -- you know, like he would say, "I think you're beautiful.  I am really attracted to you," and he was sorry.  That was all that was being said.

Q.   He called you sexy; is that correct?

A.   He did.

Q.   And this second incident, the grabbing of your breast, was it with your consent?

A.   It was not.

Q.   Did he ask permission?

A.   He did not.

Q.   Did he ask permission to say any of these statements to you?

A.   At one point he said, "Can I tell you you're sexy?"

And I responded, "You just did and let's not do it again."

Q.   Why did you say it that way?

A.   It is just really uncomfortable.  And I -- honestly I thought, I am a 50-year-old overweight

128

woman and he thinks that I'm flattered by this, and I was not flattered by it.  It was very uncomfortable.  Every time that he would -- what he probably phrased as a compliment, it made me very uncomfortable.  It didn't feel like he meant it.  I felt like he was degrading me.

Q.  What else did you feel in that seat?

A.  I felt alone, trapped.  He's on the aisle, I'm on the window.  My preference with United is I want an aisle seat.  I just don't like to be trapped in, no matter who I'm sitting next to.  But now I'm sitting next to someone I really don't want to sit next to and I'm trapped.

Q.  So it is your testimony he has already touched you twice, and if you wanted to exit at any time for any reason to the aisle, what --

A.  I would have had to ask him to move.

Q.  And if he didn't want to move, what would you have to do?

A.  Cause a scene.

Q.  Did you want to cause a scene?

A.  I didn't.  At this point in the flight, everyone has their lights off.  The entire first class is asleep.  I'm the only one with my light on and I am not turning my light off for anything.  It is the

only thing that makes me feel a little bit better, right?  Like I'm not turning it off.  I don't care if people are trying to sleep and my light is bothering them, I'm not turning my light off.  I'm alone.  I am trapped in my seat.  And I have this man next to me saying things I don't want to hear.

Q.  So is it your testimony that the cabin lights -- I would like to ask some questions about your environment.

You said that it was dark?

A.  It was dark.

Q.  What do you mean by "dark"?

A.  They had dimmed the cabin lights.  Nobody had a reading light on.  I had it on for knitting, obviously, and I kept mine on.

Q.  Do you remember what others were doing in that cabin?

A.  It was quiet.  I don't know if they were sleeping or they were resting, but it was quiet.  There was no other chatter.  That's part of the reason when he was loud I was uncomfortable, because people weren't loud, they were quiet.  It was a later night flight. People were sitting with their eyes closed.  Their lights were off, no one was reading, no one was talking.

130

Q.   But looking back at Exhibit No. 1, how many other passengers were there in that first class cabin?

A.   There are 12 in first class on that particular jet.

Q.   And you don't remember anyone around that was active or --

A.   No one ever turned around and looked at us.  I don't -- I don't know about the seat behind me.  I don't know if they were disrupted.  I couldn't see them.  And then there was one person across the aisle that was quiet in the dark.

Q.   But is it correct you were worried about disturbing them?

A.   I was.

Q.   Why?

A.   That is a good question.  I -- I don't know. That's just who I am, right?  Like everyone has been on a plane where somebody is loud and you just want to rest.  And I -- I don't like to draw attention to myself.  I didn't want to repeat everything he was saying.

Q.   Now, did he -- what did he do next after that?

A.   I know that I had moved as far to the window as I could, and I was sitting up close to the edge of my seat.  My head was pretty close to the seat in front

131

of me, just trying to like get out of reach.  And I was startled that he again reached under my arm and his hand was there again.

Q.   Let me ask you this:  So this is the third time that he has touched you?

A.   Correct.

Q.   Can you describe what you felt, physically felt, on this third time?

A.   The same kind of grab as the last time.  Again, not enough to hurt, but enough to know it was happening.

Q.   Was there pressure?

A.   Yes.

Q.   Did you feel fingers?

A.   I did.

Q.   Was it with your consent?

A.   It was not.

Q.   As he is grabbing you, for the third time, what did you do?

A.   I told him to please stop touching me.  I asked him to leave me alone.  I am pretty sure at this point I might have started to cry a little bit.  Not really meaning to, but maybe not crying, maybe welled up, weepy like.  And, you know, it was just like, "Please just leave me alone.  Please don't touch me."

132

Q.   How did you remove his hands?

A.   Again, I just pushed them away.

Q.   Does he leave you alone at that time, the third time?

A.   There is one more grab after that.  And again, I asked him to please leave me alone.  He does -- every time I say this to him, anything I say to him, he's got a pretty stock response of, "I'm sorry, sorry, sorry.  I find you really attractive.  I'm sorry.  I should leave you alone.  You're just really sexy."

Q.   Let me ask you, so this is now the fourth time. So after the third grab, he grabbed you a fourth time; is that correct?

A.   He did.

Q.   And where are you -- what is your physical posture and where are you?

A.   I'm as close to the edge of my seat and up to the window in the seat ahead of me as I can get.

Q.   Why are you doing that?

A.   Because I -- I don't know what else to do.  He's not listening.  I'm just trying to remove myself. I'm trying to stay out of his reach.

Q.   When he was -- when he made these comments to you, during and after the grabbing, was he slurring his words?

133

A.  He was not.

Q.  Was he intelligible?

A.  He was.

Q.  Does he say anything?  How does he react?

A.  He tells me he's going to leave me alone now.

Q.  Does he get up at any point?

A.  This is when he gets up.

Q.  What is he doing?

A.  He gets up to go to the bathroom.

Q.  What do you do immediately?

A.  I wait until I see the door close in first class for the bathroom, and I hit my call light for the attendant.

Q.  I would like to slow down for a second.

You pressed the call light for the attendant.

A.  Yes.

Q.  Why are you doing that, at that time?

A.  I wanted to ask for help.

Q.  What are you feeling at that time?

A.  Vulnerable.  I can't move far enough away.

Q.  Have your feelings escalated or de-escalated because he's now in the bathroom?

A.  I think I am probably a little bit relieved that he's out of the -- out of my perimeter for a minute

134

or two.  And it gave me the opportunity to call for help.

Q.  Did you feel threatened when he was gone in the bathroom?

A.  No.

Q.  Did you feel threatened when he was not in the bathroom?

A.  When he was in the seat, I felt threatened.  If he was standing, which he really only stood up to go to the bathroom, and sometimes when he would have his headphones on with his eyes closed, I would think maybe he's asleep.  Maybe he'll stay asleep for the flight.

Q.  Maybe this is an odd question, but did you ever hear him snore?

A.  I didn't.

Q.  You have signaled for help according to your testimony.  What happens next?

A.  The flight attendant comes.  She stands in the aisle and asked me what I need.  And I said, "Can you please stop serving him alcohol?  He's getting really handsy and I'm very uncomfortable."

Q.  What do you mean by "handsy" in your experience?

A.  He is groping me essentially, right?  He's not keeping his hands to himself.  He's not staying in

his space.  He's invading mine.

Q.   So you told the flight attendant that he's getting handsy, and what else?

A.   And I'm very uncomfortable.

Q.   What did she say?  How did she respond?

A.   She says, "You saw" -- she said, "You saw on the last drink service, I was reluctant to give him a drink."

Q.   What did she do next?

A.   She stands there a second and then she continues down the aisle into the main cabin.

Q.   She left you?

A.   She did.

Q.   At this point, you both still have -- do you have your masks on?

A.   He's in the bathroom still.  I have my mask on.

Q.   Did she?

A.   She did.

Q.   But she left?

A.   Yeah.  And so --

Q.   What did you feel at that point?

A.   Definitely alone, like I thought she was going to help me.  I thought she came right away, I thought she was going to help me.  And I just -- I kind of gave her the benefit of the doubt, that maybe she

136

didn't hear me.  You know, we have masks on, the plane is loud.  Maybe she didn't hear that part.  I can't imagine why, if she heard it, she would walk away.

Q.   What did you do at that point physically?

A.   Just stayed as far over in my seat as I could.

Q.   And she didn't come back immediately at that point?

A.   If she came back, she didn't say anything to me.

Q.   Did he come back?

A.   He came back after about ten minutes.

Q.   So approximately ten minutes, your best recollection, he comes back.  Does he take his seat?

A.   He does.

Q.   Does he look your way or say anything at that immediate point?

A.   No.  I don't know if he looked.  I wasn't looking at him.

Q.   Okay.  So you were turned away?

A.   I was.

Q.   Did you go back to your knitting or did you try to occupy your time in a way?

A.   I don't think I was knitting, but I was -- I mean I maybe did a stitch or two just to look like I was knitting, but I definitely wasn't knitting.  When she

137

didn't -- she didn't do anything, I was trying to figure out what I would do next. Knitting was just a way for me to look busy.

Q. You just said you were trying to think about what you would do next. So what was -- at that point, what was your goal? What was your objective at that point in the flight? And this is after four gropings.

A. I just wanted him to leave me alone.

Q. Did you want to get off the plane?

A. For sure.

Q. He comes back from the bathroom. And is it your testimony on the fourth time he said he would leave you alone?

A. He did before he went to the bathroom. He said, "I will leave you alone." He went to the bathroom, he came back. He didn't say anything.

Q. Has he said "I'll leave you alone" a few times?

A. Yes. Every time I have said -- maybe not -- no, he had said, "I should leave you alone." The only time he said, "I will leave you alone now," is when he went to the bathroom.

Q. What do you make of "I should leave you alone"?

A. I feel like he's saying he can't help himself. Like every time he says, "I'm sorry, sorry, sorry. I

138

should leave you alone," it's as though he knows but he's not doing it.

Q. Does he leave you alone after the fourth groping? He's back from the bathroom.

A. There's a period of time where he has his eyes closed and his headphones on, seat reclined, and he doesn't do anything.

And then I probably let my guard down a little bit. I thought maybe he was sleeping, or, you know, like maybe the worst of it was over. And then I feel him grab me again.

Q. What did you actually feel physically?

A. I felt a lot of pressure and I felt fingers and I just felt his nearness to me.

Q. How did that make you feel?

A. I know on this one I was mad. I was like, "This is crazy, who does this?" I just keep thinking this is surreal. Why is this happening? This can't be happening to me.

I think about standing up and causing a scene. I can't do it. I keep telling myself I should do it but I can't do it, because it just feels so humiliating. I feel like to tell somebody that he's calling me beautiful, they are going to be like, "What? You're a 50-year-old overweight woman, he's

139

calling you beautiful?"  It is just -- it was just so degrading and so humiliating.

Q.    And that gave --

A.    And I just didn't want to like stand up and have everybody turn their lights on and look at me.  I know I should have stood up and I wanted to.  I just could not do it.  Just could not.  I would open my mouth to like yell something, and I just could not make myself do it.  I was just like, just get through this.  You know, we're getting close, we're almost done.

Q.    Did you feel no one would believe you?

A.    I felt as though he was treating me like I should appreciate the flattering comments, but they weren't flattering to me.  And yeah, maybe I thought no one would believe that he would say those things to me, I guess.

I just know I should have stood up, but I just could not.  If it had happened to somebody else, I know I would have stood up and said that it is happening to me.  I didn't know what to do.

Q.    What words would you describe that feeling -- that feeling?

A.    I felt very vulnerable.  I felt humiliated.  I felt degraded, harassed, like he just wouldn't leave

me alone no matter what I said.  I have not experienced that.

Q.   Did you feel free?

A.   Did I feel free?  No.

Q.   Did you feel trapped then?

A.   I felt stuck and trapped.  I just wanted the flight to be over.  I just wanted to land.  I knew I had a really long walk to the gate.  I knew I was tired.  I was tired of doing this with him.  I just wanted it all to end.  I just wanted to get off the flight and go to my hotel and pretend this never, ever happened.

Q.   This fifth time that he grabbed your breast, was it with your consent?

A.   It was not.

Q.   After this happened, what did Mr. MacLean do?

A.   Sat back in his seat again, put his headphones on, closed his eyes.  He did not have his mask on, not sure why, just know he didn't have it on, or maybe it had been askew and it was off now.  I don't really know, but his mask was off.  And he appeared to be like resting or sleeping.  I don't know.  He wasn't talking to me, wasn't saying anything.  He was in his seat.

Q.   So it is your testimony that you have now been

141

touched or grabbed and groped five times, correct?

A.   Correct.

Q.   And it was your testimony that you were now upset and mad, correct, and the defendant put on his headphones?

A.   He did.

Q.   And Mr. MacLean closed his eyes?

A.   He did.

Q.   What happened next?

A.   I think I probably was in tears at this moment. And the flight attendant walked by and we made eye contact and she didn't say anything. And then a couple of minutes later, she came back with a napkin and handed it to me.

Q.   She came with a napkin. Was that to wipe your eyes?

A.   There was writing on the napkin. She had written me a note on the napkin.

Q.   There was writing.

MR. REEVES:  Your Honor, permission to publish to the witness what is marked as Government Exhibit 2A and 2B, please.

THE COURT:  Any objection?

MS. WESTGATE:  No, Your Honor.

THE COURT:  2A and 2B are admitted into

142

evidence and may be published.

MR. REEVES:  Thank you.

Q.   (By Mr. Reeves)  Do you recognize what is marked as 2A and 2B, Ms. Jay?

A.   I do.

Q.   And how do you recognize them?

A.   2A is my handwriting and 2B looks like the napkin that I received from the flight attendant.

Q.   Okay.

A.   Can I take a step back?

Q.   Yes, please.

A.   So I think why she gave me this note was that she came to our seats and was going to wake him to put his mask on.  And I said, "Please don't wake him up." And she stared at me for a second and then she walked away.  Then she came back with the note.

Q.   Okay.  So when he put on his headphones and closed his eyes, his mask was off?

A.   It was.

Q.   Okay.  Could you please -- could you please read 2A for the members of the jury.

A.   "Are you okay with sitting by him?  I don't want to wake him up either.  Are you feeling" -- I think it's supposed to say uncomfortable at the time.

"Do you want me to do anything?  I can have

143

the police meet us at the gate" -- "police meet the plane," sorry.

Q.   Can you read -- and again 2B is your handwriting?

A.   2B is my handwriting.

Q.   Could you read what you wrote to her?

A.   I wrote, "I feel like an idiot but he's groping me and saying inappropriate," and then in parentheses, "what he probably thinks are flattering comments," end of parentheses.  "I'll just stay on the plane until he gets off.  I don't want to cause a scene.  And I'm okay.  Thank you.  And I'm good if he's sleeping."

Q.   First, what do you mean, "I'm good if he's sleeping"?

A.   A little bit of time had passed and he had kind of left me alone.  So I thought if he stayed asleep, she didn't wake him up, she didn't make him put on his mask, it was probably done.

Q.   Earlier you said that you felt threatened in his presence.  When he was sleeping, did that change your analysis that was in your head?

A.   I thing a couple of times it did, and I was wrong, obviously, because he would touch me again.  But this, a little more time had passed and he stayed like that.  And so I did feel like, okay, he must be

144

asleep, let's not cause a scene, just leave him.

Q.   Now again --

A.   If he wakes up, then I have a problem, right? But if he's sleeping, that's why I say, "I'm good if he's sleeping."

Q.   Again, can you describe the environment of your cabin at that point?  This is after five grabs and gropes.

A.   Still dark, still quiet, still the only one with my light on.

Q.   Can you explain, why did you say, "I feel like an idiot"?

A.   It comes back to the comments, like I just -- it was -- I don't know his intention in the comments, but they were humiliating to me.  They were degrading.  And they were like saying because he thought those things, it was okay, or maybe he thought that I would find them flattering.  And so I just felt stupid.  I felt stupid that I had given him the benefit of the doubt the first time that this was happening to me.  I don't know how to explain why it feels humiliating.  I don't really know, but it is. It's just -- repeating it would be humiliating.

Q.   Why did you say that you didn't want to have the police waiting at the plane?

145

A.   Honestly, I just wanted the nightmare to be over. I just wanted to get off the plane and go to my hotel.

Q.   What did you do at that point, physically?

A.   Still just in my seat, minding my own business, sort of knitting, thinking about the long walk at the Salt Lake City Airport to get to Terminal A, and knowing that I didn't want to walk with him that whole walk.

Q.   What else were you thinking about about that night -- what would happen that night?

A.   I'm sorry, I don't understand.

Q.   Were there any other thoughts that were going through your head, as your testimony is that you were processing what would happen after you left the airport or left the plane?

A.   No.  I just -- I had a moment where I thought I should have told her to call the police, then I just went back to this is just almost done.  You can get through this, Wendi, you got this.  You're almost done.

Q.   Did your interactions with Mr. MacLean stop at the fifth groping?

A.   They did not.

Q.   What happened?

146

A.   He's leaving me alone.  He is in the seat to my left.  I am in my seat.  He's still reclining and he's still not wearing his mask.  He still has his headphones on.  He really hasn't changed very much.

And suddenly the seatbelt light dings on and someone, I assume the captain or pilot, or I'm not sure, says that we need to put our seatbelts on.  I have my seatbelt on.  I've never taken my seatbelt off.  He pops -- he pops up and without leaving his seat, he's still sitting, he twists towards me and puts one hand on each breast and says, "We need to get you in a seatbelt."

Q.   He used both hands now?

A.   Correct.

Q.   What did you feel?

A.   I felt both hands on my breasts and legs.  It was so unbelievably brazen at this point.  You just can't even believe this is happening to you.  Who does something like this?

I'm in my seatbelt.  I'm on a plane.  I'm traveling for work and I've done nothing.  And he's so brazen to do that, it made me feel degraded.

Q.   So now he has grabbed your breasts for the sixth time?

A.   Correct.

147

Q.   What does -- what do you say?  What do you do at that point?

A.   I push his hands away.  I don't know if I said anything.  I was just -- I know I started to cry for sure.  I was tired.  I had been tense this whole flight.  I just wanted the nightmare over.  I just wanted to get off the plane.  I just wanted to go to my hotel and pretend none of this had ever happened.

Q.   What did he say, if anything?

A.   I don't recall.  Maybe another "sorry."

Q.   I'm sorry?

A.   Maybe another "sorry."  He usually said "sorry" after he did it to me.  He might have said he was sorry.

Q.   It is your testimony that he said "I'm sorry" multiple times during this flight?

A.   Every time I had pushed his hands away, he has said he's sorry.

Q.   It is your testimony that he said, "I think you're really sexy," or something to that effect multiple times?

A.   Yes.

Q.   And finally, on that line of questioning, has he said that he will leave you alone multiple times?

A.   He did.  And actually, he did say that.  You're

148

right.  He did say that again.  And this is the first time I think he actually said, "I will leave you alone," not "I should leave you alone."

Q.   You said that the signal for descent or -- were you descending in preparation for landing?

A.   I think it was just a little bit before that. Maybe the very, very beginning of coming in.  And yeah, so the seatbelt sign went on.  It wasn't the sit up in your seats yet and all that stuff.  That was still to come.  But definitely, we were told to put on our seatbelts and we were close.

Q.   So there's time that will elapse between the sixth groping and landing?

A.   Yes.

Q.   What happens during that time?  Did you see the flight attendant again or was that the last time you saw her?

A.   She did eventually wake him up to tell him to put on his seatbelt, put on his mask, prepare for landing.  You know, move his seat up and such.

Q.   Was he responsive to her?

A.   He was.  He did what she said.

Q.   That sixth grabbing, was that the last time that he touched you on the flight?

A.   It was.

149

Q.   Did he do that with your consent?

A.   He did not.

Q.   Did he ever have your consent?

A.   He did not.

Q.   What are you doing physically now as you're approaching Salt Lake City, physically?

A.   Just sitting in my seat, probably put my knitting away, put anything I had taken out away.  My light is still on.  I think the cabin lights are on at this point as we're preparing to land.  That is it.

Q.   What are you thinking now?

A.   I'm almost done.

Q.   The plane lands, what happens?  Walk us through that.

A.   We land very quickly.  After the ding of you can take off your seatbelt and start collecting your things, he takes off his seatbelt immediately, pops up to the standing position, collects his things, and is one of the first people off the flight.

Q.   Let's talk about that, but --

MR. REEVES:  Can we go back to exhibit -- can we publish Exhibit 1, Your Honor?

THE COURT:  Yes.

MR. REEVES:  Thank you.

Q.   (By Mr. Reeves)  Are you -- there we go.

A.    Sorry.

Q.    Ms. Jay, can you see that Exhibit 1?

A.    I can.

Q.    And you see where you're located?

A.    Correct.

Q.    In 3D?

A.    Yes.

Q.    He was one of the first off?

A.    He was.

Q.    There's two rows ahead of him.

A.    He had popped up very quickly when the seatbelt light went off, and we were parked at the gate.  He popped up pretty quickly, and he was either one or two off the plane.

Q.    None of the folks in one or two were able to exit first?

A.    Maybe one person.

Q.    Okay.  What did you do?

A.    I stayed in my seat.

Q.    Why?

A.    I wasn't getting off the plane.  If you've been to Salt Lake City Airport, I guess it's changed now, there was a really long walk from A terminal to B terminal, and I didn't want do it with him.  I didn't want him to be there when I was getting my Uber.  I

151

just wanted to be as far from him as I could be.

So as I told the flight attendant, I was just going to stay on the plane until all of the main cabin deplaned and then I would get off.

Q.   Did all of the cabin deplane?

A.   No, they did not.  So while he was standing, waiting for the door to open so he could get off, he leaned over and he said, "It was nice talking to you."

Q.   Before Mr. MacLean left, he said what?

A.   "It was nice talking to you."

Q.   And then he left?

A.   And then he left.

Q.   Were you approached by anyone after that?

A.   So I was still just in my seat, letting everybody get off.  There was a delay.  Something happened in the main cabin with deboarding.  I don't know what it was, but they weren't coming.  First class was off, they weren't coming.  And I noticed that he had left his headphones on the seat, so I handed them to the flight attendant and I said, "He left his headphones."

Q.   Again, maybe an odd question, you've been groped, grabbed, caressed six times.  Why would you hand his headphones to the flight attendant?

152

A.   I just didn't want him to be back on the plane. I didn't want him to come back and get on.  I was hoping that she could stop him before he got back on the plane, if he knew he left them.

Q.   Did anyone else interact with you as you were about to exit the plane?

A.   So the flight attendant told me that the gate agent wanted to speak to me and wanted me to file a statement with United.  And so the gate agent came onto the airplane.  This is between first class and whatever is holding up the main cabin from getting off.

And so she said, "I'd like to talk to you, and we can go up to the gate and talk in private." And so her and I were on our way up to the gate.  We were in the jetway or gangway, I don't know what it's called, and I looked up and he was coming down the gangway.

Q.   What did you do?

A.   She had started to ask me some of the questions and I said, "I don't want to talk about this until I know he's not around."  And I said to her, "That's him.  He left his headphones.  I don't want to talk about this until he's not around."

And so she walked me up to the gate and we

153

stood there awhile.  I didn't know -- I don't know why he was down there as long as he was, maybe five minutes.  It seemed weird, but we stood there for five minutes saying nothing.  And then finally, he came up, he looked at us and then he left the gate area.

Q.   Once he had cleared the gate area, did you start to talk?

A.   I did.  She said to me, "I heard you had an incident on the airplane."

And I said, "I did."

And she said, "I heard he was touching your leg."

And I was like, "No.  I don't know where that came from, but no, he was touching my breasts repeatedly, after I had asked him not to."

And she said, "I'm sorry, and can I take your statement?"  And she called somebody on the phone.  They were listening, too, and I gave my statement.  During my statement, the flight attendant and the pilot came out and talked to me.

Q.   Let's talk about that.

She said she thought that he touched your leg or your -- what did you say?

A.   My leg.

154

Q.   Now, during that flight, it's your testimony that the defendant on multiple occasions leaned over into your space, well over that invisible line?

A.   Absolutely.

Q.   Do you remember him touching any other part of your body?

A.   I don't.

Q.   Could that have happened?

A.   Anything could have happened I guess.  And it felt all so surreal so I guess he could have.  To me, that wouldn't have probably warranted how upset I was if he had just touched my leg.

Q.   If it had happened between the second groping or between the fourth or fifth groping, would you be able to -- would you be -- would you have recognized that as significant after being groped?

A.   I don't think so, no.  I don't know that he did it either.  I don't.  It's not something that I recall.

Q.   So back to your having a conversation with a United representative.

A.   Correct.

Q.   You tell her the events that transpired?

A.   Correct.

Q.   And how did she react when you told her that you

155

were being groped multiple times?

A.   She was surprised.

Q.   Okay.  You said that the pilot came and spoke to you as well, and the flight attendant who was on the flight; is that correct?

A.   Correct.

MR. REEVES:  Now, I should say when I asked the question about the pilot, the witness nodded her head.

THE WITNESS:  Sorry, yes.

Q.   (By Mr. Reeves)  Did you recount to them the events or what happened to you on the plane?  Just what you said to them.

A.   I am not really sure that I recounted everything. I know they were standing there.  They were probably hearing me say it to the gate agent.  And then when they talked to me, the pilot said, "I'm sorry."  He said, "I was aware that this was happening."

Q.   Did you -- did you leave -- after you had finished your conversation, did you leave alone?

A.   No.  They walked me -- they were going to walk me all the way to the Uber stand.  Probably a half hour to 45 minutes had passed since I got off the plane, giving my statement.  They called United.  You know, United said, "We've got this.  We know who he is."

They told me he was a Global Services passenger.

Q. Let me go back to when you're leaving the airport.

You didn't walk alone to catch your Uber?

A. I didn't.

Q. You were escorted? Is that your testimony?

A. I was escorted from the B gates to the A gates.

Q. Okay. Did you make it to your hotel?

A. I did.

Q. About what time do you estimate this must have been?

A. I feel like one o'clock, around.

Q. So this is now March 2nd and you have a corporate call, the purpose for your trip at 8:00 a.m., I believe your testimony was?

A. Correct.

Q. On that call, are you -- do you have a specific role or are you ancillary to that call?

A. I am the presenter for best practices in HR.

Q. Okay. So you get back to your hotel. Do you go to sleep or do you call anyone?

A. I called my husband. That is why I think it was about 1:00, because I remember thinking it's 2:00 his time. He'll never answer.

Q. So you spoke to your husband?

157

A.   He did answer.

Q.   Did you call anyone else that night or in the morning, early?

A.   So John and I had agreed that I was going to sleep on it and talk about it in the morning.  He was upset.  So he actually woke me up the next morning before my alarm.  He called and it was, I don't know, 6:00 a.m. probably.

Q.   So you spoke again that morning?

A.   We did.

Q.   Did you speak with anyone else?

A.   I called my daughter.  My daughter was an intern at the prosecutor's office in a county in Wisconsin, and I thought she would understand.  And I -- United was telling me, you know, that night before I left, if I changed my mind, to call the police in the morning.  I just wanted someone to tell me was this even worth -- I remember saying to Alyssa, "He didn't rape me."

So I just wanted some legal advice, like is this even a crime?  This does -- does it -- just somebody tell me.  And then I talked to her for a little bit, she gave me some great advice.  She didn't tell me what to do, she gave me pros and cons, and then I called United.

158

Q.   So after that night, I think it was your words were that "nightmare flight," you were wondering if that was even a crime?

A.   I mean I think I knew he shouldn't have done it, but I didn't know how seriously someone would take it.  He didn't rape me.  He didn't go underneath my clothing, but I felt violated.

And I didn't know -- I've never done this before.  I never had somebody do this to me before. And I remember asking Alyssa, "Is this a federal crime?  Because if it's a federal crime, I don't want to do this."  Like that seemed too big, right?  That seemed scary.

And Alyssa is like, "Oh, you probably won't end up in court.  You won't have to do this."

And I'm like -- you know, I was just scared. And so she talked me through it.  She didn't tell me what to do.  She gave me both sides.  And I called United first to try to get somebody to talk to me. They didn't have a record of what I had.  And so I called the Salt Lake City Police Department.

Q.   Okay.  So you reported to one form of law enforcement that day?

A.   I called the nonemergency line for the Salt Lake City Police.

159

Q.   Did you ever subsequently call the FBI tip line?

A.   Yes.  So a couple of days into the -- maybe the day after I had the incident, or maybe it was probably two days later, somebody from United called and she apologized.  She was from services.  She talked to me.  She told me where my file was, that if I just called, not everyone would have it, not every United employee would have access.  Because I was scared that it was going to get lost, like his name was going to be lost or, you know, the flight attendant wasn't going to remember.  I just wanted somebody to just say like, "We got it."

And so I called Salt Lake City Police to do that.  And then I called United again.  And then she called me back, gave me all of the information.  And she said to me at the end, "This is a crime.  You should call the FBI."

Q.   And did you call the FBI?

A.   I waited a day or two to try to decide, and I did, I called the FBI.

Q.   Because calling the FBI meant what to you?

A.   That he couldn't do this to someone else.  That I was showing my kids, my daughters, that you don't have to put up with this.  This isn't okay.  And as humiliating as it felt, I didn't deserve that.  I

didn't do anything to him.  I stayed in my seat.

Q.   Ms. Jay, I'd like to ask you, how has the events that transpired on that flight affected you emotionally at this point?

A.   I was flying once a week for my job and I've never felt afraid.  I never paid attention to who was coming down the aisle to sit next to me.  I didn't care if it was a man or a woman, someone big or someone small.  It never even occurred to me before that day.  Now I care.  I care who's going to be sitting next to me.  I pay attention.  I will never sleep on an airplane ever.  I was naive to that.  I will never be able to do that again.

Q.   Just to clarify, I didn't hear, you can't sleep?

A.   I will never sleep on an airplane again.  Like I had done that, everybody does that.  That's what I thought when I got that first class bump, maybe I'll be able to take a nap, but I can't do that to this day.

I realized that my seat isn't my own.  My space is not my own.  And then not everyone looks at it the way I look at it, like you just stay in your space and you are polite.  But, you know, I don't know.  I just -- I've lost the naivete that it's a really safe thing to do.

161

Q.   How has it affected you, I guess mentally, or your confidence?  How you think about things?

A.   It's still humiliating.  And I don't tell people about this.  I didn't go home and post it on Facebook.  I didn't -- I didn't tell anyone.  My family knew and that was it.

Q.   Did you seek any additional help since then?

A.   I have seen a therapist.

Q.   To help you through what?

A.   Well, we can't -- she says we can't process this yet until I'm done with this part of it.

Q.   Okay.  Physically, has this affected you in any way physically?

A.   I don't think so.  There's not like something I would say, you know.  Like, "Oh, I shouldn't have worn that," if it had a hoodie on.  I don't know what I could have possibly said that made him think I was going to want to be a part to this.

Q.   How has it affected your family?

A.   We don't talk about it all that much at home.  They have been very --

        MS. WESTGATE:  Objection, Your Honor, relevance.

        THE COURT:  Sustained.

        MR. REEVES:  Thank you, Your Honor.

162

Q.   (By Mr. Reeves)   How -- before you were employed, you had a responsibility as a national director of human resources, correct?

A.   Correct.

Q.   How long did it take you to elevate yourself to that position?

A.   I had worked there 24 years.  I was part of our mergers and acquisitions.  If we were buying a company, I would be somebody that was selected to go down and put people at ease, make sure they, you know, understood, we were the good guys.

Q.   How did it feel to be part of that level of mechanics in the company, a national company?

A.   I loved that job.  I loved doing that.  I was the only female on the team.  I worked with incredible people.  And it felt good to be out of the day-to-day and doing something new and exciting, like going to new companies or helping set up HR departments in companies we had purchased.

Q.   Did -- as a result of the events on the plane, the actions that Mr. MacLean took against you, how did it affect your employment?

            MS. WESTGATE:  Your Honor, same objection, relevance.

            MR. REEVES:  This is her employment, Your

163

Honor.

THE COURT:  She can answer the question.

THE WITNESS:  I had a policy at work, it was my policy, that if you had any contact with the police on any trip, you had to disclose it to HR. I'm HR.  I had to tell my boss, the CEO of the company, what happened.

We were supposed to fly together that next day, but because I went early, I went alone.  And there were comments made that maybe I shouldn't travel alone anymore.  It was shared among the whole management team and it was just embarrassing.

Q.  (By Mr. Reeves)  I'm sorry, you -- they said you couldn't travel alone?

A.  They didn't say it, but I mean they didn't say it as a policy, but it was said.  Like my boss said, "Maybe you just can't travel alone anymore."

It seems so unfair.  What would it have mattered if he were sitting somewhere else on the plane?  We didn't sit together.  I didn't -- it didn't feel like it was my fault, but it felt like everybody was judging.  There were some that like, "Oh, you should go all the way."  Everybody had an opinion.  It was just nobody's business.  It's not the sole reason I left the job, but I left that job.

164

Q.   You left the job?

A.   I did.

Q.   After how many years?

A.   Twenty-four.

MR. REEVES:  Your Honor, Ms. Jay, may I have a quick moment to consult with Mr. Kennedy?

THE COURT:  Sure.

(Brief pause in proceeding.)

MR. REEVES:  Your Honor, Ms. Jay, thank you.

THE WITNESS:  Thank you.

THE COURT:  Thank you, Mr. Reeves.

Let's take a recess until about quarter to 11:00 and then we'll start the cross.  Thank you.

THE CLERK:  All rise for the jury.

(Jury exits the courtroom.)

MR. KENNEDY:  Your Honor, before you leave the bench, can I put something out just for thought as we're going forward?  And it goes back a little bit to the lesser included offense.  It goes entirely to that.

THE COURT:  The rest of you can sit down, if you want, or leave, whatever you want to do.

MR. KENNEDY:  And, Your Honor, part of our argument on not including the lesser included offense was that the evidence would have -- would have to

165

negate the -- you know, all of the -- all of the intent in the intent, abuse, harass, degrade, humiliate, as well as the sexual intent.  And the issue with regard to the hand on the -- on the knee only -- only goes to the sexual intent part of it.

And so I want to just put that out there that we still don't think that as things are coming in that we're going to quite get there on the lesser included.

THE COURT:  Okay.  Do you want to say anything at this point about that?

MR. CLARK:  No, Your Honor.  Thank you.

THE COURT:  Thank you.  We'll be in recess.

(Recess.)

THE COURT:  Ready to proceed?

MR. KENNEDY:  Yes, Your Honor.  If I could have one second for the convenience of the record on one small housekeeping matter.

It wasn't addressed at the beginning, but we, on both sides, have been observing the exclusionary rule, and we're going to continue to do that.  We've been observing that and I know that the defense has.

I would note that Detective Ruiz is a likely witness, but she's a case agent so she's exempt.

166

THE COURT:  Yes.

MR. KENNEDY:  All right.

MR. CLARK:  We don't disagree.

THE COURT:  Thank you.

Ready to proceed?

MS. WESTGATE:  Yes, Your Honor.

THE COURT:  We'll get the jury and proceed.

THE CLERK:  All rise for the jury.

(Jury entered the courtroom.)

THE COURT:  Ms. Westgate, you may proceed with your cross-examination.

MS. WESTGATE:  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MS. WESTGATE:

Q.   Good afternoon, Ms. Jay.

A.   Hi.

Q.   You've had several opportunities to talk to law enforcement in order to explain your version of events, correct?

A.   No.  I gave my statement to the FBI and the Salt Lake City Police.  That's it.

Q.   So -- but earlier today you did testify that you spoke with both Salt Lake City Police and at least the tip line, correct?

A.   Yes, the FBI and the Salt Lake City Police.

167

Q.   Okay.   Let's walk through some of those conversations that you've had with them.

So you first contacted Salt Lake City Police on March 2nd, 2022, didn't you?

A.   I did.

Q.   And that was the first law enforcement agency that you contacted after the alleged event?

A.   It was.

Q.   You spoke with an officer, I believe Miguel Ruiz, who took your statement over the phone?

A.   I don't know his name, but yes, somebody took my statement over the phone.

Q.   And it was around 11:00 a.m., correct?

A.   I can't say.

Q.   But it was early in the morning after the night's flight, or midmorning, correct?

A.   Yes.

Q.   And so that interview took place about 12 hours after the plane had landed from the night before, right?

A.   I don't know the time.

Q.   But approximately?

A.   I would have said it was earlier, but yes, there was time lapsed.

Q.   So at that point, if your testimony is that it

was perhaps earlier, the events were still fresh in your mind, correct?

A.   Correct.

Q.   And at that point, you hadn't reviewed any reports or any other information from United Airlines?

A.   I had not.

Q.   You hadn't reached out to the FBI?

A.   I had not.

Q.   You hadn't met with any prosecutors?

A.   I had not.

Q.   So at that point, no one from the government had told you what was important to this case or what they were focused on, correct?

A.   Correct.

Q.   You had spoken with your husband, right?

A.   I had.

Q.   And you had spoken with your daughter, correct?

A.   I had.

Q.   And you testified that your daughter was interning with a prosecutor's office back home, right?

A.   Correct.

Q.   And she was working towards becoming a prosecutor herself?

169

A.   She was.

Q.   During that conversation, you were trying to be truthful to the officer when you gave your statement, correct?

A.   Of course.

Q.   You intended to provide accurate information?

A.   I did.

Q.   Because you understood that your statement was going to be used in a criminal investigation, didn't you?

A.   I don't think I did at that point.

Q.   So you didn't understand that when you called the police, Salt Lake City Police, to report the incident, you didn't understand that it could be part of a criminal investigation?

A.   I thought they would look into it.  I didn't know if it was something that could be raised to that level.

Q.   In fact, the officer prepared a police report documenting your statement, right?

A.   He did.

Q.   You had an opportunity to review that report?

A.   I have not.

Q.   So over the last three years, you haven't asked to see the report?

A.    From the Salt Lake City Police, no.

Q.    Correct.  And your daughter who was working for the prosecutor's office, she didn't suggest that you should get the report?

A.    No.

Q.    Next, five days after you spoke to the Salt Lake City Police on March 7th, you testified that you called FBI's tip line, called the National Threat Operation Center, correct?

A.    I called the FBI phone number that the customer service at United Airlines told me to call.

Q.    So you -- you did call the tip line for the FBI, though, correct?

A.    If that's the tip line, yes.  I don't know.  I just -- she gave me a phone number, that's what I called.

Q.    And the United Airlines person that you spoke with, she indicated that that would be the line in which you could report the conduct, right?

A.    Correct.

Q.    You also understood the importance of being truthful on that conversation -- during that conversation, right?

A.    Absolutely.

Q.    And that at that point, you did understand that

it could be part of a federal investigation, correct?

A.    I would say that any time I was talking to them, no one ever said, "This is a punishable crime."  They said they would look into it.  I wanted someone to say, "If everything happened the way you just told me, it is a crime."  That did not happen.

Q.    Ms. Jay, my question wasn't whether or not you thought it was a federal crime.  It was whether or not you thought you were calling to potentially commence a federal investigation.  And you understood that, correct?

A.    I understood that the FBI would decide if it was something that warranted further action.  That is what United told me to do.

Q.    Through an investigation, right?

A.    I assume.  I don't really know what they do.  I didn't know if they would meet with the defendant or I didn't -- I had no idea what the course of events would be.

Q.    But you knew that the call was being recorded?

A.    I did know the call was being recorded.

Q.    Have you had a chance to review the recording?

A.    I have.

Q.    Did you review the audio recording or a transcript of it?

172

A.    I have seen both.  I've heard the audio and I've seen the written.

Q.    Did anything in the recording appear or seem accurate?  Did you hear anything or see anything that was inaccurate?

A.    No.

Q.    I want to talk about another time that you spoke with the FBI that you haven't previously mentioned.

So six days after you called the tip line, on March 11th, 2022, you participated in an in-person interview with the FBI, right?

A.    I did.

Q.    You met with a Special Agent Daniel Gartland, right?

A.    I don't know their names, but yes, I did.

Q.    That was the special agent in person to give your statement, correct?

A.    Correct.

Q.    So at that point, it had been only ten days since the flight, right?

A.    Correct.

Q.    And again, you were giving your statement?

A.    Correct.

Q.    Like before, you were being truthful to the officer during that interview?

173

A.    Absolutely.

Q.    You intended to provide accurate information?

A.    I did.

Q.    Again, you understood that in speaking with the FBI, now for the second time, that you were giving a statement for the purpose of a potential criminal investigation, right?

A.    I believed I was telling them my story for them to make a decision on whether or not they would proceed.

Q.    You understood that your statement might be summarized in a report?

A.    I don't think I actively was thinking those things, but if you ask me if logically I would think that is what would happen, yes.

Q.    Have you had an opportunity to review that report from March 11th, 2022?

A.    I have not.

Q.    So again, since 2022, over the last three years, you have not had an opportunity to review that particular statement from the FBI on March 11, 2022, correct?

A.    That is correct.

Q.    Finally, last month, on June 2nd, 2025, you had a joint interview with the FBI at the U.S. Attorney's

Office, right?

A.    Correct.

Q.    And Special Task Force Officer Kylie Ruiz was there, correct?

A.    Correct.

Q.    She's been your case manager; is that right?

A.    Yes.

Q.    Again, you provided a statement about the alleged incident, correct?

A.    I don't think there was me going through the whole thing.  I think there were questions and I answered them.  I told them as much as I could, yes.

Q.    You were preparing for trial a month ago and the case agent was asking you specific questions, and you responded to those questions, right?

A.    Correct.

Q.    And when you responded to those questions, you were being truthful?

A.    One hundred percent.

Q.    You were giving an accurate statement?

A.    I was.

Q.    And again, you thought or understood that that was going to be summarized in a report, right?

A.    Again, it wasn't something I was thinking about, but in logic, I do understand it probably was put

175

into a report.

Q.   Have you reviewed that particular report from last month, June 2nd, 2022?

A.   I have not.

Q.   Okay.  So you haven't had an opportunity to review that over the last month and a half to prepare for today?

A.   I have not.

Q.   Beyond the interviews that we just discussed, did you have any other opportunities to speak with law enforcement about the alleged events?

A.   No.  I never gave another statement, if that's what you're asking.

Q.   So in total, you've spoken about there were at least four instances that you gave statements to law enforcement?

A.   There are at least four times I talked, and I guess potentially gave statements.  I've never seen those statements with the exception of my call to the FBI.

Q.   Except you did see one of the statements, right?  You confirmed that you saw the first FBI statement and the audio recording, right?

A.   Yes.  My call to the FBI I have heard, and I have seen it in transcript form.  I have not seen any of

176

the other statements, documents.  I have not heard them.  I have not read them.

Q.   Okay.  But the original question wasn't whether or not you read them, it was just whether or not there had been four interviews with law enforcement, correct?

A.   As I said, I did talk to them, and four times sounds about correct.

Q.   But when our investigator, when the defense investigator reached out to you, you declined to speak with him, correct?

A.   I did.

Q.   So you've spoken with law enforcement --

MR. REEVES:  Your Honor, as to the FBI, the investigator, relevance.

THE COURT:  It's already been answered.

MR. REEVES:  It's their investigator.

THE COURT:  Yeah.

MS. WESTGATE:  Still relevant to her credibility, Your Honor.

THE COURT:  Overruled.

Q.   (By Ms. Westgate)  Let's turn now to what happened on March 1st, '22, the date of the flight.

On that date, you testified that you took an earlier flight from Milwaukee to Chicago, correct?

177

A.    Correct.

Q.    You were seated in the first class cabin on that flight as well, right?

A.    No.    There is no first class cabin on that flight.

Q.    You were seated in seat 3B, but you were not in first class; is that correct?

A.    I don't remember what seat I was in.  There's nothing about that flight that stood out to me that I could tell you about today.  I know that I do that flight quite often from Milwaukee to Chicago because it's the best way to get a direct flight and it was often a very small aircraft.

Q.    For the flight we're discussing today, the departure time was about 10:25 Central Time, correct?

A.    No.

Q.    It wasn't approximately 10:25 Central Time --

A.    I believe --

Q.    -- from Chicago?

A.    -- I believe it was like 7:35.

             MS. WESTGATE:  Can we please publish Government's Exhibit 4.

Q.    (By Ms. Westgate)  It looks like it's about 8:25.  Does that sound right?  Looking down at the bottom of Government's Exhibit 4.

178

A.   Yes.

Q.   You can see that second line over here, the departure time?

A.   Uh-huh (affirmative).

Q.   And the arrival time.  So looking at that second column, it looks like it's about 11:15 p.m. and that would be in Mountain Time, correct?

A.   Yeah, about 11:30.

Q.   So the flight wasn't a redeye flight.  You weren't flying over --

A.   I was not flying overnight.

Q.   You were only on that plane for a couple of hours or a few hours, right?

A.   About three hours.

Q.   You testified that your original seat assignment was in the main cabin, wasn't it?

A.   It was.

Q.   But you were upgraded to first class by United Airlines that night, right?

A.   I was.  I flew a lot.  I had some status with them.  They would often give us a complimentary upgrade.

            MS. WESTGATE:  Mr. Clark, may we please pull up Government's Exhibit 1.

Q.   (By Ms. Westgate)  Can you see that, Ms. Jay?

179

A.   I can.

Q.   Again, so looking at Government's Exhibit 1, the first class cabin had two seats on one side of the aisle, correct?

A.   Correct.

Q.   And there was only one seat on the opposite side of the aisle?

A.   That's correct.

Q.   You were seated in seat 3D, which was a window seat?

A.   Correct.

Q.   And Mr. MacLean was seated in seat 3C, which was an aisle seat next to you, right?

A.   Correct.

Q.   The beginning of the flight, you testified that you and Mr. MacLean introduced yourselves and you shook hands, right?

A.   We did.

Q.   And you testified that you engaged in approximately 20 minutes or so of small talk or, you know, talk that you considered that was normal?

A.   Polite conversation.

Q.   Polite conversation, correct?

During the initial conversation, you also testified that you both shared personal information

about each other to each other, right?

A.   I think I shared the names of my children.  I shared that I was married, and that I was an HR manager.  I didn't do a lot of the talking.

Q.   But that's personal information that you shared with him?

A.   I did share that, yes.

Q.   And Mr. MacLean, he told you that he attended Stanford University?

A.   He did.

Q.   And that he owns a business as a software consultant?

A.   He did.

Q.   You guys spoke about your children?

A.   We did.

Q.   You connected on the fact that you both had daughters who were attending law school, or were entering the legal profession, right?

A.   Correct.

Q.   He also mentioned that his parents had served as missionaries to the Ukraine, right?

A.   He did.

Q.   You said that Mr. MacLean -- a few times that -- you said it a few times, that he was drawing attention to himself by speaking very loudly, right?

181

A.   I don't know if I would say very loudly, but loudly enough that most of first class could probably hear.

Q.   Right.  So --

A.   Because it was very quiet.

Q.   It was quiet, he was speaking loud enough that you were worried that it was drawing attention to you, right?

A.   Correct.

Q.   While speaking loudly, you testified that Mr. MacLean allegedly made a comment about Russian President Vladimir Putin.

        Do you recall that?

A.   I do.

Q.   What is it that he said to you?

A.   He said that Putin was a pussy.

Q.   You were nervous that other passengers could hear that comment, right?

A.   For sure.  I found it offensive, something I don't like to say or I don't say.  And I was afraid people would hear it and think we were together.

Q.   So again, you were concerned, not only about the loudness with which he was speaking, but the content that he was speaking about, that it was drawing unwarranted attention to you?

182

A.   At that point, it was just that word.

Q.   That word in particular?

A.   Otherwise, it was polite conversation.

Q.   Okay.  When you sat down and drink service began, you've testified that you and Mr. MacLean -- you each ordered a Vodka cranberry, right?

A.   Correct.

Q.   And you've said that Mr. MacLean had five drinks?

A.   I think I said approximately five drinks in my statement.

Q.   You weren't taking notes?

A.   I was not.

Q.   You were just going off of memory, though, right?

A.   Correct.

Q.   You feel fairly confident that it was five and not fewer?

A.   It could have been four.

Q.   Ms. Jay, based off your life experiences, would you agree that alcohol can lower a person's inhibitions and cause them to say or do things that they wouldn't do if they were sober?

A.   For somebody who doesn't really get drunk, so I don't know from my personal experience how to answer that.  I don't like to feel out of control.

Q.   But you haven't observed other people who have

183

been drinking and have said and done things while under the influence of alcohol?

A.   Sure.

Q.   Are you aware that even one or two drinks can have that effect on a person?

A.   I am.

          MR. REEVES:  Your Honor, objection.  Calls for speculation.

          MS. WESTGATE:  I'm asking about her own awareness.

          THE COURT:  Her own experience?

          MS. WESTGATE:  Correct.

          THE COURT:  She can answer that.

Q.   (By Ms. Westgate)  You've seen people become more talkative when they drink?

A.   Probably, yes.

Q.   Sometimes they over-share personal information they might otherwise not, right?

A.   Correct.

Q.   Have you heard that alcohol can have that -- that it can have an exacerbated effect when you're at high altitudes like on a plane?

A.   No.

Q.   Are you aware that alcohol can affect the way that people perceive events?

184

A.    Sure.

Q.    And you testified earlier today that United Airlines has a policy where they give complimentary drinks to the passengers that are sitting in first class, right?

A.    That is correct.

Q.    You also testified that you were drinking that day, correct?

A.    I had one drink, yes.

Q.    But you were drinking, correct?

A.    I had one drink.

Q.    Ms. Jay, earlier today you've also acknowledged that you're not exactly a small-chested woman, that's the words that you used, right?

A.    Correct.

Q.    Because of that, people have accidently touched, grazed your breasts before; is that right?

A.    Certainly been bumped with an elbow.

Q.    I'm sorry, I didn't catch that.

A.    I've certainly been bumped by an elbow.

Q.    Bumped by an elbow.  No grazes of hands, nothing like that?

A.    I am sure it's possible.

Q.    Today you testified that Mr. MacLean touched your breasts six times, correct?

185

A.   Correct.

Q.   But in your initial interview, the one we spoke about with the Salt Lake City Police, as a reminder, this is on March 2nd, 2022, you told the officer that Mr. MacLean had touched your breasts only twice; isn't that right?

A.   That's not correct.

Q.   You didn't -- you didn't tell the officer that it was only twice?

A.   I did not.  It absolutely was not twice.  And there was no officer.

Q.   You didn't speak to an officer on the telephone?

A.   On the telephone I did not.

Q.   You testified earlier, when we first started this, that you had spoke with an officer over the phone who took your statement from Salt Lake City Police.

A.   I did not tell him two.  I told him six.

Q.   Ms. Jay, I'm going to direct your attention to the Salt Lake City Police report summarizing your March 2nd, 2022, interview.

        MS. WESTGATE:  You can publish it to the jury.

        MR. REEVES:  Your Honor, objection.  May we approach?

THE COURT:  Yes.

MR. REEVES:  Thank you.

(Sidebar conference.)

MR. REEVES:  Your Honor, a summary by anyone that is not the defendant's statement, there is only one statement in play here that resulted from her in a recorded call to the FBI tip line.  She did not adopt this.  She has not adopted it as her own statement.  It is not her statement.  You cannot post or publish something that is not hers.

MS. WESTGATE:  Your Honor, I can show her, in order to let her see the summary, whether or not it appears accurate.  I have already laid the foundation that she had the conversation, and this is just for impeachment purposes only.

MR. REEVES:  It is not her statement.

MR. KENNEDY:  She cannot impeach her on another statement.  She can impeach her only on her own statement.

THE COURT:  That's right.  You can't impeach her by what somebody else wrote down.

MS. WESTGATE:  But I can ask her whether or not she, you know, if that appears accurate to her.

MR. KENNEDY:  And, Your Honor, she did ask that question.  She got the answer.  She answered

187

with the answer.  A summary of what a conversation that is an interpretation of an agent of what she said, the only statement before the Court, is a recorded call by the witness herself.  And she acknowledges that is her statement.  She has seen her statement.  She has adopted that as her statement.

MR. CLARK:  Your Honor, we can show her the report.  There cannot be any problem with showing her something and asking her to look at it.  Now what questions following that, that would be something different, but trying to stop her from even being able to look at the report, it is a report of her statement.

MS. WESTGATE:  We have a good faith basis to ask her about a statement that --

MR. REEVES:  You can ask her if she said something to somebody, but you can't use that as a --

MS. WESTGATE:  I haven't asked to admit to the jury.

THE COURT:  Not going.

MS. WESTGATE:  I haven't asked her to admit it to the jury.  I asked her to review so she has an opportunity to explain or deny it, consistent with Rule 13(B).

MR. KENNEDY:  And, Your Honor, again, that

would be appropriate practice if it was her own statement. Officer Miguel Ruiz's statement is not her statement.

THE COURT: It isn't her statement. Why can't you ask her if it is accurate or not?

MR. KENNEDY: She just did. She got her answer.

MS. WESTGATE: She said she hasn't looked at it, though.

MR. REEVES: Because it is not her statement.

THE COURT: You know what she's going to say. I'll let her say it but --

MR. CLARK: We're asking for the opportunity to let her look at the report and ask her if that is accurate.

MR. REEVES: We would object, Your Honor.

MS. WESTGATE: We are not asking if she said it, we're just asking if it is accurate.

MR. KENNEDY: Again, Your Honor, I think we have beaten this horse well enough now that it is simply it is improper impeachment, and --

THE COURT: I think it is. Not her statement.

MR. CLARK: Your Honor, is the Court telling

189

us that we cannot show her that police report?

THE COURT:  What if I don't let her, I don't let her see it and get reversed on that.

MR. KENNEDY:  Again, I just think that it is asked and answered.  She asked the question and they're asking her to confirm her statement that it is not her own statement.  It is improper impeachment.

THE COURT:  It is unfair to ask a statement that isn't hers -- to confirm a statement that isn't hers.  Get the officer in here and ask them.

MR. KENNEDY:  Yeah.

MR. REEVES:  You got his name.  Where is the witness list?

MR. CLARK:  Your Honor, is the Court saying we cannot show her the police report?

THE COURT:  Yes.

MR. CLARK:  Okay.  We object to that.

THE COURT:  Okay.  It is on the record.

MR. CLARK:  Okay.

MR. KENNEDY:  Thank you, Your Honor.

MR. REEVES:  Thank you, Your Honor.

(Sidebar conference concluded.)

Q.   (By Ms. Westgate)  Ms. Jay, you've also testified today that Mr. MacLean -- he woke up when the

190

seatbelt sign was turned on and that he grabbed both of your breasts, correct?

A.   He did.

Q.   But you initially told both Salt Lake City Police and FBI that he had grabbed only one breast, correct?

A.   Not to my knowledge.

Q.   So you don't remember telling the Salt Lake City Police that it was only one?

A.   I do not.

Q.   You don't remember telling the FBI that it was only one?

A.   No.  It was two.

Q.   So that would be an inaccurate summary?

A.   Absolutely.

Q.   Ms. Jay, you've also testified today that you exchanged notes with the flight attendant, correct?

A.   Correct.

Q.   And after you exchanged notes, you said that Mr. MacLean allegedly grabbed your breast after the seatbelt sign turned on, right?

A.   Yes.

Q.   Then he grabbed it one more time after the flight attendant had been alerted twice to that behavior, correct?

A.   Can you repeat that?

191

Q.   Sure.

After you exchanged the notes, you said that Mr. MacLean allegedly grabbed your breast after the seatbelt sign turned on.

A.   Correct.

Q.   He allegedly touched you one more time after the flight attendant had been alerted two times to this alleged conduct, right?

A.   After the notes, he did it one last time with the seatbelt sign, yes.

Q.   So just to clarify, you had spoken directly with the flight attendant earlier, when you pressed the call button?

A.   Yes.

Q.   And then you had exchanged a note with the flight attendant, right?

A.   Yes.

Q.   So she was on notice to be looking for that behavior, correct?

A.   I will tell you again, when I told her what I felt, that I was feeling uncomfortable, and that he was getting handsy, she walked away.  I don't know if she heard me.  I gave her the benefit of the doubt that she didn't hear me, because her response to me was not appropriate.  She didn't offer to help me.

192

So I don't know whether she was on notice or not.

Q.   But, Ms. Jay, that was the first time, right?

A.   That was the first time, right.

Q.   But she was on notice the second time?

A.   She was on notice the second time.

Q.   We're talking about now, that last grab is after the note, correct?

A.   Correct.

Q.   When you spoke with the case agent just last month to prepare for this trial, you told her that Mr. MacLean didn't touch you again after the note, right?

A.   I don't recall that.  I will tell you it has been three and a half years and figuring out the scenario and the timeline and exactly what he said after every time and exactly when it falls in is difficult.

Q.   So you would agree that it's harder to remember precise numbers, chronology, those sorts of things, three years later, right?

A.   I remember exactly what happened.

Do I remember exactly what he said or where in that timeline I told the flight attendant?  Yes.

Do I remember what he said exactly?  I do not.

I remember every single touch.  Can I put

193

them perfectly in order as you're asking me to?  I can't.

Q.   But would you agree that it would be a significant variation if he didn't touch you again after the note were passed versus prior to the note being passed?

A.   I'd say he touched me again after the note was passed.

Q.   After the note, when the flight attendant had already exchanged notes with you, right?

A.   Yes, correct.

Q.   You described two separate interactions with the flight attendant.  I want to take a closer look at those with you.

At some point during the flight, Mr. MacLean went to the restroom, right?

A.   He did.

Q.   While he was gone, you called the flight attendant over to you, you pushed the button?

A.   I pushed the button.

Q.   You asked her not to serve him any more alcohol, right?

A.   Correct.

Q.   But you testified earlier today that he didn't appear like he was intoxicated, right?

A.    I can't tell you whether he was intoxicated or not.  I did think it could be contributing to what was happening.  So I did say to her, "Please don't serve him any more alcohol."

Q.    So despite saying that he didn't appear --

A.    He didn't appear drunk.  He wasn't slurring his words.  He did not stumble when he got up to go to the bathroom.  He did not stumble when he came back. I could understand him at all times.

Could he have been drunk and I wouldn't have known?  Yes.

Could he have been completely sober?  Yes.

I don't know.  I think if someone is touching me inappropriately like that, and being told to stop and not stopping, that's crazy, so maybe he'd had too much to drink.

Q.    You said he was getting handsy at that point, too, right?

A.    Correct.

Q.    During that conversation, did the flight attendant -- did she ever ask you to move?  This is the first conversation when you were face-to-face.

A.    She did not on the first conversation face-to-face.

Q.    You testified that she left you and she didn't do

195

anything, right?

A.    She walked away.

Q.    Did she ever ask you if you wanted to move?

A.    I think in the note she said, "Are you comfortable sitting by him?"

Q.    And you interpreted that as an offer to move, correct?

A.    Yes.

Q.    Now, while Mr. MacLean -- we're still talking about the time when he's in the bathroom.

At that time, he's not blocking your ability to exit your aisle, right?

A.    He's not.

Q.    So you weren't trapped at that point, correct?

A.    I was not.

Q.    You could have stood up?

A.    I could have.

Q.    You wouldn't have made a scene?

A.    I could have made a scene.

Q.    You wouldn't have looked like a scene to people around you if you just stood up when your seat mate was in the restroom and walk to the front, correct?

A.    Correct.

Q.    That's pretty common for people to stand up or even cross by their seat mate to use the restroom,

196

right?

A.   Sure.

Q.   The second time you interacted with the flight attendant was -- it was when he fell asleep; is that accurate?

A.   His eyes were closed.  His headphones were on.

Q.   He appeared asleep?

A.   He could have been sleeping.

Q.   And during that time, you passed the note back and forth to each other, right?

A.   She handed me the note.  I wrote my response and I handed it back to her.

Q.   And you'd agree that she was trying -- appeared like she was trying to be helpful and she was concerned about you, right?

A.   She was.

MS. WESTGATE:  Mr. Clark, if we can publish Government's Exhibit No. 2A that's already admitted.

THE COURT:  Sure.

Q.   (By Ms. Westgate)  Let me know when you can see this, Ms. Jay.

A.   Okay.  I can see 2A.

Q.   To confirm, this is the -- I think it was an error initially.  You testified first that this was your handwriting, but this is actually the flight

197

attendant's handwriting, correct?

A.   If I said that, that was incorrect.  This is not my handwriting.  This is the flight attendant's handwriting.

Q.   In that note the flight attendant asks you whether you're okay sitting by him, right?

A.   She does.

Q.   She also asks you whether or not -- down at the bottom she says, "Do you want me to do anything," right?  She says that?

A.   She does.

Q.   That could also be interpreted as an offer to help you or to have you move seats, right?

A.   It could.

Q.   To be clear, you've testified that you never -- you never asked to move, right?

A.   I did not.

        MS. WESTGATE:  Mr. Clark and Your Honor, if we could publish Government's Exhibit 2B.  That's also already admitted into evidence.

        THE COURT:  Yes.

Q.   (By Ms. Westgate)  Ms. Jay, please let me know when you can see it again.

        Taking a look at this note, Ms. Jay, you say that you're good -- down at the bottom you say,

198

"I'm," quote, "good if he is sleeping"; is that right.

A.    That is what it says and I did write that.

Q.    And you're good even though, at this point, according to your testimony earlier today, Mr. MacLean had purportedly groped you up to five times at this point, correct?

A.    Correct.  I didn't mean I'm good, having a great day.  I meant, "I don't need you to do anything right now if he stays asleep."

Q.    So you're declining help, you're declining to move?

A.    I'm declining to move seats, yes.

Q.    You also never alerted any of the nearby passengers or asked anyone else for help, correct?

A.    I did not.

Q.    Based on your interactions with the flight attendant, I think you've already testified that she was on notice about the allegations, correct, or at least that there were --

A.    At the time of the note, yes.  I will never know if she heard me on the other comments when she was in the aisle.  We both had masks on and it was loud. Because she walked away, I'm assuming she did not hear me.

Q.   But at some point during the flight, she was on notice?

A.   She was on notice enough that she noticed something to give me a note.

Q.   And because of that, she was likely watching your row for any inappropriate behavior?

A.   I don't know where she was.  I can't testify to where she was.  I can't testify to what she was doing.  If it were me, yes, I would pay more attention to the people in those two seats.

Q.   So it would be reasonable for a flight attendant who's responsible for passenger safety to kind of keep an eye on your aisle, correct?

A.   I would hope so.

Q.   After you landed, you spoke with the flight attendant, right?

A.   I did.

Q.   On the -- I think you referred to it as "the gangway"?

A.   At the gate area, yes.

Q.   Okay.  And she speculated about what Mr. MacLean was doing in the bathroom, right?

A.   She did.

Q.   What did she say he was doing in the restroom?

A.   She said he was probably masturbating.

200

Q.   You acknowledge and would acknowledge that there was no proof of that, right?

A.   There was no proof of that.  That hadn't occurred to me.  I could have gone my whole life not thinking that.

Q.   So that comment, it stuck out in your mind because it's not something that you would think about, right?

A.   No.  I wouldn't speculate on what he was doing in the bathroom.  She said it and I remember feeling like, I wish you had never said that to me.

Q.   It made the situation feel worse to you than it already did?

A.   It felt more gross.

Q.   But something that couldn't be proven, correct?

A.   Absolutely not.  I did not tell anybody that he did.  I told them what the flight attendant said he did.  I never said he did that.

Q.   You've also testified that you -- you don't recall whether or not he touched your knee?

A.   I don't.  If he touched my knee when we were ordering the second drinks, I don't recall it.  But I would also say to you that if he had never touched me again after that second time, I would not be here today.  I would have let the whole thing go.

201

So the knee wasn't going to bring me to this point. The knee wasn't important.

Could he have done it? If she thinks she saw it or somebody thinks she saw it, then they saw what they think they saw. I don't remember it. I'm not accusing him of that.

Q. Right. But you're acknowledging that there are parts of the interaction with Mr. MacLean that you don't recall, right?

A. No. I'm not saying it happened. I'm saying I don't recall it happening. I'm not saying I don't remember it, that it did. I'm saying it didn't happen or I don't recall it.

Q. Right. So there are parts of your memory that could be a little fuzzy if you don't recall it, but someone else may; is that right?

A. No, it may have never happened. That's what I'm saying. I am never accusing him of something I'm not sure of. And so he did not put a hand on my knee to my memory.

Q. Ms. Jay, aside from speaking with the flight attendant your drew attention to yourself in other ways on that flight, right?

For example, you kept your overhead reading light on the entire time, right?

A.    I did.

Q.    You've testified that you repeatedly pushed Mr. MacLean's hand away from you, correct?

A.    I did.

Q.    And earlier, you testified that when you pushed him away, you did that fast.  Isn't that true?

A.    I was -- I was more alert than I was the earlier times.  And yes, I did it fast.  I was -- yes.

Q.    Okay.  So you pushed him away, you've done that quickly, multiple times, right?

A.    Correct.

Q.    You've also told him to "stop touching you" multiple times, right?

A.    I asked him to leave me alone.  I asked him to please stop touching me.

Q.    You said, "Keep your hands to yourself, pal," right?

A.    I said, "Listen, pal, keep your hands to yourself."

Q.    And you've testified earlier that you were angry when you said this, correct?

A.    The fifth time, I testified that I was angry at that point.  It was so absurd.

Q.    And you've also testified that the cabin, because it was a late night flight, it was dark, right?

A.   Correct.

Q.   It was quiet?

A.   Correct.

Q.   So your behavior could reasonably draw the attention of nearby passengers, right?

A.   I was not yelling.

Q.   But you were speaking loudly and angrily, correct?

A.   My testimony is that I wish I had stood up and spoke loudly or caused a scene or said something.  I said something to him.  I know that he heard me.  I don't think I said it loud enough.  I know I did not say it loud enough to wake the plane, because I did not want to do that.

Q.   But you said that you said it angrily, and you're also pushing him in a quiet cabin, correct?

A.   I am pushing his arms, right?  I'm just -- I'm just using both of my hands to protect myself and pushing his hands away.  He's not out of his seat.  He's not standing.  I'm not standing.  We're not causing a scene.  No one is paying attention to us.

Q.   You'd acknowledge that this is confined space, right?  People are feet away from you.  So even movements that otherwise wouldn't seem big, are bigger in a small place, correct?

A.   I would say that were true in the main cabin.  I would not say that is true in the first class cabin.  There's plenty of leg room.  My knees do not come close to the seat.  There's eight inches between us.

Q.   Ms. Jay, you had your spotlight on.

A.   I had my spotlight on the whole time and I would not turn it off.

Q.   You are the only person that is doing that, and that alone would potentially draw attention from passengers who maybe want to sleep, right?

A.   It's -- it's on me.  I don't feel like by having my light on I'm necessarily keeping people awake.  I've certainly been on an airplane and closed my eyes when somebody somewhere on the plane has their light on.  It doesn't bother me.

        For me, I kept my light on because I was scared of what would happen if I turned my light off.

Q.   There were 12 passenger in first class, right?

A.   There were.

        MS. WESTGATE:  And Mr. Clark and Your Honor, may we pull up Government's Exhibit No. 1, and have permission to publish it.  This is already also in evidence.

        THE COURT:  Sure.

Q.   (By Ms. Westgate)  I want to take a look at the

205

schematic that Mr. Reeves spoke about earlier.

So again, there are 12 seats in this cabin, right?

A.   Yes, there are.

Q.   All of them are occupied?

A.   They are.

Q.   You were sitting in row three, correct?

A.   Correct.

Q.   So there are two passengers that are sitting in front of you, right?

A.   Correct.

Q.   There are two passengers that are sitting directly behind you in row four, right?

A.   Correct.

Q.   And there are three -- so there's three passengers that are essentially either directly beside you or adjacent to you.  So I'm looking at 2A, 3A and 4A, right?

A.   Correct.

Q.   People are surrounding you on all sides?

A.   That is correct.

Q.   You've testified -- you've testified that no one turned around to see you, right?

A.   I don't recall anyone turning around to look at me.  I certainly didn't make eye contact with

206

anybody. I know that I looked at the passenger in 3A and he appeared to be sleeping.

Q. You told -- would it surprise you that you told the FBI, on March 11th, 2022, that people around you had to have known.

A. I felt like the people behind me had to have seen it because there's a gap between the seats where we're not supposed to cross, right? So like the armrest between us don't necessarily see behind them.

I was hopeful that somebody in 4A or 4B could corroborate my story. I didn't say they had to know. I said I feel like they had the opportunity to see. I hope that they will say something if they saw it.

Q. So your testimony today is that you think there was a possibility that people behind you in four could see you, right?

A. If they were awake, I would think they would be able to see that he was leaning over the armrest into my seat.

Q. So you didn't tell the FBI that the man in 2A kept turning around to look at you?

A. I did not.

Q. You didn't tell them that the person --

A. I did not.

207

Q.   -- in seat 2C -- I haven't finished my question, Ms. Jay.

You didn't tell them that the individual, the gentleman sitting in front of you in seat 2C and 2D, kept turning behind to look at you, correct?

A.   No one looked at me on that flight except Mr. MacLean.

Q.   So that would be -- that would be an error on behalf -- or on the part of --

A.   I wished 2A and 2B had looked at me.  They did not.

Q.   But if they saw you, there's a potential that people -- or if you did say that --

MR. REEVES:  Your Honor, the witness has given the answer.  She's been given ample leeway.  It's asked and answered.

MS. WESTGATE:  That's not my question, Your Honor.

THE COURT:  What's your question?

MS. WESTGATE:  My question is that if it's true, that she thinks there's a possibility that people in the fourth row saw her, and if there's a possibility that the officer understood that she thought people in the second row could see her, that she was surrounded by people who could have

208

potentially seen her.  That has not been asked and answered.

MR. REEVES:  We're dealing with conjecture and possibilities.  What does that have to do in a federal court of law?  Your Honor, speculation.

THE COURT:  You are asking her to speculate, I think.

MS. WESTGATE:  I have no further questions, Your Honor.

THE COURT:  Thank you.

Any redirect?

MR. REEVES:  Yes, Your Honor, if I may.

Could we also pull up the exhibits, admitted Exhibits 2A and 2B, please.

**REDIRECT EXAMINATION**

BY MR. REEVES:

Q.  Ms. Jay, hi.  Let me take a breath.  We have a few things to cover.

A.  Okay.

Q.  First, let's turn to 2B.  Can you see 2B?

A.  I can.

Q.  I know you did this before, but could you read your handwriting on your note.

A.  Sure.

"I feel like an idiot but I" -- it's kind of

209

folded weird there, but I believe it says, "he's groping me and saying inappropriate," and then in brackets, "what he probably thinks are flattering comments," in brackets. "I'll just stay on the plane until he gets off. I don't want to cause a scene. Thank you. I'm good if he's sleeping."

Q. Okay. And has this image been manipulated in any way, altered?

A. A little crumpled. That's it.

Q. Do you see a comma or a space or something after the phrase, "I'm good," or is that a sentence?

A. There's no punctuation between "good" and "if he's sleeping."

Q. So when you say, "I'm good if he's sleeping," what did you mean by that specifically?

A. He kind of started to leave me alone towards the end of the flight. And I assumed or hoped that he was sleeping. His eyes were closed, he had his headphones on. He was reclined in his seat. His mask was off. He wasn't bothering me at that time. So I thought perhaps he had fallen asleep. And so what I said was, "I'm good if he's sleeping."

Q. And did you request anyone to wake him up?

A. I asked her not to wake him up.

Q. Specifically, not to wake him up?

210

A.   When she came to wake him up, I knew she was going to wake him up because he didn't have his mask on.  And she told him several times in the flight to put his mask on.  And so I knew when she stood there what she was going to do.  And I said, "Please don't wake him up."

Q.   You intervened?

A.   I did.  He was in his seat minding his own business, and I wanted him to stay that way.  If she woke him up, I feared he would not do that.

Q.   And that's why you asked her to not wake him up?

A.   That's why I asked her not to wake him up.

Q.   And it was your testimony earlier that -- I believe you said you felt threatened when he was awake?

A.   I did.

Q.   And --

A.   I didn't -- I didn't know what else I could be doing, right?  I can't be any further away from him, but while he's sleeping, he's leaving me alone.

Q.   So did the threat disappear when he was sleeping, or how did it change in your mind?

A.   I felt more comfortable that when I was watching him his eyes were closed.  And I could pay better attention to him and see if something was coming.

211

Q.   There's a few points that I wanted to cover with you, but let's go back to your responsibilities the morning of March 2nd.

So you flew in late, it was late at night.

MS. WESTGATE:  Your Honor, beyond the scope and relevance.

THE COURT:  Pardon me?

MS. WESTGATE:  Beyond the scope and relevance.

MR. REEVES:  This is going directly to -- on the line of questioning, Your Honor.  She, the defense counsel, made the point that there was this enormous delay, 12-hour delay between the landing of the flight and when she called law enforcement.  I am going to ask a couple of questions specific to what she did during that 12-hour period that defense counsel was elaborating on.

THE COURT:  You did bring that up, didn't you?

MR. REEVES:  Quote, "12 hours" --

THE COURT:  Twelve hours between.

MS. WESTGATE:  I don't think I referred to it as a delay.  I did say there was 12 hours between.

MR. REEVES:  Let's get the record.  Let's take a second and pull that up.

212

THE COURT:  Go ahead and ask your question.

MR. REEVES:  Thank you, Your Honor.

THE COURT:  Let's not take a second and pull it up, let's --

MR. REEVES:  My apologies.

THE COURT:  Maybe it's not a delay, but -- you did make reference to the 12 hours --

MR. REEVES:  The 12 hours.

THE COURT:  -- or a period of time, I think.

Q.   (By Mr. Reeves)  Ms. Jay?

A.   Yes.

Q.   You have been groped, grabbed, assaulted six times in approximately a three-hour flight; is that correct?

A.   That is correct.

THE COURT:  That is leading, of course.

Q.   (By Mr. Reeves)  Were you groped, grabbed, harassed, degraded, humiliated on an approximate three-hour flight?

A.   I was.

Q.   After going through that, and the defendant was leaving the airplane, he said one last thing to you. What was that?

A.   "It was nice talking to you."

Q.   When you had your first chance to call for help,

213

when he went to the bathroom, what happened?

A.   I pushed the button.  The flight attendant came. I asked her to please stop serving him and told her he was becoming handsy and I was uncomfortable.

Q.   And what did she do at the time you needed help?

A.   She said, "I think you saw I was reluctant to give him the last drink," stared at me for a second and walked away.

Q.   After going through that, you went to your hotel?

A.   I did.

Q.   Did you fully process what had just happened to you after midnight, now March 2nd?

A.   I don't think I processed it until I told my husband.

Q.   And you called him first at the hotel?

A.   We don't -- we don't do that.  I don't call when I get to the place or anything.  I traveled a lot. We often wouldn't speak while I was traveling, but I called.  I thought there's no way he will answer.  He answered and I was probably the most hysterical on that call with him.

Q.   I'm not asking you about the contents of your communications, but was that call difficult?

A.   It was.  He was stunned.  And what do you do?  He is all those miles away.  I have no one.  I'm in a

hotel room.  He's on the phone.  I just wanted to go home.  But I didn't want to get on another plane to go home.  Just --

Q.  With all of that happening, what did you have -- what responsibility did you have at 8:00 a.m. in a few hours?

A.  I had to present on best practices in HR for portfolio companies.

Q.  Ms. Jay, after everything you went through, did you make your presentation?

A.  I did.

Q.  After your presentation -- was this a national presentation or local?

A.  It was for their portfolio companies.  So they would have been all around the United States, I think.

Q.  This was at 8:00?

A.  8:00.

Q.  So you had a few things to do and you still met your responsibilities that morning?

A.  I did.  I had a one-hour call.

Q.  Okay.  Counsel for the defendant talked about an investigator calling you, their investigator.  Do you remember how, in the very first few seconds of that conversation, how that investigator introduced

215

himself?

A.   He did.  I was on my lunch hour at work.  I was sitting in a parking lot.  My phone rang.  It was an eight-zero something area code, which I know to be Salt Lake City.  Kylie would call me a couple of times to give updates.  I thought it might be her.

I answered, he spoke very fast, but I heard the word "defense."  And I was like, "Wait, who are you?"  And he told me.  And then I said, "I don't think I can talk to you."

And he said, "Oh, you can."

And I said, "Well, I'm going to call the prosecution to make sure that's okay."

And he said, "They know me.  They'll tell you you can talk to me.  I'm a good guy," whatever, and he said, "Is this your cellphone number?"

Q.   Did he ever say what he did for a living previously?

A.   He told me he was a previous FBI agent and that is why the prosecution team would know who he was.  He gave me his name.  I don't recall it.

Q.   Their investigator called you and said it was okay to talk to you and that he was ex-FBI?

A.   He did.

Q.   Thanks.

216

Ms. Jay, just to -- so it's unequivocal, how many times did the defendant, Robert MacLean, touch your breasts?

A.   Six times.

Q.   I am not asking you to be a breathalyzer test. What -- at any time, from the beginning to the end, did Mr. MacLean ever stagger, bump into the walls of the airplane?

A.   No.

Q.   Did he ever slur his words with the countless statements he made to you that you testified today?

A.   He did not.

Q.   At any time, was he unintelligible?

A.   No.

Q.   We've used this word "loud," but why did you not want him to be loud?

A.   Other people were sleeping.  I just didn't want to be -- everybody is put on a plane with that obnoxious person that's loud, and I didn't want to be those people.  They were all sleeping or resting.  I don't know if they were asleep or not, but everyone's light was off and everyone was quiet.

Q.   Okay.  Ms. Jay, I'm going to ask you to do something.

There were several times where you had to

217

either shove, or push his hands away.  So will you take your hands and will you -- I just don't want to knock over the water.

A.    Okay.

Q.    I'm not asking you to relive this, but will you push your hands away.  Pick a time.

A.    So I will tell you that on the very first time --

Q.    I'm sorry, would you physically just push his hands away.  We're going to just demonstrate.  I'm sorry, I didn't hear that.

A.    On the first time --

Q.    No, I didn't hear your pushing.

A.    Oh.

Q.    Could you do it one more time.

A.    (Indicating).  That's it.

        MR. REEVES:  Your Honor, let the record reflect that the witness moved her hands in a pushing motion, so that it could be -- it could register on the record?

        THE COURT:  She did.

        MR. REEVES:  Thank you.

Q.    (By Mr. Reeves)  Ms. Jay, have you ever missed something in your house, something ongoing in the house when you were asleep?

A.    Sure.

218

Q. Okay. So when someone -- when you are asleep, you're not aware of everything going on around you?

A. No.

Q. To your best knowledge, to your best knowledge, were the passengers in that cabin, the first class cabin, the ten other passengers who had their lights off, were they asleep to your best knowledge?

MS. WESTGATE: Your Honor, speculation and already asked and answered.

THE COURT: It is speculation.

Q. (By Mr. Reeves) Okay. Did you see any of them -- during the times that you were groped and grabbed, did you see any of them up and about? Did you see any of them getting luggage out of their overhead?

A. I did not.

Q. Did you see any of them getting up and going to the bathroom, except for Mr. MacLean?

A. I did not.

Q. Did you see any of them call for the attendant for another drink?

A. I did not.

Q. Did you see anyone asking for pretzels?

A. I did not.

Q. After the flight attendant left you alone, your

219

testimony, did you doubt -- did you have any doubt that what you were subjected to was a crime?

A.   I think I went a long way without knowing whether it was a crime or not.  It's not something I have ever had happen.  I don't have experience with it.

Q.   If I may, how did her reaction to you contribute to your mental analysis of whether it was worthy of attention?

THE COURT:  "Her" being who?

MR. REEVES:  The flight attendant, Your Honor.

Q.   (By Mr. Reeves)  How would the flight attendant's reaction to you telling her "he's handsy," how did that go into your analysis of what to do?

A.   I felt like if she heard me, she did not care.  I was on my own.

Q.   You were on your own, correct?

A.   (Witness nodded).  Correct.

Q.   Ms. Jay, this word "statement" has been thrown out a number of times.  What is -- according to you, what is your statement?  When was it given?

A.   To the FBI.

Q.   And was that recorded?

A.   It was.

Q.   And have you reviewed that?

A.    I have.

Q.    And was that true and accurate?

A.    It was.

Q.    You're before a jury.  Was it true and accurate?

A.    It was.

MR. REEVES:  Thank you, Your Honor.

THE COURT:  Thank you.

You may step down, Ms. Jay.  Thank you.

The government may call its next witness.

MR. KENNEDY:  Thank you, Your Honor.  The United States calls Kylie Ruiz.

**KYLIE RUIZ,**

called as a witness at the request of the Government,

having been first duly sworn, was examined

and testified as follows:

THE WITNESS:  Yes, I do.

THE CLERK:  Please come around to the witness box and have a seat.

Please state your name and spell it for the record.

THE WITNESS:  Kylie, K-Y-L-I-E.  Last name, Ruiz, R-U-I-Z.

**DIRECT EXAMINATION**

BY MR. KENNEDY:

Q.    Ms. Ruiz, where are you employed?

221

A.   Salt Lake City Police Department.

Q.   And do you have a title?

A.   I am the detective over the Salt Lake City Police Department, Airport Division.

Q.   And would you prefer to be referred to as "detective"?

A.   It doesn't make a difference.  "Ms. Ruiz" is fine.

Q.   So Detective Ruiz, I want to clarify one thing.

We heard reference to an individual with the Salt Lake Police Department named Miguel Ruiz who took an initial report.  Was that you?

A.   No, that was not me.

Q.   That was a different officer?

A.   Yes.

Q.   Did you assist in investigating this case?

A.   Yes, I did.

Q.   And assist in preparing it for trial?

A.   Yes, I did.

Q.   As a part of that, did you attempt to contact individuals who may have been seated in the area around row three on that flight?

A.   Yes, I did.

MR. KENNEDY:  And can we please bring up Government Exhibit 1, please.

222

Q.   (By Mr. Kennedy)   In attempting to make those contacts, what part of the plane did you focus on?

A.   The first class cabin.   Which would be the first four rows.

Q.   And did -- and how did you go about trying to contact people?

A.   I used the information that was provided to the airline at the time for contact, and then reached out to them.

Q.   Okay.   And do you remember the details of those contacts?

A.   Generally.

Q.   Okay.   So let's focus on row two first.   Did you attempt to make contact with the person in seat 2A?

A.   Yes, I did.

Q.   And were you able to?

A.   No.   I believe that one never called back.

Q.   Okay.   Let's talk about the individual in seat 2C.   Now, that would have been directly in front of Mr. MacLean, correct?

A.   Yes.

Q.   Were you able to make contact with that individual?

A.   Yes.

Q.   Did you ask him questions?

A.    Yes.

Q.    What did he say?

A.    I'm sorry, what did he say or what did I say?

Q.    Let me put it this way:  Did he have any memory of these events?

A.    He did not.

Q.    Did he say anything about his practices on flights?

A.    One of those in row two, it was either C or D, said that they often wear noise cancelling headphones and travels quite a bit for work.

Q.    What about seat D, directly in front of Ms. Jay?

A.    The other one in that seat area recalled the flight, recalled traveling to Salt Lake, but did not recall any disturbance or flight attendant in the extra area.  Nothing that drew his attention or recollection.

Q.    Okay.  What about the individual across the aisle in seat 3A?

A.    That gentleman traveled a lot for work.  I believe he said something to the effect of, that's the story of his life, being on a late night flight. And he did not recall anything significant.

Q.    Let's talk about seat 4A.

A.    That gentleman's information wasn't really

224

provided in the reports.  I believe he was from Ireland and we didn't really have a way to talk to each other.

Q.   You were unable to contact him?

A.   Correct.

Q.   What about 4C, directly behind Mr. MacLean?

A.   One of those seats in D and C, row four, also traveled quite a bit for work.  He said that he often takes a nap.  And I believe he said it was nap time, if that was the correct passenger.  One of those ones right in the area.  But essentially had no recollection and nothing brought to his attention.

Q.   Okay.  And finally, seat 4D.

A.   The remaining one in that row I reached out to and never received a call back.

Q.   And when did you -- when did you make these calls?

A.   I would have to see a report to know the exact date, but they were within the last probably four months.

Q.   So recently?

A.   Yes.

MR. KENNEDY:  No further questions, Your Honor.

THE COURT:  Thank you.

225

Cross-exam?

MR. CLARK:  Yes, Your Honor.  Thank you.

**CROSS-EXAMINATION**

BY MR. CLARK:

Q.   Good morning, Detective Ruiz.  Good morning for three more minutes, right?

A.   Good morning.

Q.   You testified you're a detective with the Salt Lake Police Department?

A.   Yes.

Q.   And you're also a task force officer with the FBI, right?

A.   Correct.

Q.   And is it fair to say that you help generally on a lot of these airport cases?

A.   Yes.

Q.   And do I have it right in saying that you've been working this case since at least June of 2022?

A.   It has been in my queue, yes.

Q.   It looks like maybe on June 8th of 2022, you sent out a Grand Jury subpoena to United.  Does that sound right?

A.   That was sent.  I couldn't recall the date, but yes.

MR. KENNEDY:  Your Honor, beyond the scope.

226

THE COURT:  Pardon me?

MR. KENNEDY:  Beyond the scope.

MR. CLARK:  I don't think so, Your Honor.

THE COURT:  Overruled.

Q.  (By Mr. Clark)  Would it help if you looked at a report that you wrote about that?

A.  Sure.

MR. CLARK:  May I approach, Your Honor?

THE COURT:  Yes.

Q.  (By Mr. Clark)  Can you see that report, Ms. Ruiz?

A.  Yes.

Q.  You wrote that, right?

A.  Yes.

Q.  And that really just says that it was June 1st, 2022.  Is that the date on the report?

A.  That is not the date on the actual report.

Q.  Okay.  Is it June 8th on the report?

A.  Yes.

Q.  And that's you who wrote it and you reported serving a Grand Jury subpoena to United Airlines that day?

A.  Yes.

Q.  I have to imagine, as a Salt Lake Police detective and FBI task force officer, you are trained

227

to follow-up on leads promptly, right?

A.   Yes.

Q.   And when you took over this case, I have to also imagine that you read all of the reports of interviews that had happened up to that point, right?

A.   As reports came in and I had the time, yes, I was reading the reports.

Q.   Did you read Ms. Jay's report of interview with the FBI on March 11th, 2022?

A.   At some point, yes.

Q.   Would you have done it like as soon as you took over the case?

A.   Not necessarily, no.

Q.   Why not?

A.   I bounce between two offices, and some of those reports are only available at one office.  And so it just depends.  Plus, I have several other cases that I'm continuously working.

Q.   But what if something important is on that report, Ms. Jay {sic}, that requires immediate attention?

        Ms. Ruiz, I'm sorry, I called you Ms. Jay. Forgive me.

        What if something is on the report from three months earlier that requires immediate

228

attention, Ms. Ruiz?  Don't you want to get on that right away?

A.    Yes.

Q.    Okay.  So are you aware that in that report the agent says that Ms. Jay reported that she saw the people in 2A and 2C and D, that they must have seen something?  Are you familiar with that report?

A.    Yes.

Q.    Okay.  Do you have any recollection of when you would have -- that would have been brought to your attention, that she saw the people in 2A or 2C and D, and that they must have seen something?

A.    I don't.

Q.    Okay.  And that report was generated -- at least the interview was March 11th, 2022?

A.    I'm sorry, which report?

Q.    Ms. Jay's interview with the FBI in Wisconsin was March 11th, 2022, right?

A.    Yes.

Q.    And you just testified that you didn't try contacting these people until a couple of months ago, right?

A.    Yes.

Q.    So we're talking about over three years?

A.    Yes.

229

Q.    And this is three years after Ms. Jay tells the FBI that, "I think these people can corroborate my claims"?

A.    Yes.

Q.    Three years is a long time, would you agree?

A.    Yes.

Q.    Does it seem like this was good work on your part waiting three years to follow-up with them?

MR. KENNEDY:    Objection, Your Honor. Relevance.

THE COURT:    Ask it in a different way.

MR. CLARK:    All right.

Q.    (By Mr. Clark) Would you say that this follows your standard practice, waiting three years to follow-up on a lead that has been given to you by a potential victim?

A.    I think there were factors in this case that attributed to that.

Q.    There were factors that attributed to you waiting more than three years to following up with these witnesses that she says must have seen something?

A.    Yes.

Q.    Is it fair to say, though, that you could have contacted them much sooner?

A.    Potentially.

230

Q.   Potentially, Ms. Ruiz?  Couldn't you have contacted them years sooner?

A.   Potentially.

Q.   Potentially.  What would have stood in the way of you contacting these witnesses that the alleged victim says must have seen something?  What potentially stood in the way of you contacting them three years ago?

A.   I was managing another case.  We had another case that was trial prepping at the time that took a bit of precedence.

Q.   But it's not like you're the only one in the office, right, Ms. Ruiz?  You can hand these things off to other people, right?

A.   I would not agree with that statement, no.

Q.   You weren't out in Wisconsin doing that interview on March 11th, right?

A.   Correct.  That interview was done when jurisdiction was still trying to be sought of where this case would end up.

Q.   Let me just make sure I understand then.

     Are you trying to tell us that waiting three years to try to contact these people is the best that you could do?

A.   I feel like I always try to do my best.

231

Q.   Ms. Ruiz, was this the best that you could do?

MR. KENNEDY:   Objection.   Asked and answered and badgering.

THE COURT:   Sustained.

Q.   (By Mr. Clark)   Now, you're familiar, Ms. Ruiz, the indictment in this case was returned in April 2023?

A.   Yes.

Q.   So you hadn't even tried contacting these witnesses before the indictment was returned?

A.   Correct.

Q.   Let's go over some of the specifics of these passengers that you reached out to.

Does it sound correct to say you reached out first time May 27th, 2025?

A.   Could be.

Q.   Would you like to take a look at your report?

A.   Sure.

MR. CLARK:   Your Honor, if I may approach?

THE COURT:   You may.

MR. CLARK:   One moment, Your Honor.

Q.   (By Mr. Clark)   We may be in a digital age, but nothing really replaces paper sometimes, right, Ms. Ruiz?

A.   Yes.

232

Q.   Okay.   Thank you for your patience there.

This is your report that you've got there in front of you about this?

A.   Yes.

Q.   And this says that you reached out on May 27, 2025?

A.   Yes.

Q.   Okay.   You didn't go over these folks --

MR. CLARK:   Could we bring up exhibit -- would you be able to help government's side, just to make it easier?

THE WITNESS:   I'm sorry.   Can you repeat that last part?   Did I acknowledge that I reached out on May 27th?

Q.   (By Mr. Clark)   Yes.

A.   That is incorrect.

Q.   It's not correct?

A.   The top line in this report says on May 27th I received personal contact information and seat numbers.   And then further down, when I go into it, it does say when I reached out to each person.

Q.   I was testing you, Detective Ruiz.

A.   Gotcha.

Q.   Thank you.

So it is May 29th, right?

233

A.   May 29th, and the individuals.

Q.   May 29th.  We didn't talk about these folks initially, but the folks in row one you tried to reach out to, right?

A.   Yes.

Q.   And with the guy in 1A, I think your report notes that you left him two voicemails?

A.   Yes.  That appears to be correct with a quick reading.

Q.   And you didn't do anything more than leave him two voicemails, right?

A.   That's correct.

Q.   Now, you've got his email address, right?

A.   I cannot be certain without those records in front of me.

Q.   Well, you got records from United?

A.   Yes.

Q.   Okay.  Would you like to see those records from United?

A.   Sure.

Q.   Okay.

         MR. CLARK:  Your Honor, if I may approach once more.

         THE COURT:  Yes, go ahead.

Q.   (By Mr. Clark)  All right.  Ms. Ruiz, can you see

234

those records?

A.   Yes.

Q.   So is it fair to say that you had his email address as well?

A.   Are we on one -- can you remind me of the seat number?

Q.   Seat 1A.

A.   1A appears potentially to be a female, McKenzie.

Q.   Oh, boy.  McKenzie Huntington?

MR. KENNEDY:  Your Honor, I would request that we not use the names for the individual's privacy.

MR. CLARK:  I'm trying not to, for what it is worth, Mr. Kennedy.

THE COURT:  Right.

Q.   (By Mr. Clark)  So the person in 1A, you had his email -- or her email address?

A.   It was not highlighted in the return, so I don't initially see it on here.

Q.   Do you have a physical address for this person?

A.   I would have to sift through this to be certain.

Q.   And maybe we can speed this up a little, Detective Ruiz, but isn't it fair to say that if you wanted to get the email address and the physical address of the person in 1A, the FBI could have done

235

it, right?

A.   Yes, with additional time.

Q.   If you had made the call anything earlier than May 29th of 2025?

A.   Yes.

Q.   Yeah.  But you settled for just leaving two voicemails?

A.   Yes.

Q.   Okay.  1C, with this person, you also just left two voicemails for them?

A.   Yes, that's correct.

Q.   And you could have done more to find this person if you had wanted to?

A.    I could have attempted more calls or sent certified letters or something that would have taken additional time.

Q.   Or found that person's address, right?

A.   Yes.

Q.   Sent people to their house, right?

A.   I suppose.  This type of case, we don't typically do that.

Q.   You're a task force officer with the FBI, right, Ms. Ruiz?

A.   Yes.

Q.   And this is a case in a federal courtroom, with a

236

jury in front of us, in front of a federal judge,

it's not a resource issue for the FBI, right?

A.   I suppose not.

Q.   It's an important case, right?

A.   Yes.

Q.   With the person in 1D, you actually spoke with him, right?

A.   Yes.

Q.   And he told you he didn't remember anything about the flight?

A.   Yes.

Q.   Okay.  Now, the person in 2A, we had just gone over, Ms. Ruiz, that this is one of those people that in the March 11th, 2022 interview, the alleged victim, Wendi Jay, says that person had to have seen what was going on.  And you just left the person in 2A two voicemails, right?

A.   Yes.  2A, yes.  I called 2A two times.

Q.   Two times more than three years after the events, right?

A.   Yes.

Q.   And that's all you did to find this person?

A.   Yes.

Q.   2C, you mentioned that you spoke with both people in 2C and 2D, right?

237

A.   Yes.

Q.   And 2C said he didn't remember anyone looking like they needed assistance?

A.   That sounds correct.  Nobody in first class that I got ahold of --

Q.   Okay.

A.   -- acknowledged that.

Q.   And he also said he didn't remember anyone needing anything out of the ordinary?

A.   That sounds correct.

Q.   And this is the guy who also said he would have probably had noise cancelling headphones, right?

A.   Yes, that's correct.

Q.   But he also says he definitely would have remembered if there was a disturbance, right?

A.   That sounds correct.

Q.   Seat 2D, he said that he talked with his seat mate during the flight, right?

A.   Yes, that's correct.

Q.   Because they were both coming out here to ski?

A.   Yes.

Q.   And he says he doesn't recall any loud talker, right?

A.   Yes.

Q.   Or anything else out of the ordinary?

238

A.    Correct.

Q.    And you also got ahold of the person in seat 3A, right?

A.    Yes.

Q.    And he said he doesn't remember anything, correct?

A.    (Witness nodded).

Q.    Now, 4A, I think you mentioned you thought this person might be in Ireland?

A.    Yes.

Q.    So you didn't even try to find that person?

A.    Correct.

Q.    And you spoke with the person in 4C, right?

A.    Yes.

Q.    And the person in 4C told you he or she doesn't remember anything?

A.    Correct.

Q.    And the person in 4D, you left two voicemails, right?

A.    Correct.

Q.    Now, are you aware -- you received some records from United.  Are you aware of any passengers making complaints to United besides Ms. Jay for that evening?

A.    I requested anything related to any reports from

239

this flight from United.

Q.   And are you aware of any of these passengers making a report to United about that event that night besides Ms. Jay?

A.   No, I'm not, except for the flight attendants.

Q.   Fair enough, except for the flight attendants.

A.   And I believe the captain may have written a report as well.  So we'll say United staff on that flight.

Q.   Okay, but none of the passengers?

A.   Correct.

Q.   And you said you got a report from the captain, but the captain was flying the plane, right?

A.   Correct.

Q.   So he didn't see anything that was going on?

A.   Correct.

        MR. CLARK:  Okay.  Thank you for your time, Ms. Ruiz.

        THE COURT:  Redirect, Mr. Kennedy?

        MR. KENNEDY:  Thank you, Your Honor.  Just briefly.

**REDIRECT EXAMINATION**

        BY MR. KENNEDY:

Q.   Detective Ruiz, do you investigate cases diligently?

240

A.   Yes.

Q.   How many airport cases do you have at any given time?

A.   Over 30, probably.

Q.   Are reports of disturbances of various natures on flights common in your work?

A.   Yes.

Q.   About how many times a year do you get an investigation like that?

A.   I'm sorry, was the question -- could you repeat it?

Q.   How often -- how many a year disturbances on flights of any nature do you get?

A.   A good amount.

Q.   And some of those are investigated because law enforcement report to the gate, correct?

A.   Yes.

Q.   And then you can actually interview people live, correct?

A.   Correct.

Q.   When it's reported later, is the investigation more difficult?

A.   Absolutely.

Q.   Is it harder to track down people?

A.   Absolutely.

241

Q.   Have you found that there's a law of diminishing returns in terms of the value of the information that you get?

A.   Yes.

Q.   How frequently -- how frequent is it, in a report of conduct of the nature that we're talking about here, that other -- that in your experience, other people around it have actually observed it?

A.   Almost never.

MR. KENNEDY:  No further questions, Your Honor.

THE COURT:  Thank you.

We need to take a lunch break now.  You have one more witness; is that correct?

MR. KENNEDY:  Yes, Your Honor.

THE COURT:  Well, let's -- maybe a little bit after noon.

MR. KENNEDY:  It is 12:15, Your Honor, I believe.

THE COURT:  Yeah.  We should already be back under my calculations.

MR. KENNEDY:  Constructive lunch, Your Honor.

THE COURT:  Constructive lunch, 1:10.

THE CLERK:  All rise, please.

242

(Jury exits courtroom.)

THE COURT:  Will counsel come up.

(Sidebar conference.)

THE COURT:  I'm not going to give a lesser included.  I'm going to instruct on the indictment and not include the thing you asked for.

MR. CLARK:  After saying you were going to give it to us, Your Honor.  That's not fair.

THE COURT:  I said I was inclined but have done a lot of research and thinking since then.  So do you want to put anything on the record about my objection?

MR. CLARK:  Yes.  We object to that.  We think it is going to be appropriate.  We still haven't heard from the final witness yet, Your Honor, so we haven't heard all of the evidence on that.  That would suffice for the record.

THE COURT:  Okay.

MR. KENNEDY:  We'll stand on our papers on that.

MR. CLARK:  Your Honor, I have one other thing to bring up.  I didn't bring it up when Ms. Ruiz was on her cross-examination because I didn't want to surprise the government, because we talked about the narrow scope of cross-examination;

243

but given Ms. Jay's testimony today and the limitation we've had about showing her the reports, I need to be able to talk to Ms. Ruiz about the interview that she did with Ms. Jay last month where she said something that directly contradicts what Ms. Jay said on the stand today.

So I'm asking you for permission to either get that done once we're back before we put Ms. Tincher on, or be able to call her in our case.

THE COURT:  You want to talk to Ms. Ruiz again?

MR. CLARK:  Yes.  I didn't do it at the time, Your Honor, because I didn't want to surprise the government, give them a chance to object outside of the presence of the jury.

MR. KENNEDY:  Your Honor, I think it would be appropriate for him to do it in his case in chief if he wants to do it.  We have no objection to him calling her.  He can do that.

MR. CLARK:  Okay, after they finish.  It would be limited.

THE COURT:  All right.

MR. CLARK:  Thank you.

THE COURT:  Thank you.

MR. KENNEDY:  Thank you, Your Honor.

244

THE COURT:  Have a good lunch.

MR. KENNEDY:  Thanks, Judge.

(Sidebar conference concludes.)

(Recess.)

THE COURT:  Are you ready to proceed?

MR. KENNEDY:  Yes, Your Honor.

THE COURT:  We'll get the jury.

THE CLERK:  You may be seated while I get the jury.

(Jury entered the courtroom.)

THE COURT:  You may proceed, Mr. Kennedy.

MR. KENNEDY:  Thank you, Your Honor.  The United States calls Mary Tincher.

THE COURT:  Come forward and be sworn, please.  Right up here in front of the clerk of court.

THE CLERK:  Please raise your right hand.

**MARY TINCHER,**

called as a witness at the request of the Government, having been first duly sworn, was examined and testified as follows:

THE WITNESS:  Yes.

THE CLERK:  Please come around to the witness box here and have a seat.  Then if you will please state and spell your name for the record.

245

THE WITNESS:  My name is Mary Tincher.  Do you want me to spell the whole name?  M-A-R-Y, T-I-N-C-H-E-R.

THE COURT:  Go ahead.

MR. KENNEDY:  Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. KENNEDY:

Q.   Good afternoon, Ms. Tincher.  Are you feeling okay today?

A.   Yes.

Q.   Thank you.

I want to start by asking you a few questions about your background so the jury can know a little bit about you.

Where do you live?

A.   I live in Lehi, Utah.

Q.   And how long have you lived in Lehi?

A.   I've lived in Utah for 24 years, but Lehi only about a year.

Q.   Okay.  And do you have family?

A.   Yes.

Q.   Tell us generally about your family.

A.   I have a husband of 37 years.  I have four children and two and a half grandchildren.

Q.   Two and a half.  Does that mean one is on the

246

way?

A.    I have a little girl -- we have a little girl on the way.

Q.    Congratulations.

A.    Thanks.

Q.    Where did you go to school?

A.    I went to Ricks College - BYU Idaho.

Q.    And did you get a degree there?

A.    Yes.

Q.    In what?

A.    I got an associate's degree in floral design and horticulture.

Q.    And what year did you get that degree?

A.    '89.

Q.    Are you employed right now?

A.    Yes.

Q.    Where are you employed?

A.    I work for American Airlines.

Q.    Okay.  And what do you for American Airlines?

A.    I'm a flight attendant.

Q.    Where are you based?

A.    Chicago.

Q.    So does that mean you have to commute a lot?

A.    Yes.

Q.    Is that a common experience with flight

attendants to live someplace but have your home base somewhere else?

A.   Fifty/fifty.

Q.   How long have you been with American?

A.   I've only been with American, mainline, since -- for -- since May 20th.

Q.   And where were you before that?

THE COURT:  Excuse me, can you get a little closer to the microphone, please.

THE WITNESS:  Sure.

THE COURT:  Thank you.

THE WITNESS:  Do you want me to pull it down or --

MR. KENNEDY:  That mic will work if you pull it down a little closer to you.

THE COURT:  Thank you.

Q.   (By Mr. Kennedy)  And where were you before you joined American main carrier?

A.   So I worked for a sister company, Envoy.  And then before that, I worked for Southwest Airlines and Sky West Airlines.

Q.   Okay.  How long -- how many years total have you been a flight attendant?

A.   Ten.

Q.   Were there any gaps in your service?

A.   Yeah.  I took two years off to take care of my mom.

Q.   Now, what years did you work for Sky West?

A.   I worked for Sky West from October of 2017 I think.  It was '16 or '17 to '22.

Q.   And --

A.   Actually, I'm sorry, I worked with them until May of '23.

Q.   And while you worked for Sky West, did you have any special duties in addition to being just a regular flight attendant?

A.   Yes.

Q.   And what duties were those?

A.   I was an -- I was an in-flight lead instructor. So when flight attendants graduated from training, before they were certified with the FAA, they had to complete their in-flight training with me over eight to ten segments.  So over three to four days.

Q.   Okay.  I didn't catch that last word, three to four?

A.   Three to four days.

Q.   Three to four days.

     Describe what a segment is?

A.   So that would be like going from Salt Lake City to, let's just say, St. George.

249

Q.   Okay.  So for instance, if a flight is -- if a passenger is going from like Salt Lake to Minneapolis, but there's a layover in Denver, the Salt Lake to Denver would be a segment and then Denver to --

A.   Wherever.

Q.   -- would be a segment?

A.   Yes.

Q.   Okay.  About how many flights do you think you've been a flight attendant on in your career?  Can you even guess?

A.   Thousands.

Q.   Thousands.  And is there a -- is there a special course of training to become a flight attendant?

A.   Yes.

Q.   And what is that training?  What does that training consist of?

A.   It's six to seven weeks training unpaid.  And that includes -- people think service is my only job, but it's not.  It includes emergency evacuations, it includes medical, it includes CPR, it includes learning different door procedures, flight deployments.

We are drilled on scenarios from intoxication, to child trafficking, to disgruntled

250

passengers.  We're trained big time to diffuse a situation.  We wear many, many hats.  There's a ton of medical, fire.  We're trained in fire equipment on an aircraft.

Q.   How to evacuate an aircraft?

A.   Very much so, yeah.  We are trained to teach it on land or water.

Q.   What would you say is the number one responsibility of a flight attendant on a plane?

A.   Safety.  We're drilled that constantly.

Q.   And everything else is secondary?

A.   Yes.

Q.   And did you go to this training?

A.   Yes.

Q.   And you, in fact, helped train others; is that right?

A.   Yes.

Q.   When did you go through your initial training?

A.   The first time?

Q.   Yes.

A.   In 2016.

Q.   And was that for Sky West?

A.   Yes.

Q.   Now, is your job governed by rules and regulations?

251

A.    Yes.

Q.    Whose rules and regulations?

A.    So there's company policies that are governed by Southwest Airlines.  When the door shuts, it's governed by the FAA so it's by the Federal Government.

Q.    And when you say Southwest Airlines --

A.    I'm sorry, Sky West Airlines.

Q.    And you mean whatever airline is actually operating the aircraft?

A.    Right.  There's two sets of policies.

Q.    And the FAA being the most important?

A.    Yes.

Q.    So the airlines have to follow FAA regs; is that right?

A.    Correct.

Q.    And you and all the -- all the crew, pilots, they all need to be certified by the FAA?

A.    Right.  That's why my job was so important when I was teaching.

Q.    And so you're trained in these regulations as well; is that right?

A.    Yes.

Q.    Are there standards for customer care?

A.    Yes.

Q.   And who primarily governs those?

A.   Well, standards are mostly by the company and the airlines.  It's kind of a gray area.  I mean they kind of go hand-in-hand, to be honest with you, because we have to adhere to the government policy, you know, to make sure we're doing the correct procedures from the FAA; along with the standards also are set higher with a company.

Q.   And you have to make sure that everything that you do with customer care also fits into the safety realm?

A.   Very much so.

Q.   Are you trained on the -- on how to handle behavior issues on a plane?

A.   Yes.

Q.   How do you handle an in-flight customer complaint?  What is the standard for handling an in-flight customer complaint?

A.   We're taught to listen, to observe.  We're taught to problem solve, you know, see what it is that we can do to fix the problem, thank the passenger, you know, give the best feedback.

        The biggest thing that we're taught is to try to diffuse a situation, but also not give anyone like false hope.

253

Let's just say a connection. I can't tell you that your flight is going to get there at 3:00 because you would be disappointed in me if it got there at 3:30. So I don't want to ever give false information.

Q. Okay. How do you handle instances of in-flight customer misbehavior?

A. I try to find -- I try to diffuse the situation. I go to them, I talk to them, I listen to them, find out what their complaint is. I try to offer a solution. If I can't offer a solution, I'll ask my other flight attendant for the solution. You know, in the end, we're trying to make sure that everyone is safe and that we're trying to give a positive outcome. But the biggest thing is we never jeopardize safety.

Q. And that is the safety of everybody onboard?

A. Yes.

Q. Let me ask you a few specific questions specifically about alcohol intoxication.

Are there regulations governing that with regard to customers?

A. That comes from the FAA, yes.

Q. Okay. And in general, what are those regulations?

254

A.    A passenger may not board a plane if they appear to be intoxicated.  We can't take a passenger if they appear to be intoxicated.  We have to monitor and observe the passengers throughout the flight, that they would be safe to be able to walk off, be able to catch a connection.  We have to make sure that they would be safe to drive possibly, or if they're not, that they have a ride to pick them up.  But it's a big thing that we watch all throughout the flight.

Q.    And you also need to make sure that they're sober enough to evacuate if that became necessary?

A.    Yes.  I'm sorry, I forgot that.

Q.    So this is something that you watch pretty carefully?

A.    Very.

Q.    And was that something that you did when you worked for Sky West?

A.    Yes, and I currently do.

Q.    Is that something that you trained other flight attendants to do?

A.    Yes.

Q.    So I'd like to direct your attention back to March 1st of 2022.

        Would you remind us where you were employed then.

255

A.    Sky West Airlines.

Q.    On that date, do you recall if you were working?

A.    Yes.

Q.    And were you working that day?

A.    Yes.

Q.    Okay.  Do you recall where or what flight you were working?

A.    We worked from Chicago to Salt Lake City, was the last flight of the day of a four-day trip.

Q.    Do you recall what time the flight left?

A.    Around 8:00 p.m., 8:00-ish.

Q.    Okay.  Do you recall whether it was daylight or dark at that point?

A.    It was dark.

Q.    Do you recall what type of aircraft you were on?

A.    We were in an Embraer or the ERJ 175 aircraft.

Q.    And what was your assignment that day?

A.    The forward flight attendant which covers first class.

Q.    Okay.  I'd like to show you --

        MR. KENNEDY:  If we could call up what has been admitted as Government Exhibit No. 1.

Q.    (By Mr. Kennedy)  Do you recognize that?

A.    Yup.

Q.    Would you -- is this -- does this represent the

256

plane that you were using -- that you were flying that night?

A.   Yes.

Q.   And when I say "that night," I mean the night of March 1st.

A.   Yeah.   This is an ERJ 175 aircraft.

Q.   And configured the way that one was configured?

A.   Yes.

Q.   I'd like to ask you to point out a couple of public areas for us.

Would you point out where the -- where the first class cabin is?

A.   So if you see the yellow, and that would be rows one through four.   There would be one seat on the left side of the aircraft, two seats on the opposite.

Q.   Okay.   And that's the entirety of first class?

A.   Yes.

Q.   Would you tell us what on this map signifies the galleys?

A.   The galley that I was responsible for would be the forward gallery, where you see the cup.   This aircraft does have a nice galley in the back.   It's all the way in the back of the aircraft which was not my responsibility.

Q.   Okay.   And are the -- and the lavatories?

257

A.    There are two lavatories, one in the forward and one in the back.

Q.    Would you point out for us where on this aircraft the -- first of all, let me back up.

Are there special assigned jump seats for flight attendants on this aircraft?

A.    Yes.  So on this type of aircraft, we -- there's two flight attendants.  One is called the forward flight attendant which is the first class flight attendant.  The back is the aft flight attendant.

The forward flight attendant jump seat -- so you see the red arrow on the left side of the aircraft and you see the lavatory, it would be placed on that wall right there.  Go a little forward.  No, it's little bit more toward the corner.

Who's got the mouse?

So I would tell you it is more toward the corner, like go back to where the gentleman -- the lav is -- so go, go, go a little further.  Right there.  Right around there.  So it's like in that area.

Thank you, sorry.

And there is a wall -- that line that you see, there is a full cut wall right there.

Q.    So that partially blocks the view down the --

258

down the aisle; is that right?

A.   That's correct.  The aft jump seat is also right by the lavatory.

Q.   But in the back of the plane?

A.   Yes, which was not my responsibility.

Q.   Did you ever occupy the aft seat on this flight?

A.   The aft jump seat?  No.

Q.   Okay.  Are there any surveillance cameras on this plane?

A.   Absolutely not.

Q.   Okay.  Now, on the night of March 1st, 2022, was the first class cabin full?  Were all 12 seats occupied?

A.   Yes.

Q.   I'd like to -- I'd like to show you what has been admitted as Government Exhibit No. 3.

     And does this appear to you to be a United Airlines passenger record?

A.   Yes.

Q.   And let me back up for one second.

     You worked at that time for Sky West Airlines?

A.   Yes.

Q.   What is the relationship between Sky West and United?

259

A.    So Sky West Airline is a regional airline that employs over 35,000 employees, but they represent all four of the big four.  They represent American, United, Delta, and Alaska.  Their aircrafts are designed for them purposely to mimic their image, I guess, or their decor.

So when I fly for United, the aircraft looks just like a United aircraft.  I say the United announcements.  I do the United Airlines service.  So each -- so I am trained on all four of the major four aircrafts.  But on this particular leg, in this segment, I was flying for United.

Q.    So that's what it means when -- like when it says, "United Airlines flight X operated by Sky West," it's the "operated by" part that is Sky West?

A.    Yes.

MR. KENNEDY:  Can we zoom in on the upper left corner of this please, Ms. Gaitin.

Q.    (By Mr. Kennedy)  Do you recognize -- is that the name of the passenger that this relates to?

A.    This is the passenger that was sitting in 3 Charlie.

Q.    Okay.

MR. KENNEDY:  So let's back out of that, and if you would zoom in that last row, please.

260

Q.   (By Mr. Kennedy)   So the bottommost row that says "2," going through that, what does -- what does O-R-D mean?

A.   So we're going from -- I can read the line for you.

We're going from Chicago to Salt Lake City on United, operated -- that OO is the call sign for Southwest -- excuse me, for Sky West Airlines.  It's date of the flight, March 1st, 2022.  The flight number is 5433.

Then it has the same flight number because that was the originating flight number.  Sometimes you'll get a different flight number in case like it changed, because we had flown in and out, but this segment was the same flight number.  It departed at 20:25, so 8:25.  We landed at 23:15, which would be 11:15.

Q.   And this record also shows the passenger's previous flight just above it; is that right?

A.   Yes, he had a connection in Chicago.

Q.   Okay.  And O-R-D stands for O'Hare Airport; is that right?

A.   That's correct.

Q.   Okay.

MR. KENNEDY:  Let's take this down, please,

261

and then bring up what has been admitted as Government's Exhibit No. 4. And if you would zoom in on that upper left, please.

Q. (By Mr. Kennedy) And what passenger does this relate to?

A. This was the female passenger seated in 3 Delta, which would be by the window. Wendi Sue Jay.

Q. Okay.

MR. KENNEDY: And if we could zoom in on the bottom line there.

Q. (By Mr. Kennedy) And this information is identical other than the seat number, is that right, from the previous record?

A. On No. 2, that's correct.

Q. So she was seated in 3 Delta?

A. Yes. She --

Q. Or 3D since it was a United flight.

A. I'm sorry?

Q. Never mind. I withdraw that comment.

A. Yeah, I got it.

MR. KENNEDY: Let's go ahead and take that down.

Q. (By Mr. Kennedy) You may have said this, but if you did, I didn't -- I didn't catch it.

How many flight attendants were on this

flight?

A.    Two flight attendants, a forward and an aft flight attendant.

Q.    Did you ever provide any assistance in the main cabin?

A.    No.

Q.    Were you able to see and hear everything in first class at all times?

A.    No.

Q.    What was the lighting like on this flight after takeoff?

A.    Because it is the evening flight, we try to match the conditions outside.  So the lighting was dark or dim.  I believe that evening, we have -- I believe United's policy is we can't have a dark cabin, so the sidewalls were dimmed.  That's the lighting against the aircraft.

Q.    But it was -- it was pretty dark in there; is that correct?

A.    Yes, that would be so.

Q.    Now, in the first class cabin, do you recall any passengers that had their -- had their lights -- their reading lights on or anything like that?

A.    Yes.

Q.    What do you recall about that?

263

A.    Wendi was knitting.  I don't recall anybody else. There might have been -- I'm trying to think if anybody was working, but for the most part, it was late.

Q.    Did the cabin -- let me -- I'm talking about the first class cabin.

Did it seem pretty quiet?

A.    Yeah.

Q.    I'd like to direct your attention specifically to events that may have occurred in row three.

Is there anything from that flight that really sticks out in your mind about that?

A.    Yes.

Q.    Okay.  And let me also ask you, do you remember what the passenger in seat 3 Charlie, the aisle seat, looked like?

A.    He was a gentleman, an average sized gentleman. He wasn't overweight or anything.  He appeared to be probably in his late 40s or early 50s.

Q.    Do you think you would recognize him if you saw him again?

A.    Possibly, yes.

Q.    Would you look around the courtroom and tell us if you see him.

A.    Well, you're standing in my way.

264

Q.   I'm sorry.  I'll go over here and get out of your way.

A.   Yes.

Q.   Would you please point him out to the Court by something he's -- distinctive that he's wearing?

A.   Distinctive?

Q.   Something that would separate him from other people that might be sitting around him.

A.   He looks sad.

Q.   Anything about his clothing that's different?

A.   No.  He has a suit on.

Q.   Okay.

A.   I can't see everything.

THE COURT:  Mr. Kennedy, we'll stipulate she's identified Mr. MacLean.

THE WITNESS:  Yes.

Q.   (By Mr. Kennedy)  And --

A.   I remember him being an attractive man.  You know, he was very nice.  He was friendly.

Q.   Let me stop you there.

A.   Okay.

Q.   Since we don't have a question pending.

You had -- so you have identified the defendant, Mr. MacLean.

Do you also remember interactions with the

265

passenger seated in 3D, the lady?

A. Yes.

Q. On boarding, did either of these passengers appear to you to be intoxicated?

A. No. No.

Q. Had they, would they have been allowed to board?

A. No.

Q. Do you recall anything about their demeanor at the beginning of the flight?

A. They were very friendly with each other. They were very nice to one another.

Q. Okay. What were they doing?

A. Chatting.

Q. Okay. Did you hear any of the conversation?

A. They were just nice to one another, chatting.

Q. Okay. And at this point, you were also helping other customers, correct?

A. That's right.

Q. So you weren't focused 100 percent on them?

A. Yeah. There was nothing to alarm me.

Q. Okay. Did you know whether or not they were traveling together?

A. I assumed they were, because they were nice to one another.

Q. Okay. Now in -- in first class, there's a drink

266

service, right?

A.   That's right.

Q.   And is that complimentary?

A.   Yes.

Q.   Includes complimentary alcohol?

A.   That's right.

Q.   Do you recall whether the passengers on the left side of row three ordered drinks?

A.   Yes.

Q.   And when you had that situation with a male and female, whose drink order do you take first, typically?

A.   We take the lady's first.

Q.   Okay.  Did you do that in this case?

A.   Yes.

Q.   And did Ms. Jay take an -- order a drink?

A.   Yes.

Q.   Do you recall what she ordered?

A.   Well, I believe it was a Vodka soda.  I believe they both had the same drink.

Q.   Okay.  That was getting to my next question.

        Did Mr. MacLean also order a drink?

A.   Yes.

Q.   And it was the same drink as Ms. Jay?

A.   I believe so.

Q.   And that order was placed after her drink?

A.   Yes.

Q.   Okay.  Was there a -- was there a second drink service on this flight?

A.   In first class, we just constantly monitor.  And Mr. MacLean had two drinks throughout the flight, a total of three, but he had two additional drinks.

Q.   Okay.  Was there anything about the -- about the second drink order that stands out in your mind?

A.   Yes.

Q.   And what is that?

A.   He was being very nice, nothing out of the ordinary, but very nice.  He encouraged her to try to have another drink.  She said "no."  He put his hand on her knee, like come on, like, you know, just a very friendly gesture to have a drink.  So I assumed they were a couple, but she declined.  She said no.

Q.   And she was adamant about that?

A.   Very much so.

Q.   Did you serve Mr. MacLean that second drink?

A.   Yes.

Q.   And at some point, did you serve him a third drink?

A.   Yes.  He seemed completely fine.

Q.   Did you -- do you recall approximately when in

the flight that third drink was ordered?

A.   So that's a 3-hour and 25-minute flight.  And so it was probably midway through the flight.  I can't tell you exact, but probably.

Q.   Okay.  Now, at some point, did the flight attendant call button for seat 3D ring?

A.   Yes.

Q.   Okay.  And just for clarification, was the third drink served to Mr. MacLean before or after that?

A.   It was before.  It was quite a bit before.

Q.   Okay.  At that point, when that call button went off, did you respond to that?

A.   Yes.

Q.   Was Mr. MacLean in his seat?

A.   No.  He had gone to the restroom.

Q.   And did you see him go to the restroom?

A.   Yes.

Q.   When he went to the restroom, did you observe anything like odd about his behavior or gait?  Was he staggering or anything?

A.   No.  He was totally fine.

Q.   When you -- when you talked with him, was his -- did he -- was his voice slurred in any way?

A.   He never appeared to be intoxicated.  He had no slurred voice.  He had no red face.  He could stand.

269

He never staggered.

Q.   Did you ever hear him talking loudly?

A.   No.  He just was nice.  He was very nice.

Q.   And that was your initial impression of him?

A.   Yes.  Very friendly.

Q.   Okay.  Were there any issues with -- this is during Covid; is that right?

A.   Yes.

Q.   Were there any issues with masking?

A.   Yes.  He fell asleep and his mask had come off.

Q.   Were there any other issues any other times when you had to correct him on masking, that you recall?

A.   It's very common that people thought that they could take their mask off.  And as long as they had a glass in front of them, they didn't have to wear their mask.  So it's very likely that I probably had to remind him to put the mask on.  I can't tell you 100 percent.

Q.   Okay.  So let's go back to where the -- where you're responding to the call button pressed by Ms. Jay.

        Did you approach the row?

A.   Yes.  She asked me to come.  She rang the call button.

Q.   And when you got there, what happened?

270

A.   She motioned for me to get closer to her and so I did.  And she asked me not to serve him any more alcohol and I said, "Okay.  Is everything fine?"

        And she said, "No, he is being -- he's saying inappropriate things to me.  He's very handsy."

        And I asked her if she would want me to do anything.

Q.   And what did she say?

A.   I asked her if she wanted to move.  It was close to landing.  She said, "No."  I asked her if she felt comfortable.  She said, "I'll be okay," but her body language had become very rigid.  She had a tear in her eye.  She was emotional.

Q.   Okay.  So armed with this information, what did you do?

A.   So when the gentleman came back to his seat, I was watching and I could tell that she was facing the window.

Q.   Do you need a minute?

A.   Just a second.

        And she was in tears just like me.  So it concerned me enough and with my training -- go ahead, you ask the question.

Q.   Let's back up.

271

At this point, did you go anyplace and report this to anybody?

A.    Yes.  I called the captain.  I said that I had a female that had asked me to stop serving alcohol to the passenger.  I gave him the seat number, that he was saying rude and inappropriate things, being handsy.

He asked then, "What would she like us to do?  What can we do to help her?"

Q.    And what did he tell you to do?  Did he direct you to do anything in particular?

A.    I had offered to move her, she had declined.  I had told him that.  He said, "Keep an eye on it."  He said, "Inform me of any changes."

Q.    Okay.  So at this point, you're aware that there's some issue here?

A.    Oh, yeah.  That's big time.

Q.    And so does Mr. MacLean return to his seat?

A.    Yup.

Q.    And does he -- does he make any requests?

A.    He comes back completely fine.  And as he's sitting down, he asks me if he could have some more liquor.  I told him I was done serving for the night.  Excuse me.  Then he asked me for a beer.  I said, "I'm sorry, I can get you some water."

272

He was -- like kind of gave me a little bit of a face and sat down. I brought him back the water. Shortly after that, he fell asleep.

Q. Okay. Are you certain he was asleep or did he appear to be asleep?

A. Oh, I'm pretty sure he was asleep. I'm very sure.

Q. Okay. And during that -- during that period again, you're still going throughout the cabin and attending to other customers that might need anything?

A. I only had four rows.

Q. Okay. Did you notice any changes in -- we've already talked a little bit about this.

Did you notice any changes in Ms. Jay's demeanor over the course of this?

A. Oh, it came from being a friendly conversation to her looking scared. Her body had more twist. Her shoulder was more twisted. She was still continuing to knit. She kept her face a lot to the window. She cried several times.

Q. Did that set off any alarm bells in your mind?

A. Yes.

Q. And --

A. This wasn't normal.

273

Q.   And did there come any point where you were going to wake Mr. MacLean?

A.   I didn't want to wake him.

Q.   Okay.  But did you approach the row to possibly do so?

A.   I approached the row to try to get him to put his -- the seatbelt sign was on and his mask was down.  But because he was sleeping and the circumstances, I did not have him do that.

Q.   Okay.  Did Ms. Jay make any indication to you about -- about that situation?

A.   She asked me not to.

Q.   Okay.  And how did she do that?

A.   It was more of a hand-like conversation, like -- like what should --

Q.   Sort of putting her hands up to stop or something?

A.   I kind of asked her if it should be -- should I wake -- I didn't ask.  I never said a word.  Does that make any sense?  This is more of like looking at her, should I wake this gentleman up or not, but it was -- I'm going to be honest, I deemed that it was safer to not bother him and not bother with the seatbelt, because of the way her body language was.

Q.   Describe that body language to us, please.

274

A.    She was fearful.  And she kind of waved to me with her hand like "please don't wake him."

Q.    And based on that, did you take any additional actions?

A.    So I was really concerned.  And I've never done this in all my years of being a flight attendant.  I was nervous and so I wrote a note to her, asking her again if she was okay.

Q.    Okay.

            MR. KENNEDY:  And let's pull up, please, what has been admitted already as Government Exhibits 2A and 2B.

Q.    (By Mr. Kennedy)  Do you recognize these?

A.    Yes.

Q.    Is this a true copy or true depiction of the notes that you exchanged between -- exchanged with Mary -- with Wendi Jay?

A.    Yes.

Q.    And is "2A" your handwriting?

A.    Yes.

Q.    And does "2B" depict your hand --

A.    Yes.

Q.    And did you, in fact, provide these images to the United States Attorney's office?

A.    Yes.  I had taken a screen shot.

275

Q.   Okay.  And do you recall when you took that screen shot?

A.   I had to take the screen shot for my report to the company.  And so -- oh, I'm sorry.

I have to report any incidences that happen on the aircraft within 24 hours of the flight.  And so it was done right after.

Q.   So you, in fact, did that?

A.   Yes.

Q.   And you kept this for a substantial period of time; is that right?

A.   I still have it.

Q.   Would you please tell us or read for us what you -- what you wrote to Ms. Jay.

A.   I asked her -- the first time I asked her, "Are you okay with sitting by him?"

Q.   And was this a note that passed back and forth between you or was this something like you wrote the whole thing and then she wrote a whole response?  Do you recall?

A.   Yes.  I wrote, "Are you okay with sitting by him?  I don't want to wake him up either."

I believe my second response, because the note went back and forth, is, "Are you feeling uncomfortable?  What do you want me -- do you want me

276

to do anything?"

And because of her response I wrote, "I can have the police meet the plane."

Q.   What was her response?

A.   She said, "I feel like an idiot but he's groping me and saying inappropriate" -- "inappropriate, what he probably thinks is flattering comments.  I'll just" --

And then this was another time the note passed through, "Upon landing, I'll just stay on the plane until he gets off.  I don't want to cause a scene.  Thank you."

And she also said she was good because he was sleeping.

Q.   Now, based -- now with this note in hand, what did you do?

A.   I called the -- I went to the back of the aircraft.  I showed it to my fellow flight attendant. I called the captain.  He asked me, "What can we do to help her?  What can we do?"

He asked if she wanted the police, because that's actually normal policy when something like this happens.  And I said that she had declined.  So that's why I wrote, "Do you want the police to come?"

Q.   What was her body language and demeanor at this

277

point, during this note exchange?

A.   She was crying.  She was upset.

Q.   And based on all of that, did you take any other actions that might be a little bit different from what you would have done ordinarily, other than contacting the captain and updating him?

A.   I also notified the back flight attendant, but I also decided that I needed to stay close to her.

Now you have to understand, she wasn't bawling, but she had tears streaming down.  She was very quiet, like trying to not be heard or seen.  So I sat in my jump seat so I could observe, to make sure nothing was happening, that she was okay.

Q.   And did you stay there for the entire rest of the flight?

A.   I can't.  I stayed there for a fair amount, but I also got up, picked up other drinks, checked on it, checked on them, you know, make sure there's nothing happening.  But I mean, I kept going as often as I could.  I sat down, which is uncommon.  I tried to stay out of the galley where I could have visual of my cabin at all times.

Q.   Did you have an unobstructed view -- when you were seated in the jump seat, did you have an unobstructed view of those seats?

278

A.    No.  I can't see everything.

Q.    And could you -- and if you weren't in that jump seat, you might -- your back might have been turned or something else could have happened, something could have happened when you weren't looking; is that right?

A.    Exactly.  If I'm in the galley I can't see anything.

Q.    So from what you observed, was the rest of the flight quiet?

A.    Yes.  A lot were sleeping, but that's -- still people were having beverages.  I can't tell you what kind or anything.

Q.    But there comes a point where you stop, when you stop serving beverages, and you were getting ready to land; is that right?

A.    Yes.

Q.    Now, was the -- was there much other activity in the first class cabin?  In other words, were you -- were there a lot of drink requests or other requests from other from passengers in other rows?  Is there anything memorable about that service?

A.    No.  There was nothing out of the normal. Nothing.

Q.    Quiet?

A.    Yeah.  I mean you have to understand, it's late.

Q.    Yeah.  Is there a certain degree of ambient noise on the airplane that's always there?

A.    Sure.  Yes.

Q.    Is that sometimes distracting?

A.    For me, no.

Q.    For people generally, in your understanding?

MR. CLARK:  Objection, Your Honor, calls for speculation.

THE COURT:  The last part of it, sustained.

MR. KENNEDY:  I'll rephrase.

Q.    (By Mr. Kennedy)  How would you describe the noise level inside of an airplane, in flight?

A.    On this particular aircraft?

Q.    Yes.

A.    It is not a loud aircraft.  It's normal.  I mean it's a little bit quieter aircraft.  Where these seats were located were not by the engines, so it was -- it was a reasonable -- it was just your normal noise.  There was nothing loud.

Q.    I want to back up a little bit and discuss a little bit more about Mr. MacLean's demeanor and alcohol.

Are you trained to spot intoxication?

A.    Yes.

280

Q.   And do you also consider that part of just your general life skills?

A.   Yes.

Q.   Do you recall how many drinks you served him?

A.   Three.

Q.   And if you did not believe he was intoxicated, why did you cut him off?

A.   Why did I?

Q.   Yeah.

A.   Because the passenger in 4A (sic) asked me to. And the biggest reason is that it's not that he appeared to be intoxicated, he is was putting my passenger in an unsafe environment.  When somebody says somebody is saying something inappropriate or touching them, no more.

Q.   You want to mitigate that?

A.   No.

Q.   I'm saying, do you want to mitigate that?  Do you want to lessen that possibility?

A.   Do I want to lessen?

Q.   You want to reduce the possibility by not serving alcohol?

A.   Yes.  I want to diffuse it.

Q.   Now, at one point in this investigation, you had a conversation or an interview with Salt Lake City

281

Police Detective Ruiz; is that right?

A.   Yes.

Q.   And at one point in that interview, you described Mr. MacLean as, quote, tipsy.

A.   He was.

Q.   What did you mean by that?

A.   Tipsy means sometimes that you're a little bit more friendly, that he was talking.  But I mean he was not -- he was never mean.  He was very, very friendly.

Q.   And later in that same interview, you stated that he had not crossed the limit.  What did you mean by that?

A.   He did not show any of the signs.  He wasn't loud.  His face wasn't red.  He wasn't demanding.  He was not slurred speech.  He could stand.  He could walk.  He could carry -- he carried a conversation with me.  I could tell that -- you know, like I said, they were friendly.  He could carry a conversation with Wendi.  He continued to try to carry conversations with her.

Q.   And what did you observe about that?  What was her reaction to that?

A.   He was twisting his body trying to talk to her. And I could tell that she wanted no part of it.

282

Q.   Okay.   And how could you tell that?

A.   Well, I don't know that she ever showed him that she was crying, but she was very adamant, like, "No, thank you."   I don't -- she had turned -- like I told you, she was facing -- her shoulder basically is to him.   Like basically she's showing every sign of "please leave me alone."

I know that he would talk to her and say -- he would try to get -- she was knitting, and tried to get in her personal space to see what she was doing.

Q.   You saw this?

A.   Yes.

Q.   About when in the flight do you recall that being?

A.   It happened several times, but at least mid-flight.

Q.   And was she resisting that?

A.   Yes.

Q.   At any point, did you have the sense that he was too -- had had too much to drink to know what he was doing?

A.   Never.

Q.   And you say that he was -- he was sleeping at one point.   Do you know about what part of the flight that was?

283

A.   I would say the last -- the last 45 minutes. Like it takes 30 minutes to descend.  So maybe 15 minutes before that, he fell asleep.  He slept until the lights came on to prepare for landing.

Q.   And this was late at night, right?

A.   Yes.

Q.   Is that a common occurrence?

A.   Very.

Q.   Were there other passengers that were sleeping?

A.   Yup.

Q.   Had they all had alcohol?

A.   I can't tell you yes or no.

Q.   Let's talk a little bit about the landing and deplaning.

Did this flight arrive on time?

A.   I believe so.

Q.   So about what time was that?

A.   Around 11:30.

Q.   Do you recall who got off the plane first?

A.   Between the two of them?

Q.   Generally.

A.   First class passengers deplane first.

Q.   Okay.  When did -- when in that sequence did Mr. MacLean get off?

A.   It was kind of interesting, I thought out of the

normal again, because a couple had -- a couple of passengers had gotten off.  He stood up.  He seemed to linger.  He seemed to still try to engage with Wendi, with the female passenger.  He kind of hesitated like he was waiting for her.

He got off first between the two of them. While he was lingering to get off the aircraft and still trying to engage with her, she still -- her body language was still facing the window.

Q.  Are you aware of anything that he may have left behind on the aircraft?

A.  I believe he left something, because that was the other thing that was odd.  He was in the jet bridge for quite awhile, then he left something.  I think he went up to the top, told the gate agent that he had left something.  He came down with her, I believe. And he -- you're not allowed to re-enter aircraft, so he never did.

The gate agent got something out of the seatback pocket and took it to him.  He still lingered there for a little bit longer, and then he deplaned and then he was gone.

Q.  What was the process for Ms. Jay getting off the plane?

A.  Ms. Jay was planning to leave later in the

flight -- later in the deplaning process, and so she left. I had -- when we had opened the door on arrival at Salt Lake City, the protocol, if there's a disturbance, is to have either a manager or a gate agent there, and I handed them the note. I asked them to wait. I told them that she would be deplaning towards the end. And they waited for her so that they could take her up to the top and talk to her.

Q. Do you know whether or not that happened?

A. Yes, it did.

Q. Did you participate in any part of that conversation?

A. Can you --

Q. At the top -- at the top of the gate, the boarding/deplaning area, did you participate in any of the conversations between the gate agent and Ms. Jay?

A. I can't -- flight attendants cannot leave the aircraft until everyone is off. So once every passenger had been off and I had checked to make sure there was no security threats left, I went to the top. I went up to her. She was still slightly crying. She was with the gate agent.

I am a female and I'm a hugger, and I had

286

felt horrible for her.  So I -- I hugged her and she was -- talked to me in my ear where no one could hear --

I'm sorry, just give me --

She told me that he had been grabbing and touching her breasts, and I told her I was so sorry.

She also, throughout that conversation, had told me that she was a mother and would never want this to happen to her daughter.  I am a mother of two girls and two granddaughters.  I would never want anyone to touch me or anyone inappropriately, and I felt like I had failed her.  It is my job --

Q.   Do you need a minute?

A.   -- to keep her safe.

Q.   While this was going on on the plane, were you fully aware of the gravity of it?

A.   No.  I missed in the note the groping part.

Q.   You missed it?

A.   Yeah.  I mean I am dyslexic and sometimes I am a very big skimmer when I read.  And when recently I read that, I didn't realize that he was groping her throughout the whole flight.

I'm so sorry.

Q.   Had you realized that, would you have done anything different?

287

A.   Well, I feel like I tried really hard to get her to -- there was really no -- the flight was basically full, so there really wasn't much place to move her. But I think I would have gone over her head at that point and had the police at the gate.

Q.   Let's talk about the moving for a second.

What is involved in moving a passenger from one seat to another on an aircraft?

A.   If there's no seats, it's quite a process.  And if there's not -- if there are, they would have to take all their belongings.  They would have to move. It would make a scene.

Q.   Could this have been done without alerting and disturbing and waking up Mr. MacLean?

A.   No.  No way.

MR. KENNEDY:  May I have a second, Your Honor?

THE COURT:  Yes.

THE WITNESS:  Your Honor, can I use the restroom?

THE COURT:  What is that?

THE WITNESS:  Can I use the restroom?

THE COURT:  She needs to use the restroom. Take her back to the jury room.

MR. KENNEDY:  I beg your pardon, Your Honor?

288

THE COURT:  She needs the restroom.

MR. KENNEDY:  Okay.

(Brief pause in proceedings.)

Q.   (By Mr. Kennedy)  Are you all right?

A.   I'm good.  Thank you.

Q.   Just another question or two.

First of all, I may have misheard you, so I want to clarify, the passenger that asked you to stop serving alcohol to Mr. MacLean was the passenger in 3D, Ms. Jay, correct?

A.   Yes.  Wendi Sue -- Wendi Jay.

MR. KENNEDY:  All right.  Your Honor, I have no further questions at this point, subject to redirect.

THE COURT:  Thank you.  You may cross-exam.

**CROSS-EXAMINATION**

BY MR. CLARK:

Q.   Good afternoon, Ms. Tincher.

A.   Hi.

Q.   It's been pretty emotional so far, the last few minutes it sounds like.

A.   Yeah.

Q.   Right.  And I imagine that it would feel awful to think that something happened under your watch.

Is that right?

289

A.   Yes.

Q.   And that seems to explain a lot of your emotional reaction here this afternoon?

A.   Yes.

Q.   Yeah.  That makes sense.

I want to go over some stuff with you.  I promise I'm not really trying to repeat things that you said before, I just want to make sure that we've got it right.

You have been a flight -- you've been a flight attendant for ten years, did you say?

A.   About ten years, yeah.

Q.   And while you were at Sky West at this time, back in 2022, I thought I heard you say that you were a lead instructor?

A.   That is correct.

Q.   Flight attendant supervisor?

A.   A lead instructor.  So let me explain that again.

Q.   Okay.

A.   So when a flight attendant graduates training, they do all this training in a classroom, on the ground in simulators.  So when they come out, before they can be certified from the FAA, they have to fly with me.  And so I am teaching them every single leg, on door procedures, on service procedures, on policy,

290

checking equipment.  I am reviewing -- I'm constantly talking about "this could happen," because when you're in the classroom, they're going to tell you it's all black and white.

But on an aircraft, we have so many -- like we said, we have different things happen, bad things happen, good things happen.  So I'm constantly teaching one on one with them.  This particular day, no teaching.

Q.   No teaching.  You said it was just the two flight attendants on that flight, right?

A.   That's correct.

Q.   And with your position as a lead instructor, it sounds like other flight attendants look to you as the example or standard, right?

A.   That's right.

Q.   And you also said that your primary duty as a flight attendant is safety; right?

A.   That's right.

Q.   It sounds like you take safety very seriously.

A.   Yes.

Q.   A couple of questions about that flight.

Does it sound right that it's scheduled for about 8:25 p.m. to 11:15 p.m.?

A.   Yes.

Q.   Would you consider that a redeye flight?

A.   No.  We don't do a redeye.

Q.   Okay.  And it sounds like you've got a pretty good memory of that flight; is that right?

A.   I have a good memory.

Q.   Yeah.  You were in charge of the first class cabin that night?

A.   Yes.

Q.   I want to ask you a little bit about that cabin.

MR. CLARK:  Could we pull up Exhibit 1 possibly.  Just 1 would be great.

Q.   (By Mr. Clark)  All right.  You looked at this before, right, Ms. Tincher?

One of the things that we're curious about, what is the size of the armrest there between seats 3C and 3D?

A.   Can I show you with my hands?

Q.   What if I -- so I've got an eight and a half by 11 notepad.

MR. CLARK:  Can I approach, Your Honor?

THE COURT:  Sure.

Q.   (By Mr. Clark)  Why don't you show us with this notepad.

A.   So it would be about -- about -- see the red line?

292

Q.   Yes.

A.   It would be about that far apart.  It would be vertical.

Q.   Okay.

A.   Not this way (indicating).

Q.   So maybe about seven and a half inches, if this is eight and a half?

A.   Yeah.

Q.   I won't hold you --

A.   I don't know.

Q.   I won't hold you to details, but maybe about seven and a half, a little less than the size of the width of this notepad?

A.   Yes.  It's substantially bigger than if you were in the main cabin.

Q.   Okay.  Now, what about the distance between seats 3A and 3C, what is the distance there?

A.   Only the armrest.

Q.   3A and 3C?

A.   Oh, I'm sorry.  I'm sorry.

So 3A does not have the armrest.  All it has is the walkway to board.

Q.   And that walkway, how big is the walkway?

A.   It is a regional jet so it's not very big.

Q.   What if I -- if we use an example, maybe the desk

the prosecutors are sitting at here.  Is it wider than the desk the prosecutors are at or smaller?

A.    Smaller.  To be honest with you, I can tell you.

It is the width of a suitcase.  And if you were to take a 22-inch or 21-inch suitcase -- now don't quote me if it's this way or that way.  I know I have to buy those sizes.

If I were to -- on the regional jet, if I were to pull my suitcase to the back, my suitcase is going to hit the seats.

Q.    So it's going to be a problem for a guy my size?

A.    No.

Q.    My suitcase is narrow enough?

A.    In first class, they just come on, pick it up, put it on the overhead bin.

Q.    Okay.  And you mentioned this before, but the first class cabin was full?

A.    Yes.

Q.    Now, it looks like you said that at least early on in the flight, it looked like Ms. Jay and Mr. MacLean were friendly with each other?

A.    Yes.

Q.    Now, is there -- did you get any sense that there might be some flirtation going on there?

A.    I wouldn't say flirtation.  I thought they were

294

together.  They were -- I mean there's -- do you want --

Q.   I want you to explain here.  Give us what you can.

A.   So they seemed more like a spouse, like a husband or wife, had a good day today.  They were going somewhere, having a drink.  It wasn't like how are you, who are you, flirty like that.

I see this every single day.  I'm a first class flight attendant all the time.  So it did not feel like two strangers.

Q.   Okay.  Last month, I think, you had a meeting with the prosecutors and Detective Ruiz, do you remember that?

A.   Yes.

Q.   Ahead of that meeting, did you have a quick phone conversation with Detective Ruiz?

A.   I did.

Q.   Do you remember saying to her something about the possibility that the two of them had been flirting?

A.   Yes.

Q.   So you mentioned that as a possibility back then?

A.   I said that, um -- that there -- yes, you're right.

Q.   Okay.  And you said that you weren't sure if they

295

were a couple, or actually you said it looked like they were a couple, right?

A.   Yes.  They were very nice to one another.

Q.   I think you hit this on direct, your direct examination, Ms. Tincher, but did you ever get -- did you ever hear Mr. MacLean being loud at any point in that flight?

A.   No.

Q.   Did any of the other -- forgive me.

Did any of the other passengers in that first class cabin ever complain to you that Mr. MacLean was being loud?

A.   No.

Q.   You said that you served one drink to Ms. Jay?

A.   Yes.

Q.   You thought that was a Vodka soda?

A.   It has been a long time, but I believe so.

Q.   And three drinks to Mr. MacLean?

A.   Yes.

Q.   Confident in that?

A.   Pretty confident, yes.

Q.   Any chance you served him five drinks?

A.   Oh, no.

Q.   You shook your head like decisively on that.  Why are you so decisive about that one?

A.   Because I know I didn't.

Q.   Okay.  Now, you also said that Ms. Jay had her light on the entire time, right?

A.   I can't say she had it on.  I said she was knitting, so I believe she had her light on.

Q.   And at what point -- at what point in the flight would the lights in the cabin otherwise go out, except for those ones on the side that you said just dimmed?

A.   So all of the lights -- all of the lights during takeoff and landing have to be turned off.  When we land -- well, we board -- let me back up.

When we board, all lights are to full bright.  When we land, until we -- the seatbelt sign goes off, the lights are dimmed.  Like there's no overhead lights.  It's not uncommon for flight attendants to turn all of the lights off.  So um -- but the lights would not have gone back to full bright until the seatbelt sign had been turned off.

Q.   Or turned on?

A.   I'm sorry, the seatbelt sign -- no, when we arrive.

Q.   Never mind.

A.   When we arrive, the seatbelt sign comes on because that means you can take your seatbelt off.

Q.   Gotcha.   Thank you.

And do you remember anyone else in the first class cabin having their reading light on besides Ms. Jay that night?

A.   No.

Q.   Now, I want to go over this part where Ms. Jay hit the call -- the attendant call button.

Describe when you -- when she hits the button and you come over, and do you sit next to her or do you stand next to her?

A.   She motioned for me to come over, and so I sat in the seat so I could hear, so it's discrete.

Q.   Okay.   So you definitely sat down next to her?

A.   I don't know that I could say I sat down, mostly leaned over, maybe one side of my thigh hit the seat, you know.

Q.   Okay.   I'm not trying to catch you in anything.

A.   No.   I'm just telling you that I can't -- it wasn't like I sat down and had a conversation like this.   I'm leaning over, you know, trying to have a private conversation with her.

Q.   So either way, you're leaning in to make sure that you can hear each other and it's just the two of you talking?

A.   For privacy.

Q. For privacy, right.

And it's at that point that she says to you that he's getting handsy and saying inappropriate things?

A. Yes -- no. She asked me point blank, "Will you please stop serving him alcohol. He's saying inappropriate things to me and being handsy."

Q. Okay. And in response to that, you asked her if she wanted to move seats?

A. Yes.

Q. And you asked her if there was anything else that you could do?

A. Yes.

Q. Now, at this point, Mr. MacLean is in the bathroom, right?

A. Yes.

Q. So let's say that Ms. Jay says, "Yes, I want to move seats," what do you do at that point?

A. I'm going to move her. I mean I'm going to take every effort. Like I said, that flight was, I think, almost completely full. So it would have taken me some time to figure out where I could put her.

To be honest with you, if I recall, the only seats that were open were in the seats directly behind first class. And the seat that would have

been open would have been directly in his eyesight.

Q.   Okay.  But what I hear you saying, though, Ms. Tincher, is that there was another open seat that was not too far away, right?

A.   But it wouldn't have given her any more privacy.

Q.   You don't think it would have given her more privacy than sitting right next to him?

A.   I mean I pushed her to move.

Q.   I hear you on that, and I guess I'm just asking, if she had said, "Yes, I do want to move," you could have moved her?

A.   I could have moved her, but I couldn't have moved her in the time that he was in the lavatory.

Q.   Why is that?

A.   Because I have to make -- I have to confer with my aft flight attendant.  I have to get her belongings.  I mean he was only in the lavatory a few minutes.

Q.   Sure.  But you could have helped her out of her seat and moved her to a different position, right, while you figured that out, right?

A.   There wasn't -- I could not have moved her to a different seat in that timeframe that he was in the lavatory.

Q.   Are you sure about that, Ms. Tincher?

300

A.   Yes.

Q.   Why did you offer her, then, the chance to move seats?

A.   Because I offered her a chance to move seats for her to do it, but her being uncomfortable and to do it discretely, I couldn't do it in that timeframe. If we wanted to be blunt and just move her, yeah.

Q.   I guess we're all talking about hypotheticals here, aren't we, Ms. Tincher, because she turned you down?

A.   I'm not going to lie to that.  She did turn me down.

MR. KENNEDY:  Your Honor, objection.  Asked and answered.

MR. CLARK:  I'm moving forward, Your Honor.

THE COURT:  He's moving forward.

Q.   (By Mr. Clark)  She turned you down, but you then went and notified the captain and explained the situation, right?

A.   Yes.

Q.   And is it fair to -- and I think I heard you say that the captain, then, was like, "Okay, I want you to keep an eye on this and keep reporting back to me"?

A.   Yes.

Q.   Okay.  And I am imagining, Ms. Tincher, with how caring and attentive you are, that you followed the captain's directive there to keep an eye on them?

A.   Yes.

Q.   I don't know how to ask this one discretely or appropriately, Ms. Tincher, so I just need to ask it.

Did you ever say something to Ms. Jay about Mr. MacLean masturbating in the bathroom?

A.   No.

Q.   Are you sure about that?

A.   Positive.

Q.   What makes you positive about it?

A.   I don't really talk about that.  It's not in my vocabulary, not to mention if I were to say that, on the job, I could probably get fired.

Q.   Fair enough.

Now moving forward in that, at some point later in the flight you talked about passing through and doing a seatbelt and mask check, right?

A.   Yes.  I'm sorry.

Q.   And Mr. MacLean didn't have his mask on?

A.   It was down.  It -- you have to understand that this is the height of Covid, or it's during Covid. It had to be over your nose and mouth.  It was not uncommon for like -- let me show you for an example,

302

that a passenger would be asleep and they would have their nose out.  Technically, I have to wake him up to put it up on his nose.  But because I was concerned, I didn't.

Q.   Okay.

MR. CLARK:  Would you mind bringing up Exhibit 2A and 2B.

Q.   (By Mr. Clark)  This is the note that we've been talking about, right?

A.   Yes.

Q.   And Ms. Jay motions to you not to wake up Mr. MacLean, right?

A.   Yes.

Q.   And you said that you did something that you have never done before, and you wrote her a note, right?

A.   Yes.

Q.   And you again asked her, "Are you okay sitting by him?"  Right?

A.   Yes.

Q.   And again, that sounds to me like you're asking, do you want to change seats?

A.   I tried.

Q.   It sounds like it.

And you also ask, "Are you feeling uncomfortable?  Do you want me to do anything?"

303

Right?

A.   Yes.

Q.   And what I note here, too, is that you then say, "I can have the police meet you -- meet the plane," right?

A.   So after I had gotten her feedback on the note --

Q.   Right.

A.   -- I then called the captain.

Q.   And that feedback, just so we're clear, Ms. Jay writes on the note, "I feel like an idiot but he's groping me and saying inappropriate, what he probably thinks are flattering, comments."  That's the feedback, right?

A.   Yes.

Q.   Now, Ms. Tincher, you testified on direct, and maybe I didn't hear it right, but it sounded like you said that you thought you had missed that groping part when she sends the note to you the first time. And I am just wondering, did you miss it, if you were there ready to have the police meet the plane?

A.   Yes.  The police was not my idea.  That was the captain's idea.

Q.   So you may have missed it, but the captain didn't miss it when he sees the note?

A.   That's correct.

304

Q.   And the captain says, "Why don't you ask her if she wants the police"?

A.   Yes.

Q.   Okay.  And she turns down having the police, she turns down moving?

A.   She doesn't want to make any kind of scene.

Q.   That's what she says here anyway, right?

A.   That's what she has said several times.

Q.   And she says, "I am good if he's sleeping."

A.   Because I'm asking her even though I wrote it, I'm still checking on her.  She's still crying.  I want to make sure she's okay.  I'm still doing everything I can to help her.

Q.   I get it, Ms. Tincher, and that's a follow-up question.

     You were concerned about her at this point?

A.   Very.

Q.   This is the second time that she has told you something is going on, right?

A.   Yes.  I'm sorry.

Q.   Forgive me.

     And you were concerned about her safety?

A.   Yes.

Q.   And it looks and sounds like you were ready to do just about anything you needed to help her?

305

A.   Yes.  I can't make her, though.

Q.   Right, you can't make her.

Now, the captain before had told you to keep an eye on her, right?

A.   To keep an eye on this situation.  If anything were to change, to let him know.

Q.   Okay.  Are you any less vigilant and attentive after you got this note?

A.   Oh, no, I'm more vigilant.

Q.   In fact, you're noting that you were trying to position yourself in the jump seat, so as much as you can, as constantly as you can, you've got eyes on them?

A.   Yes.

Q.   Now, Ms. Tincher, did you ever hear Mr. MacLean say anything inappropriate to Ms. Jay?

A.   No.

Q.   Did you -- with all of your vigilance and attentiveness, did you ever see Mr. MacLean touch Ms. Jay's breasts?

A.   No.

Q.   Did you ever see him lean over and grab Ms. Jay's breasts?

A.   No.

Q.   If you had seen that behavior, I'm imaging you

306

would have taken action immediately, right?

A.   Yes.

Q.   Now, you followed up with Ms. Jay after the plane landed and she was the last one to get off?

A.   I didn't follow-up until I got in to the terminal.

Q.   Okay.  Are you aware, Ms. Tincher, of any other passengers complaining about Mr. MacLean's language that night?

A.   He didn't swear, no.

Q.   Or even him being loud?

A.   Never.

Q.   Are you aware of any other passengers claiming that they saw Mr. MacLean touch Ms. Jay's breasts?

A.   Everything was discrete, no.

Q.   So nobody else came forward and said, "Hey, I saw something that was disturbing"?

A.   No.

Q.   Okay.

          MR. CLARK:  One moment, Your Honor.

          Ms. Tincher, we appreciate your time this afternoon.  Thank you.

          THE COURT:  Redirect, Mr. Kennedy?

          MR. KENNEDY:  Thank you, Your Honor.

               //

**REDIRECT EXAMINATION**

BY MR. KENNEDY:

Q.   Are you okay?  Do you need a minute?

A.   I'm okay.  Actually, can you give me a second?  I need to get something.  I'm fine, never mind.  That's fine.

Q.   What do you need?

A.   Nothing.  I'm good.

THE COURT:  Go ahead.  She said go ahead.

MR. KENNEDY:  Thank you, Your Honor.

Q.   (By Mr. Kennedy)  When Ms. Jay and Mr. MacLean were having their initial conversations, did they appear to you to be any different from any other passengers?

A.   No.

Q.   Was there anything at that point that drew your attention to them?

A.   No.

Q.   You were --

A.   They were just nice.

Q.   Were you attending to other customers at that point?

A.   It was Covid.  Not very many people were drinking, so very few.

Q.   Okay.  But it seemed ordinary, right?

A.    Very.

Q.    Did it change?

A.    Yes.

Q.    In what way?

A.    He tried to pursued her to drink more and she insisted, "No.  Please, no."

Q.    And did her body language change?

A.    Very much.

Q.    At that point, did you still think that they were a couple?

A.    No.  I asked her if they were a couple.

Q.    And what did she say?

A.    She said, "No, I don't know him."

Q.    Let's talk about this moving business for just a second.

Would there ever be a situation where you might move a -- where you might have moved him instead of her?

A.    Why would I move him if he didn't ask me to move? He didn't show me any signs that he was too drunk to sit there.  He didn't show me any signs that he was mean or vulgar.

Q.    Under your policies, could you have moved him?

A.    Yes.  Well, I don't know that question, to be honest.  I'm thinking.  I'm only an informer.  I

309

can't be an enforcer.  I don't know that.

Q.   Okay.  And in your years of experience, have you ever seen a passenger as distraught as Ms. Jay was on a flight?

A.   No.

Q.   If you had fully understood the situation, would you have done anything different?

A.   Yes.

Q.   What was that?

A.   I wouldn't have given her the option to say no to the police.

MR. KENNEDY:  No more questions, Your Honor.

THE COURT:  Thank you.  We're done with this witness.  You may step down.  Thank you.

I assume she may be excused?

MR. KENNEDY:  From the United States perspective, yes.

MR. CLARK:  Yes, Your Honor.  Thank you.

THE COURT:  You can stay or go as you please.

MR. KENNEDY:  The United States rests, Your Honor.

THE COURT:  Thank you.

Mr. Clark?

MR. CLARK:  Yes, Your Honor.  We would make

a motion under Rule 29, but we don't have to have that heard now if the Court doesn't want it.

THE COURT:  Pardon me?

MR. CLARK:  We would make a motion under Rule 29, but we don't need to do that in front of the jury.

THE COURT:  Right.

MR. CLARK:  We would then call Detective Ruiz back to the stand.

THE COURT:  Detective Ruiz, you're still under oath.

THE WITNESS:  Yes, Your Honor.

(Kylie Ruiz resumes witness stand having been previously sworn.)

**DIRECT EXAMINATION**

BY MR. CLARK:

Q.   Hello again, Detective Ruiz.

A.   Hello.

Q.   I just want to ask you about a couple of things.

On June 2nd, 2025, you met with Wendi Jay and the prosecutors at the U.S. Attorney's office?

A.   Yes.

Q.   And you were interviewing her to prep her for her testimony for today, right?

A.   Yes.

311

Q.   And you took notes of that meeting and wrote down what she said?

A.   Yes.

Q.   And you put those notes into a report?

A.   Yes, sir.

Q.   Okay.  And is it fair to say that in that report, you documented Ms. Jay telling you that for this final instance, where Mr. MacLean supposedly grabbed both of her breasts, that it happened before she had passed notes with the flight attendant, right?

A.   Do you have a copy of my report?

Q.   Yes, I do.

        MR. CLARK:  May I approach, Your Honor?

        THE COURT:  Yes.

Q.   (By Mr. Clark)  Just direct you to probably that first paragraph on the second page.

A.   Yes.  That's correct.

Q.   And in fact, you end that paragraph by noting that there was no additional touching after the note was exchanged, right?

A.   That's correct.

Q.   I'm sorry, yes?

A.   Yes.  That's correct.  That's what the report says.

Q.   And that's what Ms. Jay told you on June 2nd,

2025?

A.   That's what the report shows.

Q.   And did she also tell you that he ordered five drinks that night?  It would be on the first page of the report in the paragraph.

A.   That's correct.

Q.   On June 2nd, 2025, she said it was five drinks?

A.   Correct.

MR. CLARK:  Okay.  That's all.  Thank you, Ms. Ruiz.

THE COURT:  Thank you, Mr. Clark.

Mr. Reeves?

MR. REEVES:  Yes, Your Honor.  Thank you.

**CROSS-EXAMINATION**

BY MR. REEVES:

Q.   Thank you, Detective.

Detective, remind me, how long have you been in law enforcement?

A.   Almost 20 years.

Q.   And is it correct you're part of an FBI task force?

A.   That is correct.

Q.   And in that capacity, you kind of wear a couple of hats, don't you?

A.   Yes.

Q.   One for state and then for the FBI?

A.   Correct.

Q.   In the FBI world, there's something called a 302.

A.   Correct.

Q.   And for members of the jury, what's a 302?

A.   It would be a form of a report.

Q.   A form of a report.  So 302 equals report?

A.   Yes.

Q.   Okay.  It doesn't mean 302 equals transcript?

A.   No.  It's a document.

Q.   It's a document.  And you write a lot of those, correct?

A.   Correct.

Q.   Is that the form of how you memorialize all of your steps that you take as a law enforcement officer?

A.   Correct.

Q.   Okay.  So --

A.   Not all, but --

Q.   Not all, but the law enforcement -- defense counsel just questioned you on your report, this report that you took regarding a meeting.  And what was the purpose of that meeting?  Who are you meeting with?

A.   Ms. Jay.

314

Q.    And who else?

A.    Yourself and Michael Kennedy.

Q.    Trial prep meeting?

A.    You did join, yes.

Q.    Yes, but it was preparation for trial?

A.    Yes.

Q.    Okay.  Let's talk about this report, the report that you were just asked about.

Do you have it in front of you?

A.    Yes, I do.

Q.    Could you tell me, in the first paragraph, you write that the -- that Ms. Jay -- starting with that one sentence, "Ms. Jay explained," can you read that?

MR. CLARK:  Your Honor, objection.  This seems to be well beyond the scope.

MR. REEVES:  This is the report that he --

THE COURT:  You opened up the report.

MR. CLARK:  The whole report, Your Honor?

THE COURT:  The objection is overruled.

MR. CLARK:  Okay.

Q.    (By Mr. Reeves)  Could you read just that one line starting where it says, "Ms. Jay explained." First paragraph.

A.    Is she referred to as "Wendi"?

Q.    You can say "Wendi" but I prefer you just say

315

"Ms. Jay."

Can you say it out loud, "Ms. Jay explained."

A.   "She had just received a phone call from a person identifying themselves as retired FBI and a private investigator for the defense."

Q.   Let's stop there for a second.

Later on, does he give her a business card?

A.   He did.

Q.   And what is on that business card?  What does it say?

A.   It has the name of his company.

Q.   What is the name of his company?

A.   Two Shots Private Investigations.

Q.   Two shots.  You've been a law enforcement officer for 20 years and he is an ex-FBI agent apparently. What does "two shots" mean?

A.   It would be usually when practicing course of fire against a threatening suspect.

Q.   Is there a common other phrase that law enforcements use for two shots?

MR. CLARK:  Objection, Your Honor, relevance.

THE COURT:  We are wandering quite a ways.

MR. REEVES:  I just want --

THE COURT:  Just a minute.

MR. REEVES:  Okay.

THE COURT:  We are wandering quite a ways from his -- the testimony he elicited.  What point are you trying to make here?

MR. REEVES:  The defense is relying upon the accuracy of this document.  And I was pulling out a line in that paragraph, asking her about the accuracy of something stated there.  I will move on, Your Honor.

THE COURT:  Okay.

Q.   (By Mr. Reeves)  Agent Ruiz --

A.   Yes.

Q.   -- in your 302s, do you ever include quotations in a 302?

A.   Sometimes.

Q.   Why would you include quotations?

A.   To show that that is specifically what somebody said.

Q.   Look at your -- the report that was -- that you were being asked about and tell me where you find a single quotation.

A.   I see it when I mention that portion about the individual's name, their private investigator, special agent, FBI - retired, and the person's email,

317

their address -- or sorry, not their address, their phone number.

Q.   Okay.  And then?

A.   I think that's it.

Q.   In paragraph 2, last paragraph, you talk about how this report should be interpreted or understood. Would you please read that for the jury, that last sentence?

A.   The whole paragraph or the last sentence?

Q.   It is the second paragraph.  It says "below is."

A.   "Below is a summary of the interview but should not be accepted as a word-for-word account."

Q.   Agent Ruiz, in the paragraph started with -- let me actually just direct you to that.

Third paragraph, couple of lines down, you describe things that Mr. MacLean was saying, three or four things about himself.  Do you see that line?

A.   The fourth paragraph?

Q.   The fourth paragraph, third line down, "told her things about himself," do you see that?

A.   Yes.

Q.   And you used the word "including"?

A.   Correct.

Q.   What does it say after that?

A.   "Including serving a mission, a drug addiction,

318

being divorced."

Q. Let's stop there.

So you said serving a mission. Could that have been him or his parents serving a mission?

A. It could have. I just remember something about a mission.

Q. Okay. And when you use the word "including," that means that there could have been other things stated but it --

A. Correct.

Q. Okay. That's why you used the word "including," correct?

A. Correct.

Q. Let's turn to -- I believe the paragraph you were already instructed to look at related to the number of times. This is the paragraph -- it's paragraph 4, it is large, and it's on the second page of your report.

A. Paragraph 5, I think it starts on the first page.

Q. Paragraph 5. Do you see at the top, something that says -- the first line on the second page, "MacLean," what?

A. "MacLean snuggled up next to her, placing his arm under hers, telling her to teach him to knit."

Q. And then?

319

A.   I missed this quotation.

MR. CLARK:  Your Honor, again, this seems to be beyond the scope.

MR. REEVES:  The reason why I'm asking this, Your Honor, is that what she is referring to, is that the first time that she felt his hand on her breast?

MR. CLARK:  That seems beyond the scope, Your Honor.

THE COURT:  I'll let her answer that but --

THE WITNESS:  It could have been.  I don't -- I'm not certain.  I also missed that quotation, "what is happening."  Sorry.

Q.   (By Mr. Reeves)  Later on, you were asked about how many times she said that she was touched. Further on, you were referred to that line, "she recounted"?

MR. CLARK:  Your Honor, objection.  This is beyond the scope.

THE COURT:  It is beyond the scope.  I mean you -- this witness was on direct and testified about all of that.

MR. REEVES:  There seemed to have been some debate, Your Honor, on 5 or 6.

THE COURT:  Pardon me?  Oh, I see.

MR. REEVES:  Some debate on 5 or 6, and what

320

I was trying to do is ask the witness in her

statement, if we -- if we have six instances listed.

That's all.

THE COURT:  Anything else?

MR. REEVES:  Nothing further, Your Honor.

THE COURT:  Thank you.

Any redirect?

MR. CLARK:  Yes.  Thank you, Your Honor.

**REDIRECT EXAMINATION**

BY MR. CLARK:

Q.   I think this is the last time, Detective Ruiz,
but we -- I think we heard a question from the
Government about whether this was a transcript, and
you said it's not a transcript.  Right?

A.   That is correct.

Q.   Now, you didn't record this meeting with Ms. Jay?

A.   Correct.

Q.   You could have recorded the meeting with Ms. Jay?

A.   I don't typically record meetings when they're
regarding trial prep and with the attorneys.  My
portion of the investigation is basically done.

Q.   But that wasn't quite my question.

You could have recorded this meeting with
Ms. Jay, right?

MR. KENNEDY:  Objection, Your Honor.  Asked

and answered and it was attorney/client privileged.

THE COURT:  That's correct, isn't it?

MR. CLARK:  I don't think so.

THE COURT:  Could she have recorded it?

MR. CLARK:  Yes.  That's the question.  And I actually haven't gotten an answer to that one yet, Your Honor.

THE COURT:  Pardon me?

MR. CLARK:  I have not gotten a direct answer to whether or not she could have recorded it.

THE COURT:  I don't think it invades a privilege, if you -- if you --

MR. KENNEDY:  No.  No, Your Honor, I'm sorry.  What I was trying to clarify is that the -- she could have physically recorded it, but she was not allowed to record it because it was privileged.

Q.  (By Mr. Clark)  Is that what your answer would be?

A.  Yes.

Q.  Okay.

Now, you apparently couldn't physically record this, but you could physically take notes, right, Ms. Ruiz?

A.  Yes.

Q.  And you take notes so that you have some kind of

322

idea of what happened, right?

A.   Yes.

Q.   It's just maybe a less accurate version than if you had recorded it, which you couldn't do, right?

A.   Potentially.

Q.   And yet, you're trying to be as accurate as you can be with these reports, right?

A.   Yes.

Q.   Because the government relies on them to some extent, right?

A.   My portion of the investigation had already concluded.

Q.   Well, my question was whether the government would rely on -- might rely on this report.

A.   I don't know.  You would have to ask the government.

Q.   The defense might be relying on it, right?

A.   (Witness nodded).

Q.   And I think just to clarify, what you said on direct with me wasn't just that you had recorded that she said that this happened before the note was passed, but that's actually what she said.  That's what you told us, right?

A.   That's what's in my report.

Q.   Right.  And that's what you said that she

323

actually said?

A.    I don't recall her exact words.

Q.    Okay.  But you did write down, "MacLean sat up, grabbed both breasts with both hands, telling her they needed to get her buckled," right?

A.    That's what I wrote.

Q.    "She told him to worry about himself since she was already buckled"?

A.    That sounds accurate.

Q.    "During the flight, MacLean had his mask off as he was sleeping and the flight attendant was going to wake him"?

A.    That sounds accurate.

Q.    "Jay intervened and asked her not to.  She had a bit of a confused reaction and then they exchanged the note"?

A.    That sounds accurate.

Q.    And then you conclude that paragraph with this additional statement.  "There was no additional touching after the note was exchanged," right?

A.    Yes.  That's what it says.

Q.    And I'll ask you again, is that what Ms. Jay told you on June 2nd, 2025, that there was no additional touching after the note was exchanged?

A.    I can't be certain of her exact words since it

wasn't recorded.  I know that there has been a question of exact timing, but the main details have stayed the same.

Q.   That wasn't my question, Detective Ruiz.

You wrote here that she said, "There was no additional touching after the note was exchanged."

Is there any reason to think you got that wrong?

A.   That's what I wrote.

Q.   Is there any reason to think you got that wrong?

A.   In that interview, I don't think so.  That could have been what she said.  But again, I'm not 100 percent certain what she said in that interview.  This is just a summary of a very long meeting.

Q.   And you took notes during the meeting?

A.   Some notes, yes.

Q.   That's what you based this report off of?

A.   Yes.

Q.   Okay.  Thank you, Detective.

A.   And my memory.

THE COURT:  Thank you.  You can sit down.

Do you have any other witnesses?

MR. CLARK:  The defense rests, Your Honor.

THE COURT:  Thank you.  We're going to --

we'll excuse you back to the room.  We still have to

325

do -- we want to get the instructions finalized so we can give them to you, and then the lawyers will do their closing arguments.  So we're not sure how long it will be, but be patient.  We appreciate your work and your patience.

THE CLERK:  All rise, please.

(Jury exits the courtroom.)

THE COURT:  What do you want to tell me about your Rule 29 motion?

MR. CLARK:  Your Honor, based on the evidence, we don't think there's been sufficient evidence to send this to the jury for abusive sexual contact on an airplane.  We've only got one witness who's saying it happened.  There is no corroboration from anybody else who saw this.  And we don't think it's appropriate to send it to the jury.

That's it.

THE COURT:  Well, the motion is denied.  I disagree with you.  I think there's sufficient evidence to go to the jury.

All right.  Let's say 25 after.

MR. KENNEDY:  That will be for the jury instruction conference or did you want to handle that first?

THE COURT:  Haven't we done that already?

326

You stipulated to most of them.

MR. KENNEDY:  There is still the question, Your Honor, of the prior inconsistent statement question and -- or construction.

The United States' position is that the basic instruction that sort of encapsulates that is sufficient.  And that the longer instruction is not justified, but we'll defer to the Court on that.

THE COURT:  Mr. Clark?

MR. CLARK:  I disagree, Your Honor.  I think we've exposed several prior inconsistent statements. That is what Detective Ruiz was just talking about when she testified about whether this final double-handed grabbing happened before the note exchange with Ms. Tincher or after.

And also, that Ms. Jay testified today that she wasn't aware of anybody else being awake on that flight.  And we brought out, through Detective Ruiz, that in her March 11th, 2025, interview with the FBI, she said 2A, people in 2C and D had to have seen it, that they kept looking over.

So we do think that the instruction should apply here, Your Honor.

THE COURT:  Any response to that?

MR. KENNEDY:  Your Honor, I'll submit it.

327

Again, I think that the underlying instruction covers it because it talks about the same factors.  And the longer instruction just elaborates on that.

THE COURT:  All right.  Thank you.

Let's just aim for 3:30 so you know when you should be back.

MR. KENNEDY:  Thank you, Your Honor.

MR. CLARK:  Thank you, Your Honor.

THE COURT:  Thanks.  We'll be in recess.

(Recess.)

THE COURT:  With respect to Jury Instruction No. 9, I've decided that the slightly shorter version is plenty adequate.

All right, are we ready to proceed?

MR. KENNEDY:  Yes, Your Honor.

MR. CLARK:  Just note my objection to that on the record.

THE COURT:  Yes.  I think it's already there, but if it wasn't, it is; and if it was, why it's on there twice.

MR. CLARK:  Thank you, Your Honor.

THE COURT:  All right.  We'll get the jury and proceed.

THE CLERK:  All rise for the jury.

(Jury enters the courtroom.)

328

THE COURT:  Each of you has a copy of the jury instructions.  I will read them.

Members of the jury, now that you have heard the evidence and are about to hear the arguments, it becomes my duty to instruct you on the law that applies to this case.

It is your duty as jurors to follow the law as stated in the instructions to the court and to apply the rules of law so given to the facts as you find them from the evidence in the case.

Counsel may refer to these instructions in their arguments.  If, however, any difference appears to you between the law as stated by counsel and that stated by the Court in these instructions, you are, of course, to be governed by the Court's instructions.

You are not to single out any one instruction alone as stating the law, but must consider the instructions as a whole.  Neither are you to be concerned with the wisdom of any rule of law stated by the Court.  Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base a verdict upon any other view of the law than given in these instructions of the Court, just as it would be a

violation of your sworn duty, as judges of the facts, to base a verdict upon anything but the evidence in the case.

Justice through trial by jury must always depend upon the willingness of each individual juror to seek the truth as to the facts from the same evidence presented to all the jurors; and to arrive at a verdict by applying the same rules of law as given in the instructions of the court.

You have been chosen as jurors in this case -- this is No. 2.  I suppose you can all figure that out.

You have been chosen as jurors in this case to try the issues of fact presented by the allegations of the indictment and denial made of the not guilty plea of the defendant.  You are to perform this duty without bias or prejudice as to any party.

The law does not permit jurors to be governed by sympathy, prejudice, or public opinion. The defendant and the public expect that you will carefully and impartially consider all of the evidence in the case, follow the law as stated by the Court, and reach a just verdict.

The indictment or formal charge against the defendant is not evidence of guilt.  Indeed, the

330

defendant is presumed by the law to be innocent.  The law does not require the defendant to prove his innocence or produce any evidence at all, nor does it compel him in a criminal case to take the witness stand to testify.  The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so you must acquit the defendant.

While the government's burden of proof is a strict or heavy burden, it is not necessary that the defendant's guilt be proven beyond all possible doubt.  It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt.  A "reasonable doubt" is a real doubt, based upon reason and common sense after careful and impartial consideration of all of the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.  If you are convinced that the defendant has been proved guilty beyond a reasonable doubt, find him guilty.  If you're not so convinced, find him not guilty.

You are here to decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged -- crime charged.  The defendant is not on any trial for any act, conduct, or offense not alleged in the indictment.  Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them; all exhibits received in evidence, regardless of who may have produced them; and all facts which may have been admitted or stipulated.

Statements and arguments of counsel are not evidence in the case.  When, however, the attorneys on both sides stipulate or agree as to the existence of a fact, the jury must, unless otherwise instructed, accept the stipulation and regard that fact as conclusively proved.

Any evidence as to which an objection was sustained by the Court, and any evidence ordered stricken by the Court, must be entirely disregarded.

Anything you may have seen or heard outside of the courtroom is not evidence, and must be

entirely disregarded.

You are to consider only the evidence in this case. However, in your consideration of the evidence, you are not limited to the bald statements of the witnesses. On the contrary, you are permitted to draw from the facts which you find have been proved such reasonable inferences as seem justified in light of your experience. An inference is a deduction or a conclusion which reason and common sense would lead you to draw from facts which are established by the evidence in the case. You should weigh all of the evidence in the case, affording each piece of evidence the weight or significance that you find it reasonably deserves.

A "stipulation" is an agreed statement of facts between the government and the defendant. You should regard any stipulated facts as undisputed evidence.

You may consider both direct and circumstantial evidence. "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. "Circumstantial evidence" is proof of a chain of facts and circumstances indicating either the guilt or innocence of the defendant. The law makes no

333

distinction between the weight to be given to either direct or circumstantial evidence.  It requires only that you weigh all of the evidence and be convinced of the defendant's guilt beyond a reasonable doubt before he can be convicted.

Now, I have said that you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.

You, as jurors, are the sole judges of the credibility or "believability" of each witness and the weight to be given to their testimony.  You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence that tends to show whether a witness is worthy of belief.

In weighing the testimony of the witnesses you consider their relationship to the government -- you should consider their relationship to the government or the defendant; their interest, if any, in the outcome of the case; their manner of testifying; their opportunity to observe or acquire knowledge concerning the facts about which they testified; their candor, fairness, intelligence; evidence regarding the general reputation of the

334

witness for truth and veracity; and the extent to which they have been supported or contradicted by other credible evidence.  You may, in short, accept or reject the testimony of any witness in whole or in part.

A witness may be discredited or impeached by contradictory evidence; or by evidence that at some other time the witness has said or done something, or failed to say or do something, which is inconsistent with the witness' present testimony.

If you believe any witness has been impeached and thus discredited, it is your exclusive province to give the testimony of that witness such credibility, if any, as you may think it deserves.

If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness' testimony in other particulars; and you may reject all of the testimony of that witness or give it such credibility as you may think it deserves.

If any reference by the Court or by the attorneys to matters of evidence does not coincide with your own recollection, it is your recollection which should control during your deliberations.

Your decision should not be determined by

335

the number of witnesses testifying for or against a party. You should consider all of the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe. You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other.

The defendant in a criminal case has an absolute right under our Constitution not to testify.

The fact that the defendant did not testify must not be discussed or considered by the jury in any way when deliberating and in arriving at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise his privilege under the Constitution and did not testify.

As stated before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

The indictment charges that the count was committed "on or about" a certain date. Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed reasonably near the date alleged, it is not necessary for the government to prove that the offense was

336

committed precisely on the date charged.

At times throughout the trial the Court may have been called to rule whether or not certain offered evidence might be admitted.  Whether offered evidence is admissible is purely a question of law.  Neither the weight of the evidence nor the credibility of the witness is involved in such rulings.  You are not to consider evidence offered but not received nor any evidence stricken by the Court.

The defendant is charged in Count I of the indictment with a violation of 18 United States Code, Section 2244(b), and 49 United States Code, Section 46506.

49 U.S.C. Section 46506 gives the Federal Government jurisdiction to prosecute certain federal crimes when they are committed on a commercial airline in flight.

One of these crimes is 18 United States Code, Section 2244(b).  This law makes it a crime to sexually touch another person under certain circumstances, which I will explain to you in detail.

To find the defendant guilty of the crime charged in Count I, you must be convinced that the government has proved each of the following beyond a

337

reasonable doubt.

First, that the defendant engaged in or caused sexual conduct -- contact, excuse me, as I will define that term for you, with WJ.

Second, that the defendant acted knowingly in engaging in or causing that sexual contact.

Third, that the defendant did so with the intent to abuse, humiliate, harass or degrade, or to arouse or gratify the sexual desires of any person.

Fourth, the sexual contact was without WJ's permission.

And fifth, that the offense was committed in the Special Aircraft Jurisdiction of the United States, as I will explain that term to you.

The first element which the government must prove beyond a reasonable doubt is that the defendant engaged in sexual contact with WJ.

The term "sexual contact" means intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh or buttocks of any person.

Before you find that the defendant acted innocently -- excuse me, before you find that the defendant acted intentionally, you must be satisfied beyond a reasonable doubt that the defendant acted

338

deliberately and purposefully.  That is, the defendant's acts must have been the product of the defendant's conscious objective rather than the product of a mistake or accident.

The second element the government must prove beyond a reasonable doubt is that the defendant acted knowingly in engaging in or causing a sexual contact with WJ.  The term "knowingly," like intentionally, as used in these instructions to describe the defendant's state of mind, means that he was conscious and aware of his actions, realized what he was doing, or what was happening around him, and did not act because of ignorance, mistake or accident.

Although, the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind, you may consider evidence of the defendant's words, acts, or omissions, along with all of the other facts and circumstances in evidence, in deciding whether the defendant acted knowingly.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.  It is entirely up to you,

339

however, to decide what facts to find from the evidence received during this trial.

The third element which the government must prove beyond a reasonable doubt is that the defendant engaged in or caused sexual contact with WJ, with the intent to abuse, humiliate, harass, or degrade, or to arouse or gratify the sexual desire of any person.

Although the indictment charges in the conjunctive "and," and the government only needs to prove in -- the government only needs to prove in the disjunctive "or." For instance, the indictment refers, excuse me, to the intent to abuse, humiliate, harass, degrade, and arouse and gratify the sexual desire of any person. The government need only prove one of these intents; it does not need to prove all of them.

In deciding whether the government has proved this element beyond a reasonable doubt, you may consider that some contact may be so clearly sexual in nature that in the absence of any suggestion that the touching occurred in the furtherance of a non-sexual purpose, you may infer that the defendant has the required intent. You are not required to make this inference, however, and it is up to you to decide if the contact is so clearly

340

sexual that the inference is warranted.

As with the instruction on "knowingly," you may consider evidence of the defendant's words, acts, or omissions, along with all of the other facts and circumstances in evidence, in deciding whether the defendant acted with the requisite intent.

The facts and circumstances you may consider include whether the defendant was so intoxicated at the time of the crime so as not to be -- so as to be incapable of forming the requisite intent.  Evidence of alcohol consumption is not, by itself, sufficient in this regard.  If you find beyond a reasonable doubt under all of the facts and circumstances that the defendant had the required specific intent, intoxication, if any, is not an excuse or justification for the actions.

The fourth element which the government must prove beyond a reasonable doubt is that the sexual contact was without WJ's permission.

The fifth element which the government must prove beyond a reasonable doubt is that the offense was committed in the Special Aircraft Jurisdiction of the United States as defined in federal law.  Special Aircraft Jurisdiction of the United States includes all commercial aircraft while in flight, meaning an

341

aircraft from the moment all external doors are closed, following boarding, until the time that an external door is opened to allow passengers to disembark.

The government and the defendant have agreed or stipulated that United Airlines Flight 5433 from Chicago to Salt Lake City was, at the time -- was at the time of the alleged offense, in the Special Aircraft Jurisdiction of the United States, and you, therefore, are instructed that you should consider this element satisfied.

The punishment provided by law for the offense charged in the indictment is a matter exclusively within the province of the Court and should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused.

If I have said or done anything in this case that makes it appear I have an opinion about the guilt or innocence of the defendant, disregard it. You are the sole judges of the facts and should in no way be influenced by what I have done here except to follow my instructions on the law.  Nothing said in these instructions and nothing in any form of verdict prepared for your convenience is meant to suggest or

convey in any way or manner any intimation as to what verdict I think you should find.  What the verdict shall be is the sole and exclusive duty and responsibility of the jury.

Upon retiring to the jury room, you should first select one of your members to act as your foreperson who will preside over your deliberations and will be your spokesperson here in court.  A verdict form has been prepared for your convenience.

You will take the verdict form to the jury room and when you have reached a unanimous agreement as to your verdict, the foreperson will write the unanimous answer of the jury in the space provided for in each count of the indictment, either not guilty or guilty.  At the conclusion of your deliberations, the foreperson should date and sign the verdict and inform the Court Security Officer that you have reached a verdict.  The foreperson should not give the verdict to the Court Security Officer.  The foreperson should keep the verdict in his or her possession until the jury is returned to the courtroom and the judge instructs the foreperson to present the verdict to the Court.  The Courtroom Deputy will read the verdict aloud in court.

To reach a verdict, all of you must agree.

343

Your verdict must be unanimous.  Your deliberations will be secret.  You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so.  Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.  During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong.  But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

Remember, at all times you are judges, judges of facts.  Your sole interest is to speak the truth from the evidence in the case, to decide whether the government has proved the defendant guilty beyond a reasonable doubt.

Bear in mind that you are never to reveal to any person, not even to the Court, how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict.

If it becomes necessary during your deliberations to communicate with the Court, you may

344

send a note by a Court Security Officer, signed by your foreperson or by one or more jurors.  No member of the jury should attempt to communicate with the Court by any means other than a signed writing; and the Court will never communicate with any member of the jury on any subject touching the merits of the case, otherwise than in writing or orally here in open court.

You will note from the oath that the Court Security Officer will take that he, as well as any other person, is also forbidden to communicate in any way with any juror about any subject touching the merits of the case.

We will now proceed with the closing arguments.

Mr. Kennedy?

MR. KENNEDY:  Thank you, Your Honor.

May it please the Court, counsel, Mr. MacLean, ladies and gentlemen of the jury, I am going to begin where Mr. Reeves began yesterday afternoon.

"You're beautiful.  You're sexy.  I am attracted to you.  You're my type."

As Ms. Ruiz told you, these statements are important in context, because these are the

statements that the defendant said to Wendi Jay, and context matters.

You have now heard the context through the witnesses that have testified.  You know what that context is.  And I want to -- I want to talk just for a second about some of the things that Ms. Westgate mentioned when she spoke to you yesterday as well.

One of the things she said was that we should not allow like the "Me Too movement" to factor in and that we should not believe a witness just because she's a woman.

We agree with that wholeheartedly.  You don't believe the witness just because she's a woman.  The Me Too movement and other social constructs have nothing to do with this case.  In a court of law, we deal with facts and evidence, not movements.

But you also shouldn't disbelieve a person just because the defendant has denied the allegations.  I want to be clear.  This is not a comment on Mr. MacLean's right not to testify or his right not to present evidence.  His plea of not guilty, in our system, by itself, is sufficient to support an acquittal, if you don't believe the evidence.

But, my argument to you is that you should

346

believe the evidence and you should believe it beyond a reasonable doubt and find Mr. MacLean guilty.

Let's start with the elements of the offense that the Judge just read to you.

Ms. Gaitin, if you would pull up the list of the elements for us so that they're on the screen in front of us.

Let's start -- we'll start with No. 5, the fifth element, the special aircraft jurisdiction of the United States.  That has been stipulated to and that element can be checked off.

So let's go to Number 1, that the defendant engaged in or caused sexual contact with Ms. Wendi Jay.

And let's go to the instruction on the -- on what the definition of sexual contact is.  And I believe I have these instruction numbers wrong, so please disregard the numbers that I am using.

Sexual contact means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh or buttocks of any person.

What we're alleging here is that Mr. MacLean, not once, not twice, not three times, but six times touched the breast of Wendi Jay -- I

347

should say breasts of Wendi Jay through her clothing.

This also has an intentionality requirement. We'll talk a little bit more about that in a minute. But again, you have to be satisfied that he acted purposefully in having that contact. It couldn't have been an accident. It couldn't have been as Wendi was saying, Ms. Jay was sometimes saying, "Yes, sometimes people bump into me and touch me by accident." That happens. It has to be intentional.

The second element, it is also knowingly. Again, he has to do it -- do this act knowingly as the Court has defined that term for you. What that means is that he has to have an awareness of his surroundings and not doing it by some accident or mistake.

Third, and we'll spend a little bit of time on this one, the defendant did so with the intent to abuse, harass, humiliate, degrade or arouse or -- or to arouse and gratify the sexual desire of any person.

Now, of course, "any person" means any. It -- and in this instance, we are alleging that he intended to arouse his -- or gratify his own sexual desire.

And fourth, it had to be without Ms. Jay's

348

permission.

So let's talk about some of these in a little bit more detail, and the facts that support what is alleged in the indictment.

Let's talk first about engaging in sexual contact.

You've heard Ms. Jay testify how in the first -- the first touch, he snuggled up against her arm, put his hand under her arm and asked, "Show me how to knit," and then touched her breast with the back of his hand, when she objected and was pushing him away.

Then there was another touching where he again reached under her arm and touched, squeezed her breast and she told him, "Keep your hands to yourself, pal."

There was a third instance that was similar. He reached over and touched her left breast, through the clothing, over her hoodie.  And each time that he did this, he would -- and she would object, he would say, "I think you're sexy.  I find you attractive."

That is comments that you can reasonably take and infer that he had the intent to arouse his own or gratify his own sexual desire.

He said to her, "I find you sexy."  What

349

could be more indicative of gratifying sexual desire than touching somebody in an intimate way while you're saying you find them sexy?

He did this over and over and over again. And he made those same comments over and over and over again.

Let's talk a little bit more about his intent and how you can determine that he had this intent and that this was his purpose.

Let's go back to the beginning of the flight. During the beginning of the flight, they were having a pleasant conversation, nobody was concerned, there wasn't anything out of the ordinary. Ms. Jay was polite to him. She thought he was a little loud and saying things, you know, inappropriate, that she didn't want other people to hear and think that they were together, but it was congenial enough. It wasn't anything that many of us have experienced on a plane. You talk to your seat mate, or even if you're skiing, you ride up the ski lift with somebody. You have a conversation, but then it turned.

He starts telling her some pretty weird details to share with a complete stranger. He tells her he used to have a cocaine addiction, but that God

350

got him through it.  He asked her if she uses drugs.  She says, "No, I'm a rule follower."

And he says, "Oh, really, I like that answer.  You're my type, and I find you attractive."

That is not a normal conversation to have between two strangers on an airplane.  That conversation and Mr. MacLean's comments in that moment show that he had in his mind, A, that he was attracted to her; and B, that he was testing how far he might be able to go with this.  He was trying to see whether she might possibly be receptive to him.

There's a term for that that is sometimes used more in -- in child cases, but it is called "grooming."  He was trying to exactly see what he could get away with, and what his limits were.  He was testing the boundaries.

Ms. Jay didn't encourage him.  She went silent, but that didn't stop him.  He still pursued this contact with the touching, with the snuggling up, with the comments, "I'm going to leave you alone."

Now let's look a little bit -- in a little bit more detail with regard to which -- I believe it's Instruction No. 18 in your packet, but No. 19 here, where we have to prove to you beyond a

351

reasonable doubt that he -- that Mr. MacLean had the intent to abuse, humiliate, harass, degrade, or arouse and gratify the sexual desire.

We've talked about how you can find the arouse or gratify sexual desire, but you can find any or all of these. Now, you should agree among yourselves on which one or ones apply, but you can agree on more than one. And in this case, we believe that you can and should find that he had the intent to abuse, humiliate, harass, degrade Ms. Wendi Jay.

And how many times did Ms. Jay tell you that's exactly how she felt? That she felt humiliated. Why didn't she make a scene? Because she would have felt humiliated.

She felt degraded. She was mortified by this -- by this conduct, and she felt harassed. And here is where the harassment comes in, every time this happened, he would say, "Oh, I should leave you alone now," or, "I will leave you alone now," and yet, he never did. Each time he said those words, he came back again and did the same thing. That, ladies and gentlemen, shows intent to harass.

There's also an intent to abuse. I mean how much -- what is more abusive than constantly getting into the personal space and intimately touching a

352

total stranger over their objection?

And Wendi Jay objected, and this also goes to the element of a lack of permission. "Keep your hands to yourself, pal. Please stop."

And her demeanor and body language in itself, moving in her seat as far as she can to get away from this person. He didn't have permission to do this. No matter how friendly they were at the beginning of the flight, when he started this conduct there was -- there was no -- there was no permission. They weren't friendly anymore.

And you heard Mary Tincher testify about that as well. And that's where we also get to the corroboration.

Why should you believe Wendi Jay? First of all, of course, believe her because of the way she testified. Her manner and mode of testifying, she was up there for a couple of hours. She was in tears. She was emotional. She wasn't making this up, and you could see it in her face that she wasn't making this up.

But beyond that, she had a witness. She had Mary Tincher. Now, Ms. Tincher, as a flight attendant, had a lot of responsibility on that aircraft. And she candidly told you that in her

353

view, at the end of the day, she let Wendi Jay down, but that doesn't mean that Wendi Jay -- that this didn't happen to Wendi Jay.  What it means is that Mary Tincher thought that it did happen to her.  And she described to you the indicia of it happening to her.

She described Ms. Jay crying.  She described how her body language changed early on in the flight.  She described and told you, just like Wendi did, what happened when Mr. MacLean went up to use the bathroom.  She called for help.

Now their perspectives on exactly what happened when she asked for help are a little bit different.  That's going to happen.  Nobody knows what is in the mind of another person.

Wendi, quite appropriately, felt that she wasn't necessarily heard and that Ms. Tincher didn't understand really what was going on.  Ms. Tincher -- and then she just walked away.  Ms. Tincher told you, yes, she did just walk away, but she went back to report to the captain, which is what she was supposed to do.

Now, there's been a lot of talk in this courtroom over the last couple of days, last few hours anyway, of, you know, well, why didn't she move

354

seats?

Well, you heard what Ms. -- what Ms. Tincher said about that, that that would have been very hard to do without disturbing Mr. MacLean and making a scene.

You heard what Ms. Jay said about that.  The same thing, she did not want to cause a scene.  She did not want to make a spectacle of this.  She just wanted it to end.  And as long as he's sleeping, she thought she could get through it.  But to expect her to insist on moving and causing that scene, frankly, ladies and gentlemen, is to blame the victim.

And by the time this happened, the crime had already been committed.  She had already been touched.  So even if you find that she should have moved seats at that point, he can still be found guilty, because he didn't -- just because she didn't ask to move seats after the crime was committed doesn't mean the crime didn't happen.  It means she didn't want to move seats and that's all it means.

Ms. Tincher also testified how she actually didn't fully comprehend the gravity of the situation when it occurred.  And you heard her.  She was crying when she said, "I failed this person because I did not get -- I should have made sure that the police

355

were called and that there was somebody there to meet that plane."

But also, don't blame Wendi Jay for not calling the police and not wanting to call the police.  She just wanted this to end.  She wanted to get out of that situation, get home or to her hotel and not confront anyone.

Again, that doesn't mean that a crime wasn't committed.  That doesn't mean that she wasn't touched.  That doesn't mean that she didn't feel what she felt.  What it means is that as a human being, she didn't know how to react to it.  She didn't know what to do.  She didn't know what her rights were.

Once she figured out what she could do and what her rights were, she reported it.  And more importantly, she reported it while it was happening.  She called Mary Tincher over, using the call button.  And she asked, "Please don't serve him any more alcohol.  He's getting handsy.  He's saying inappropriate things to me."  She reported it, as it was happening.

And then as things got worse and as Mary Tincher noted her demeanor, and noticed that she didn't want her to wake Mr. MacLean up, Mary was so concerned that she wrote a note.

356

And please pull up 2A and 2B.

Mary asked her, "Are you okay with sitting by him?  I don't want to wake him up either.  Are you feeling uncomfortable?  Do you want me to do anything?  I can have the police meet the plane."

How did Wendi Jay respond?  "I feel like an idiot, but he's groping me and saying inappropriate, what he probably thinks are flattering comments.  He's groping me."

She told her that right then on the heels of it happening, and before it happened again.

And then she says, "I'm good if he's sleeping.  I feel safer if he's sleeping.  Don't wake him up.  Let's just get this over with.  Let me go home, get to my hotel, and get out of this awful situation."

But her body language, and what Mary Tincher observed, corroborates everything that Wendi Jay told you from that witness stand.  And if there are minor details between -- and discrepancies between her account and Mary's account, those are explained by the human brain.  They're explained by your common sense.  We perceive things differently.  We don't know, we have no idea, whether there was any comment about what Mr. MacLean may or may not have been doing

357

in the bathroom.  And that is not part of the allegations here.

Wendi said she heard the flight attendant say it.  The flight attendant said she never said it.  I think you can completely disregard that.

Is there a discrepancy in accounts that Wendi Jay -- whether the last touch, where the seatbelt light had gone on and Mr. MacLean reaches over and touched, grabs both of her breasts saying, "We have to get you in a seatbelt"?  There's a discrepancy in whether that happened before or after the note.

Ladies and gentlemen, it doesn't matter whether it happened before or after the note if you believe that it happened.  And you have heard testimony that it did happen.

If she said one time it happened before the note and one time after the note, it doesn't matter, besides which, it was the sixth time.  It was the last time.  There were five other instances that she testified about.  I'm sorry, if you are groped six times, the exact order and timing of those may slip your mind a bit.

One time you'll probably remember pretty well it happened and how it happened.  Maybe even two

358

times, but six over a three-hour period?  You're going to lose track.

So when you consider a witness's testimony, consider -- and whether the discrepancies in it, think to yourself, is it an important detail or a minor detail?  If it is an important detail, by all means, give it a lot of thought and consideration. If it's a minor detail, as to whether it was before or after the report was made, that is probably not as important a detail to focus on.

So bottom line, we have Mr. MacLean aggressively harassing, abusing, and groping Wendi Jay over a three-hour period, six different times. We have him repeatedly saying, "I'm sorry, I should leave you alone."  And then he doesn't, he just keeps on doing it, and doing it, and doing it again.

We have Ms. Jay saying, "Please stop.  Don't do this," pushing his hand away, swatting his hand away, swatting him away, and being relieved when he's asleep.

And we have this witnessed by a flight attendant who doesn't see the actual touching, but she -- but consider this.  And consider this when you think about the absence of anybody else noticing anything.

359

Mr. MacLean wasn't trying to draw attention to himself.  He didn't want to be seen.  He wasn't going to be making a lot of noise.  If Wendi Jay didn't make noise, nobody else was going to notice what was going on.  People were asleep.

You probably have all been on night flights and you don't leave your common sense at the door, as the Judge instructed you in Instruction No. 6.  You apply your common sense.  Just because nobody else saw it doesn't mean it didn't happen.  What it means is nobody else saw it.  It means simply that Mr. MacLean was quiet enough to not create a disturbance and that Ms. Jay didn't want to create a disturbance.  That's all it means.  It doesn't mean it didn't happen.

So ladies and gentlemen, when you go back in the jury room, I want you to take those words back in your mind with you, and take the words, "Stop it, pal.  Keep your hands to yourself."

Take the words, "I'm sorry.  I think you're sexy."  Take the words, "He's broken me," and apply that to the law that the Judge has given you, the instructions that he has given you, on these five elements, and return a verdict of guilty on this count of the indictment of the sexual contact in the

360

special aircraft jurisdiction of the United States.

Thank you.

THE COURT:  Thank you, Mr. Kennedy.

Mr. Clark?

MR. CLARK:  Thank you, Your Honor.  It might take just a moment to set up.  I'm hoping for a microphone.  I'm plugging in to their side.  They said it is okay.

Well, folks, I can't make this up.  We just heard Mr. Kennedy tell you that if there are minor details that they don't corroborate on, it's fine.  That's just how the human brain works.  You can disregard it.  If there's a discrepancy between the witnesses, it doesn't matter.  You get to decide if it's an important detail or a minor one.

I took notes of Mr. Reeves's opening statements, maybe you did, too.  The first thing that he said to you was that "details matter, that context matters."  And this is the same government that is telling you details matter when they did not even try to interview the other passengers on this flight until two months ago, when this happened almost three and a half years ago.  Details do matter, context matters.

Now, this case is a tragedy.  It's a tragedy

361

if it happened that Mr. MacLean grabbed Ms. Jay's breasts.  It's also a tragedy if that didn't happen, because here we are, in federal court, with Ms. Jay saying it happened, with Mr. MacLean's liberty on the line and facing a felony in federal court for a sexual assault offense.  The stakes could not be higher here for Mr. MacLean.

Now, as I've been thinking about this case over the last few days, what I just can't get out of my mind is this idea that if this actually happened, folks, if these allegations were true, this case should be easy for you.  If it were true, there should be a line of witnesses out the door coming in to tell you that they saw what happened.

What do I mean?  Because details matter and context matters.

We've heard from Ms. Tincher about the space in that cabin.  I sit down here next to Mr. Kennedy. We heard Ms. Tincher say that the space between 3A and 3C, it's not even as big as this table here. Mr. Kennedy's closer to me than the passengers were to Mr. MacLean and Ms. Jay.

And let's remember the rest of that scene, folks.  There are ten passengers in that first class cabin.  There are seven passengers directly

362

surrounding them, within a few feet.

Ms. Jay said she had her light on the entire time.  It was dark in there.  And as Ms. Westgate said in her opening statement, this didn't happen in a dark alley, this didn't happen in somebody's bedroom, in the privacy of their own home.  This happened in one of the most public places imaginable.

If this really happened, there should be a line of people able to testify that, "We saw him grab Ms. Jay's breasts.  We heard him being loud, shouting horrible things about Vladimir Putin.  We saw him reach over the six- to seven-inch armrest, with both arms, and grab her."

None of those passengers are here and none of those passengers are here because they didn't see anything.  And they didn't see anything, folks, because nothing happened.

Not even Ms. Tincher saw anything.  You listened to Ms. Tincher and she gave some tearful testimony.  It's obvious that she was affected by it, too.  Ms. Tincher didn't see what happened.  She saw the notes.  She saw that Ms. Jay was disturbed about things, but she didn't see what happened.  Not even Ms. Tincher can corroborate what Ms. Jay's claiming happened, what the government is alleging happened

363

here.

And again, if this happened -- and there's been this discrepancy, folks.  On the one hand -- on the one hand, the government wants you to believe that Robert MacLean was being loud and obnoxious and drawing attention to himself.  And on the other hand, it was so quiet that nothing was happening and there was no reason that anybody would have heard anything.  It doesn't make sense and it doesn't make sense because it didn't happen.

If these allegations were true, folks, as I mentioned, there would be lots of corroboration here, lots of it.  And you don't have any of it.

Mr. Kennedy even noted in his closing nobody else saw this happen.  This isn't just a one-time thing.  Ms. Jay is saying this happened six times now.  Some of these things being obvious where her testimony is that she is shrinking against the wall of the airplane.  And so it would not be a small thing then for Mr. MacLean to get up from a reclined seat, reach over with both hands, just have to imagine the awkwardness of that motion and how visible that would be, to grab her breasts and then sit back down when she is way over at the other end of the seat.

364

Somebody would have seen that if it happened. If these allegations were true, if what Ms. Jay said was true, you would also expect the government's witnesses to agree on the details. Remember, details matter, context matters. And instead, you find them disagreeing on important details again and again and again. Like what? Like what was he loud or was he quiet?

Ms. Jay says he was loud. She was worried about how loud he was because she didn't want people thinking that they were together. Remember? But Ms. Tincher, who is only assigned to those 12 passengers in the first class cabin, doesn't say anything like that. In fact, we asked her specifically, "Was he loud?

"No. He was just friendly."

I'm getting a little parched.

Five drinks or three drinks, folks? You heard Ms. Jay's testimony in the stand today, five drinks, possibly four, but you heard in her earlier interviews she definitely said it was five drinks.

Meanwhile, Ms. Tincher, you heard her say the opposite, that it was definitely not five drinks. She served three drinks.

Why does that matter? Well, it just so

365

happens that if Ms. Tincher -- if Ms. Jay is saying that she had -- he was served five drinks, that makes Mr. MacLean look even worse, doesn't it?

Then one of these big discrepancies, folks, is the offer to leave her seat. You heard Ms. Jay testify that she hits the call button, Ms. Tincher comes over, leans in. And what she says is that she just -- that what Ms. Jay says is that, "Ms. Tincher never even asked me if I could leave my seat." I said, "He's getting handsy with me. He's saying inappropriate things. Please stop serving him alcohol."

And what she says is that, "Maybe Ms. Tincher didn't hear me, because she said, 'I was hesitant about serving him that drink anyway.'"

Ms. Tincher didn't say that. Ms. Tincher said that she leaned in and said, "Would you like to move seats?"

Now, that's a clear discrepancy. Why? Because reason and common sense, folks, tell you that if Ms. Jay is actually in a threatening situation, if Ms. Tincher actually came over and she was in trouble, that she should have gotten up to leave her seat.

Mr. Kennedy is right. If the groping

366

happened and she didn't leave her seat, we're not victim blaming Ms. Jay.  What we're saying is the fact that she didn't get up and leave her seat is evidence to you that it did not happen.  And it's not just that there is a discrepancy here, folks.  It's that for some reason, Ms. Jay is lying to you about not being offered the chance to leave her seat.

Why?  Why?

This last one is another one of those minor details that the government says you can just skip over because it doesn't matter.  But it's really weird.  You heard this.  And also note, for some reason, we're the ones who had to bring it up on cross-examination, this detail.  The government didn't want to ask about it, in their direct examination, and so we brought it up.

But you remember, Ms. Jay says that Ms. Tincher came up to her and said, "I bet Mr. MacLean was masturbating in the bathroom."

You heard us ask Ms. Tincher about that. She's like, "I don't use that word.  I could get fired if I said that to somebody."

What does it mean then that Ms. Jay made that up, too.  What does it tell you about where her mind is at?  What she was putting together in her

367

head?  That is not a minor detail to just gloss over, folks.

Now, the third thing.  If Ms. Jay's allegations were true, you should also expect her story to stay consistent and it hasn't.  You heard her testify she met with -- she talked with Salt Lake PD, she talked to the FBI hotline center.  And then she had a meeting with the FBI and was contacted at a coffee shop.  And then she met with Detective Ruiz and the prosecutors last month.

Four times she's told her story to them.  She wouldn't talk to the defense investigator for some reason, but she was okay talking to the prosecutors four times, prosecutors and the government.  And her story has changed.

You've heard that in her initial -- in her initial reportings, she just described those first 20 minutes with Mr. MacLean as polite conversation.  Polite conversation.  But now the detail comes out, "but it was polite but I was actually unsettled.  The hairs were starting to stand up on the back of my neck because he was saying things that were inappropriate."

Which one of those is it?  Why would that change?  Why wouldn't that be in the first recording?

368

You've also heard that it came out, on March 11th, 2022, so ten -- nine days after the alleged incident.  You heard that Ms. Jay told the FBI in Wisconsin, you know, "That person in 2A and 2C and D, they had to have seen something.  They kept looking over."

Today, this morning, on the witness stand, you heard her say, "No, nobody was looking at me.  Nobody saw anything.  Maybe the people in back might have seen something, but certainly not the people in 2A, 2C and D."

Why isn't that staying consistent over time, folks?  This is important.  She's mentioned that this is what she's been thinking about the entire time.  Details matter.  Context matters.

This is also -- this thing also.  The government wants you to think it's not a big deal.  She describes to you this incident.  This, "Let's get your seatbelt on," waking up from sleep, leaning forward in her plane chair, leaning over this seven-inch seat rest, grabbing her with both breasts.  She told you today that that happened after she and Ms. Tincher exchanged notes.

Now, she also denied that she had ever said it different, especially last month when she met with

369

Detective Ruiz and the prosecutors. We had to put up Detective Ruiz to testify. It was our witness in our case, for her to testify that, "Yeah, actually, Ms. Jay did say to us in our meeting that this note passing thing, that all of the incidents happened before the notes were passed. And that after the note was passed, nothing happened."

Why did that detail change, folks? Maybe it changed because this didn't actually happen. Because you expect that people are going to keep details like that straight and they're going to stay consistent. And this one didn't. And you certainly don't expect them to get up on the witness stand and lie to you about it because that's -- I mean it's a hard thing to say.

Ms. Jay wasn't telling the complete truth today. She wasn't telling the truth. And you heard Mr. Kennedy talk about that. He said, "She wasn't making this up. You could see in her face she wasn't making it up." He pointed it out that she cried and the -- the hard thing is, folks, that it is -- it's an easier world to live in if Ms. Jay were telling the truth, isn't it? It's easier for us if Ms. Jay is up there telling the truth, because that's how the world kind of makes sense. And it doesn't make as

370

much sense if she's up there not telling you the complete truth, especially when she's as tearful as she is.

Those tears, I don't know about you, but they invoke -- they invoke a protective emotional response and we just want to do what Ms. Tincher did and run up and give her a hug. And you saw that in Ms. Tincher. Like she -- Ms. Tincher is devastated on the stand, because in her mind, all of this happened and she failed Wendi Jay. She didn't see any of it happen, but she saw Ms. Jay being emotional and it broke her.

And I get that, but the hard thing is though, folks, is that we know that sometimes our instinct to want to empathize and to protect can be taken advantage of. And if not deliberately taken advantage of, certainly misdirected.

I -- you know, get a little bit personal for a moment.

But I used like to think that I was really good at figuring out when someone was telling me the truth. You know, especially being a lawyer, I thought maybe I had a leg. Up, and it turns out I'm not better than anybody else. Especially when it comes to my kids talking to me.

In fact, like I'll give you what we'll call a hypothetical scenario.  If I approach my daughter and ask her, "Did you take my car out last night after I went to bed?"

She tells me, "No, Dad, I didn't," and then gets tearful with me and says, "I would never do something like that."

I'll tell you that those tears invoke something in me and I just want to believe her and I am inclined to, except for some things that I noticed, after those tears.

Like you would expect that if my daughter didn't take the car out at night, that my keys would be on the same key rung that I left them on the night before.  I would expect that my daughter's shoes would be in the place that I left them the night before.  I would expect that the seats in my car wouldn't be pulled all the way up.  I would expect that the auxiliary cable wouldn't be plugged in because my phone connects by Bluetooth.  And I would expect that there would not be In and Out wrappers in the passenger seat of my car.

If I just stopped, folks, at my daughter's tears, tearfully telling me, "I wouldn't do that, Dad," I am not doing my job as a parent.  We can't

372

just stop somebody's tears and decide that person must be telling the truth because they're crying. We know that that can be taken advantage of because people do lie about these things. Whether it's intentionally lying or not or just having made something up in their mind, we know that those instincts can be taken advantage of.

It's something that we call confirmation bias. Like we see something, we form a world view and then we hold onto it. We see somebody crying, we decide that they're telling the truth and then we start to exclude all of the other evidence that might suggest otherwise.

If I'm not doing my job as a parent, if I ignore all of that other evidence, folks, you probably have an even greater jobs with your role, with the oath that you took as jurors. You cannot just stop at Wendi Jay's tears and the faces that she made as she tearfully told you what happened.

You have to look at the evidence surrounding what she said and see if anything corroborates it, or if anything contradicts what she says, or if she's even being internally consistent with what she said. That's your job as jurors.

Now, why would Wendi Jay lie? We don't

373

know.  Mr. Kennedy said, "You can't get into somebody's mind and figure this out."  We can guess from what we've heard.  It sounds like she wasn't even going to call the police until she talked to her husband.  Then she talks to her daughter who is interning at a prosecutor's office, and they are pushing her.  "You gotta do this."  And then she's stuck and she's stuck taking it all the way.

And you heard her say her daughter told her, "This should not go to court," but now it is.  Now it's in court and you can't get out of it.  We don't know.  What we do know is that the evidence that you've seen, and especially the evidence that you have not seen, folks, does not corroborate what Ms. Jay has said.

There are no other witnesses.  She and Ms. Tincher contradict each other on important points, and she can't even keep her story straight.

The hard part of this, folks, is what this also means is that the government got it wrong here.  Because what you've seen play out today, is that sometimes the government -- the government is full of humans and the government is subject to confirmation bias.  They see -- when they see Ms. Jay's story, they believe it.  And they decide, you know what, we

374

don't even need to talk to any of the other passengers because this happened.

And I think you heard Detective Ruiz try to justify herself on the stand with a question from Mr. Kennedy like, "Yeah, most of the time people don't even see this stuff anyway."  So they didn't even try.

Ms. Jay supposedly gave them the seats of people nine days after who she said could corroborate what happened.  And what do they try to do to corroborate what happened?  They waited three and a half years.  They left two voicemails to the guy in 2A.  And then they talked to the people in 2C and D who said, "Yeah, we don't remember anything."  And one of them said, "But I would have remembered if something happened."

And then today, Ms. Jay said that she thought maybe the people behind her in seat 4 had seen something.  And you heard Detective Ruiz say that she didn't even try to reach out to the person in 4A, because she saw -- there wasn't some contact information in the United stuff, so she just gave up on that.

Folks, what are we doing here?  This is -- this is not a small case.  You have been brought into

375

federal court to sit in trial.  Mr. MacLean is on trial for a federal felony sexual assault and they could not be bothered to try to talk to any witnesses who were passengers that night until two months ago.

It's not enough here, folks.  It's not enough here just to try to figure out, is there a chance that Ms. Jay is telling the truth?  Is it possible?

The law doesn't allow that here.  Not -- not when we're talking about federal felony criminal charges.  The law, as Judge Kimball instructed you, is proof beyond a reasonable doubt.

We, as a society, have decided that about the worst thing that we can do as a society is convict someone of a crime unless we're sure that they committed it.  And no, we are not perfect at this by any means.  Our law really makes us try.  It requires us, as Judge Kimball instructed you, that a reasonable doubt, it's a real doubt based on reason and common sense and after a careful and impartial consideration of the evidence.

Proof beyond a reasonable doubt needs to be of such a convincing character that you would rely and act upon it without hesitation in the most important affairs of your life.

376

Folks, can you really look at the evidence that was presented today and the lack of evidence and say that you have no hesitation believing that Ms. Jay must have been correct, despite all of that?

To act without hesitation in the most important affairs of your life. I mean the analogy that I would use, my wife makes soup, okay? On our third date, she invited me over and she made a delicious fish soup. And if you can imagine, her making some soup for dinner and maybe she brings out some wine glasses or Martinelli glasses, if that's your proclivity, but she brings out some wine glasses and pours a glass of wine for each of us. And as we toast, one of those glasses shatters and some of the shards of glass fall into her soup.

Folks, she's not going to serve that soup to our kids unless she's got no reasonable doubt that she has gotten all of those shards out. That's what reasonable doubt means. That's what beyond a reasonable doubt means. Are all of the shards of glass out of that soup?

And let me just go over with you quickly as we're closing, some of the shards of glass that seem to be left in the government's soup of a case against Mr. MacLean.

377

As we talked about first, they have only put on three witnesses here today, only two of which were actually in that cabin, only one of which said that she was groped. Nobody corroborated that.

Remember also, this wasn't a dark alleyway. There were ten people in that cabin, those passengers directly around them. There were seven people directly surrounding them, closer than I am to Mr. Kennedy and Mr. Reeves.

They want you to believe that it seemed pretty quiet. Although at the same time they're saying that Mr. MacLean was loud enough to make a fuss and that Ms. Jay was worried. And yet, nobody came forward to United that night to say, "Hey, this guy in 3C is kind of bothersome."

Nobody came forward that night, nobody came forward later, and nobody told the FBI anything about what happened.

Six. Remember, Ms. Jay claims that the folks in 2A and 2C and D must have seen something. It turns out that the folks in 2C and D didn't, and they didn't even try to get ahold of the folks in 2A. Or they tried. They left two voicemails. Now it's the people behind them must have seen something. But they're not here either.

378

Remember, the guy in 2C, the 8th piece of glass, he said he would have noticed something.

And the guy in 2D, they were going on a ski trip down here and they were talking to each other. They would have noticed something.

Nine. It is odd to me, folks, that there are no photos here of the first class cabin. Why? Why is that? Why is the government not even taking the case seriously enough to show you photos of the first class cabin? Is it because they don't want you to know just how close everything is? That I had to demonstrate that myself by sitting next to Mr. Kennedy. Speaking of which, why are there no photos of the seat rest? The seat rest -- I mean maybe you guys are more used to flying in first class than I am, but the seat rest is big there, which means that it takes a much bigger effort to reach over your seat to do the things that Ms. Jay is claiming that Mr. MacLean did.

Why are there no photos of the seat rest here? Wouldn't that be an important detail?

Ten, it looks like I've got ten on there twice. How about that? Her light was on the entire time. She was trying to draw attention to herself. She was trying to make sure, supposedly, that if

379

something happened people would see it.  This didn't happen in the dark.

Eleven or twelve.  The distinction between five drinks and three drinks.  That's a clear discrepancy, folks.  And why is Ms. Jay making up the five drinks?  Because it makes Mr. MacLean look worse.  It makes him look more guilty.

Next, Ms. Jay does not change seats.  We're not victim blaming here, but she doesn't get up to change seats.  And she even testified, as Ms. Westgate is cross-examining her, like, yes, there might have been something if she had to get up, but it's not like -- it was spacious enough in the first class cabin that she could have stepped around him.  She said her knees weren't even touching the front.  And she didn't get up to leave.  She didn't get up to leave when Mr. MacLean was in the bathroom.

She had -- she's saying that this happened and that Mr. MacLean is gone, and that her savior Ms. Tincher is there, and she is telling Ms. Tincher, "You know what, just don't serve him anymore alcohol."  She had the chance to get up and leave right there.  And yes, Ms. Tincher fought me a bit on how difficult it might have been logistically to move her, but you can't blame Ms. Tincher.  I mean she

380

feels awful and she's trying to be as protective as she can of Wendi Jay while still being honest.  But she could have gotten up to leave her seat and she didn't.  She was offered the chance which brings up the next one.

Well, not quite.  But Ms. Jay had also been drinking that night.  Of the two witnesses that you heard from on that plane, only one of them had not been drinking.  Ms. Tincher hadn't been drinking.

So whose judgment should you trust here? And doesn't that add just another degree of skepticism to what Ms. Jay is telling you?

Now, this is where I was trying to get with the next one.  It's not just that Ms. Jay didn't get up to leave seats, it's that she sat here and lied to you about the offer to change seats.  She told you that it was never extended, that Ms. Tincher just said, "Well, I'll stop serving him alcohol," and left.

But Ms. Tincher told you pretty clearly that she went to Ms. Jay and asked if she wanted to leave seats -- her seat.  She heard it, she made the offer, and she said that Ms. Jay declined.  You heard her say, "I couldn't make her leave her seat."

And how do you know that Ms. Tincher

381

actually did that?  Because as soon as she left that, she went in to the captain and told him what happened and the captain said, "Well, you better keep an eye on it," and she did.  And she did a couple of times. You heard her, she was on high alert.

Ms. Tincher may have been taking care of some other passengers, but she said that nobody else was asking for anything and she was only responsible for the first class and she was watching.  She was watching from the moment that she got signaled from Ms. Jay, with the flight attendant call button, and she didn't see anything.

That comment is another shard of glass.  The "I bet he masturbated in the bathroom," what are you supposed to do with that?  Do you just ignore that that's there?  Do you sweep it away?  That's a big deal.  And it gives you a sense of where Ms. Jay's mind might have been at.

Next, it's a big deal, too, folks, that Ms. Jay has not stayed consistent about when this biggest event happened.  That it happened after the note was passed or before that note was passed.  And why does it matter?  Because Ms. Tincher specifically explained that after that second note was passed, she was on even more high alert, if that's possible.  I

382

don't know what the term for that is, but she was sitting in the jump seat, keeping her eyes on things, trying to see what happened, and she didn't see anything.

So maybe that's why her story has changed. But in any event, it changed, and nobody has seen anything.

This might be the last one that I've got in here, but there's something, too, that just doesn't sit right about Ms. Jay's comment, "I'm good if he's asleep."

You heard her explain, "Like it didn't mean that I was actually good. I wasn't good, but I was going to be okay if he stayed asleep."

The problem with that is, folks, you heard her say, minutes before that, that it had just happened that she thought he had been asleep, and he had gotten -- he had woken up and groped her again.

How does it make sense, folks, if that had already happened, that she would then tell Ms. Tincher, "I'm okay if he's asleep"? Wouldn't she be on high alert even then, if he's asleep, because he might wake up and do it again at any time? That comment makes it further evident that this did not happen.

383

And finally, one of the biggest shards of glass in that soup, what on earth is the FBI doing waiting three years to try to even interview anybody and then trying to get up there and tell you guys that that is her doing her best?

I am sorry, folks. But when you heard Mr. Reeves give his opening statement, wasn't your immediate thought of I wonder what the other passengers would have to say about this? And yet, they waited three years.

The case had been charged over two years ago. And even then, they still hadn't tried to interview anybody because they didn't think it mattered. Why? Because I think here the government is probably suffering from confirmation bias. They were taken in by what Ms. Jay said and the way that she said it and decided they didn't need to do anymore investigating. And so they didn't until two months before trial when maybe they suspect I'm going to start asking questions about it on cross-examination.

Thank goodness, folks, that we have cross-examination to be able to ask these hard questions. Because otherwise, we're just left with what people tell us and the way that they tell us without being

384

subjected to scrutiny.

I'm just about done here, folks.  And once I sit down, Mr. Kennedy -- Mr. Kennedy or Mr. Reeves gets the chance to come up here and maybe they can explain to you why those 19 or 20 shards of glass are not really a problem, you can dismiss them, and these are fine.

But this is important.  This matters.  It matters way more than figuring out if my daughter snuck out of the house to take my car that night.  The stakes could not be higher for Mr. MacLean.

And remember, if this really happened, if Mr. MacLean really did the things that Ms. Jay says that he did, this should be easy.  And why is it not easy?  Why is it hard?  Because it didn't actually happen.

So your vote, your verdict, needs to be not guilty here.  Thank you.

THE COURT:  Rebuttal, Mr. Kennedy?

MR. KENNEDY:  Thank you, Your Honor.

Most questions are easy when somebody else has to decide them.  This isn't easy, but it is straightforward.

I don't know about shards of glass, but I do know that the facts of this case are actually pretty

385

simple.  I also know, and I think you all know instinctively, that there is no such thing in this world as perfect information.  That is an economist's dream, an economist's assumption, that there's perfect information and we can make a decision with perfect information.  We don't have perfect information.  What we have is the information that's available to us at the time.

And the information that you have before you is the testimony of the witnesses that were in here.  You don't have information from people that weren't here, the people that said they didn't see anything.  Maybe we should have tried to reach out to them earlier.  But you heard Detective Ruiz tell you that it is extremely rare that people see things in these situations.

And just because Wendi Jay may have speculated to an interviewing agent, who wasn't Detective Ruiz, early in the case, that somebody might have seen something doesn't mean that they did.  And there's ample explanation for why nobody saw anything.

You heard about the, you know, about it being an evening flight.  It was certainly after the end of the workday.  It took off at 8:30 p.m.  It

landed at 11:15 p.m.  Most people that are flying in the evening just want to relax.

What did Ms. Jay tell you?  "I was excited when I got upgraded to first class because that meant I might be able to take a nap."

Mr. MacLean himself went to sleep, according to the testimony, or at least appeared to.  The only one who wasn't able to get in any sleep on that flight was Wendi Jay.

Perspective is personal.  It's not a discrepancy for one person -- for Wendi Jay to say that she perceived Mr. MacLean's comments about Vladimir Putin to be loud when she's cringing inside.

I'm pretty sure everybody on this jury can relate to the situation that I sometimes get into when I am with my wife in a public place and I say something that she thinks I'm saying too loud and shouldn't be saying and she shushes me or kicks my shin.  We have all probably experienced that, yet nobody else around me is hearing anything, or even looks in my direction.  But she, who thinks the comment is cringe worthy, cringes and perceives it as loud.  That is not a discrepancy.  That is human nature.

The offer to move.  I come back again and

387

again to the idea and the concept and the notion that the offer to move is a red herring here.  It doesn't matter whether there was an offer to move or not. Wendi Jay didn't hear it.  They're wearing masks. It's Covid.  She didn't hear the offer to move.  She acknowledged that the note, "are you comfortable sitting by him," could be interpreted as an offer to move.  But bear -- but remember that when both of those things happened, the crime had already been committed.  It doesn't matter.

The fact that she didn't want to move doesn't mean that she wasn't -- that she wasn't sexually assaulted.  It means she didn't want to move and she didn't want to cause a scene.

The no corroboration, the no line of witnesses.  Again, late night flight, people are engaged in their own worlds, they're talking about their skiing trips, they are sleeping, they have got headphones on.  It's not pitch dark, but it's dark and it's quiet.  And nobody hears Mr. MacLean because he's trying also to be quiet.

If you're going to grope a total stranger, are you going to try to draw attention to yourself? I don't think so.

The corroboration you have is what Mary

Tincher actually saw. She saw the reaction in Ms. Jay's body, on her face, in her tears. And eventually, in the note in her own words.

So let's get to the biggest shard of glass in this -- in Mr. Clark's bowl of soup. Wendi Jay is just lying. She's just making this up.

Ladies and gentlemen, think to yourself and use your common sense. What is her motive to lie? What is her motive to make this up from the very beginning?

Mr. MacLean is a total stranger to her. She's never seen him before, he's never seen her before. They don't know each other. They have polite conversation. She's a little uncomfortable, she cringes a little bit, and that is also not inconsistent. Conversation can be polite, but it can also be cringe worthy. And the conversation can turn, as it did here, into something very, very different, very, very dark and very, very inappropriate.

What's the motive to lie, to leave her job, to go into therapy, to report this, stick with it, to come into court, sit on that witness stand and bare her soul to you? To lie against somebody who she doesn't know?

389

This isn't a Me Too movement case.  This isn't a case of somebody who knew each other where there might be a motive to lie or embellish.  This isn't Harvey Weinstein.  This isn't the casting couch.  This is an airplane 30,000 feet in the air, where a woman was sexually assaulted six times, all the while while being told that he was going to stop.  "This is the last time I'll touch you.  I'll leave you alone now."  He didn't leave her alone until the very end.

Ladies and gentlemen, if you want to blame us for not trying to find more witnesses, fine.  I'll own that.  The United States Attorney's office and the FBI will own that.  But don't blame the credible story of Wendi Jay and Mary Tincher, who told you what happened.

I ask you to return that to that jury room, consider the evidence, and return a verdict of guilty.

THE COURT:  I'll ask the Court Security Officer to come forward and be sworn.

THE CLERK:  Raise your right hand.

(Court Security Officer administered an oath.)

COURT SECURITY OFFICER:  I do.

THE COURT:  Now, hold on just a second.

Juror No. 13, you're an alternate.  So you're in a frustrating position because you're partially excused now.  But if for some reason we need you back, we'll get ahold of you.  So don't talk about -- don't talk to anyone about the case until we notify you that it's done or we need you.  All right?  And thank you very much.

THE CLERK:  All rise, please.

(Jury exits the courtroom.)

THE COURT:  Now we need to get ahold of you lawyers when we get a verdict so make sure Elizabeth has your contact information.

THE CLERK:  I have printed the new exhibit and witness list.  It has the additional exhibit and the additional witnesses.  I don't know if you want to look at everything and make sure it looks good before it goes back.

MR. CLARK:  Sure.

THE CLERK:  I'll do that.

(Recess.)

391

**REPORTER'S CERTIFICATE**

I, Laura W. Robinson, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public within and for the County of Salt Lake, State of Utah, do hereby certify:

That the foregoing proceedings were taken before me at the time and place set forth herein and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

That the foregoing pages contain a true and correct transcription of my said shorthand notes so taken.

In witness whereof I have subscribed my name this 30th day of May, 2025.

___*Laura W. Robinson*_____

Laura W. Robinson

RPR, FCRR, CSR, CP